AO 91
Rev. 11/97

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>TAHMINEH TAHAMTAN, aka SISTER TAHMINEH ("TAHAMTAN"), MUSTAFA AHMADY, aka MUSTAFA AHMADI, aka MOSTAFA AHMADY, aka MOSTAFA AHMADI ("AHMADY"), HOSSEIN AFSHARI, aka HOSSEIN AFSHARIE, aka HOSSEINI DEKLAMI ("AFSHARI"), and ALI REZA MORADI, aka ALIREZA MOHOMADMORADI ("MORADI"), MOHAMMAD OMIDVAR, aka MIKE OMIDVAR ("OMIDVAR"), NAJAF ESHKOFTEGI, aka NAJAF TAJI ESHKOFTEGI, aka NAJAF TAJI ESHKKOFTEGI, aka JEFF ESHKOFTEGI, aka JEFF NAJ, aka JEFF TAJI ("ESHKOFTEGI"), and HASSAN REZAIE, aka HASSAN GHADIMA REZAI, aka HASSAN REZAI ("REZAIE") | DOCKET NO.  CR 1-209<br><br>MAGISTRATE'S CASE NO.<br>01- 01-0393 M<br><br>FILED<br>FEB 2 6 2001<br>CLERK, U.S. DISTRICT COURT<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY |

Complaint for violation of Title 18, United States Code § 2339B

| NAME OF MAGISTRATE JUDGE<br><br>CARLA WOEHRLE | UNITED STATES MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>10/8/97 Through<br>2/26/01 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) | |
|---|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

    SEE ATTACHMENT

ENTER ON ICMS
MAR 7 2001

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
  (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>/S/ |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT -- FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>HONORABLE CARLA WOEHRLE | DATE<br><br>February 26, 2001 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

DRF:rjg      REC: Detention



ATTACHMENT

From on or about October 8, 1997, through on or about February 26, 2001, within the Central District of California, defendants TAHMINEH TAHAMTAN, aka SISTER TAHMINEH ("TAHAMTAN"), MUSTAFA AHMADY, aka MUSTAFA AHMADI, aka MOSTAFA AHMADY, aka MOSTAFA AHMADI ("AHMADY"), HOSSEIN AFSHARI, aka HOSSEIN AFSHARIE, aka HOSSEINI DEKLAMI ("AFSHARI"), and ALI REZA MORADI, aka ALIREZA MOHOMADMORADI ("MORADI"), MOHAMMAD OMIDVAR, aka MIKE OMIDVAR ("OMIDVAR"), NAJAF ESHKOFTEGI, aka NAJAF TAJI ESHKOFTEGI, aka NAJAF TAJI ESHKKOFTEGI, aka JEFF ESHKOFTEGI, aka JEFF NAJ, aka JEFF TAJI ("ESHKOFTEGI"), and HASSAN REZAIE, aka HASSAN GHADIMA REZAI, aka HASSAN REZAI ("REZAIE") knowingly provided material support or resources to a designated foreign terrorist organization, namely the Mujahedin-E Khalq ("MEK") in violation of Title 18, United States Code, Section 2339B.

## ATTACHMENT A

The premises located at 12656 Marco Place, Los Angeles, California 90066, further described as a two story stucco residential home with white trim.  This location is clearly marked with the number 12656 below the front window sill to the left of the front entrance.  The driveway to the left of the entrance leads to a rear detached one-car garage which is part of the property to be searched.  The second story of the residential home is offset to the rear of the residence.  This location is located south of Palms Blvd., and west of Centinella Blvd., in the city of Los Angeles.

ATTACHMENT B

ITEMS TO BE SEIZED

a.  Files, charts, and ledgers used for maintaining records, recording data, minutes, records, reports, calendars, tape recordings, notes, transcriptions and other materials documenting fundraising associated with the Mujahedin-E Khalq (MEK), National Liberation Army of Iran (NLA), Committee for Human Rights in Iran (CHR), National Council of Resistance of Iran, (NCR) and/or the following individuals TAHMINEH TAHAMTAN, aka SISTER TAHMINEH ("TAHAMTAN"), MUSTAFA AHMADY, aka MUSTAFA AHMADI, aka MOSTAFA AHMADY, aka MOSTAFA AHMADI ("AHMADY"), HOSSEIN AFSHARI, aka HOSSEIN AFSHARIE, aka HOSSEINI DEKLAMI ("AFSHARI"), and ALI REZA MORADI, aka ALIREZA MOHOMADMORADI ("MORADI"),  MOHAMMAD OMIDVAR, aka MIKE OMIDVAR ("OMIDVAR"), NAJAF ESHKOFTEGI, aka NAJAF TAJI ESHKOFTEGI, aka NAJAF TAJI ESHKKOFTEGI, aka JEFF ESHKOFTEGI, aka JEFF NAJ, aka JEFF TAJI ("ESHKOFTEGI"), and HASSAN REZAIE, aka HASSAN GHADIMA REZAI, aka HASSAN REZAI ("REZAIE")

b.  Financial records, checks, check records, receipts, credit card transaction receipts, or other written records depicting the receipt of donations to the CHR, MEK, NCR, and/or NLA and/or the individuals identified above.

c.  Log sheets or any other records that document the receipt of payments to the CHR, MEK, NLA, NCR, and/or the individuals identified above.

d.  Records showing names of contributors to the CHR, MEK, NLA, and/or NCR, telephone records, including toll records,

statements, bills and receipts, address and telephone books, lists, and directories, Rolodex indices and papers, telephone and facsimile records reflecting names of individuals listed above and/or references to the CHR, MEK, NLA, and NCR.

e.    Bank statements, canceled checks, non-deposited checks and money orders, entries in cash disbursement journals, ledgers and check registers, records of accounts receivable and accounts payable, records of wire transfers, deposit and withdrawal slips, and other notes and papers reflecting financial deposits or disbursements that relate to payments between or among the following:  CHR, MEK, NLA, NCR, and/or the individuals listed above.

f.    Any documents establishing ownership or controlling interest in the CHR, MEK, NLA, and/or NCR.

g.    Any documents reflecting membership in the MEK, CHR, NLA, and/or NCR or a relationship between individuals listed above.

h.    Contracts and other agreements between any of the individuals identified above and/or the MEK, NLA, CHR, and/or NCR.

i.    Documents, including letters, correspondence, rulings, manuals, newsletters, and industry publications, that relate to fund raising statutes, rules, or regulations pertaining to terrorism related issues.

j.    Correspondence between any federal or state regulatory or law enforcement agency, the U.S. Department of State, and the individuals listed above.

k.   Income tax records, including tax returns and supporting documentation, such as Form 1099, for any of the individuals listed above and/or the MEK, NLA, CHR, and/or NCR.

l.   Awards and trophies commemorating fund raising activity on behalf of the MEK, NLA, CHR, and/or NCR.

COMPUTER RELATED ITEMS TO BE SEIZED

m. Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

n. Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

o. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

p. Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

q. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

r. Any physical keys, encryption devices, dongles and

similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

s. Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

<u>AFFIDAVIT</u>

I, CHRISTOPHER E. CASTILLO, being duly sworn, hereby depose and say:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation, assigned to the Los Angeles division.  I have been so employed for five years and four months.  During this time I have received specialized training in terrorism related investigations.  I have conducted numerous investigations related to individuals associated with terrorist organizations and their associated criminal activity.  For the past five years I have been assigned to the Los Angeles Task Force on Terrorism and the Joint Terrorism Task Force ("JTTF") and tasked to work with other federal and local law enforcement agencies to investigate international terrorism related issues and individuals.

2.   In preparing this affidavit I have conferred with other federal agents who are experienced in terrorism related investigation to include FBI Special Agent L. Reed Jones, who is currently assigned to the JTTF, and SA Bernard Reidel who previously was assigned to this investigation.

3.   Throughout this affidavit the following abbreviations will be utilized:

a.   Mujahedin-E Khalq, aka People's Mujahedin Organization of Iran, aka Mujahedin-E Khalq Organization, aka

1

Sazman Mujahedin-E Khalq, Mujahedin-E Khalq Organization, Sazeman Mujahedin-E Khalq, Mojahedine-E Khalq, and Muslim Iranian Student Society, will collectively be referred to as ("MEK").

b.    Committee for Human Rights, aka Committee for Human Rights in Iran, aka Committee for Human Rights for Iran, will collectively be referred to as ("CHR").

c.    National Liberation Army of Iran will be referred to as ("NLA").

d.    National Council of Resistance, aka National Council of Resistance of Iran, aka National Council of Resistance in Iran, will collectively be referred to as ("NCR").

e.    Los Angeles International Airport will be referred to as ("LAX").

f.    Federal Bureau of Investigation will be referred to as ("FBI").

g.    The four Cooperating Witnesses will be referred to as ("CW#1"), ("CW#2"), ("CW#3"), and ("CW#4").

h.    The term "last name unknown" will be referred to as ("LNU").

4.    I make this affidavit based upon information and evidence provided by CW#1, CW#2, CW#3, CW#4, witness statements, discussions, and reporting submitted by other investigative law enforcement officers and agents, physical evidence, and my own personal knowledge and experience, all as indicated herein.

a. Oral and written reports about this investigation which I received from law enforcement agents in the FBI, Immigration and Naturalization Service (INS), and the U.S. Department of State, Bureau of Diplomatic Security(DSS).

(1) U.S. Department of State, Office of the Secretary of State, Office of the Coordination of Counter Terrorism in their briefings, Patterns of Global Terrorism 1997, Patterns of Global Terrorism 1998 , and Patterns of Global Terrorism 1999.

(2) FBI Headquarters facsimile from April 30, 1998 captioned MUJAHEDIN-E KHALQ, INTERNATIONAL TERRORIST GROUP.

b. Evidence obtained during consensually monitored conversations between CW's and the subjects of this investigation.

c. Oral testimony presented by four Cooperating Witnesses.

1) CW#1 during frequent debriefings.

2) CW#2 during multiple debriefings.

3) CW#3 during multiple debriefings.

4) CW#4 during debriefings.

5) Throughout this affidavit the CW's numbering is based on their importance to the investigation, not in order of their chronological development.

5. This affidavit is made in support of a criminal

3

complaint and arrest warrant against  TAHMINEH TAHAMTAN, aka SISTER TAHMINEH ("TAHAMTAN"), MUSTAFA AHMADY, aka MUSTAFA AHMADI, aka MOSTAFA AHMADY, aka MOSTAFA AHMADI ("AHMADY"), HOSSEIN AFSHARI, aka HOSSEIN AFSHARIE, aka HOSSEINI DEKLAMI ("AFSHARI"), and ALI REZA MORADI, aka ALIREZA MOHOMADMORADI ("MORADI"), MOHAMMAD OMIDVAR, aka MIKE OMIDVAR ("OMIDVAR"), NAJAF ESHKOFTEGI, aka NAJAF TAJI ESHKOFTEGI, aka NAJAF TAJI ESHKKOFTEGI, aka JEFF ESHKOFTEGI, aka JEFF NAJ, aka JEFF TAJI ("ESHKOFTEGI"), and HASSAN REZAIE, aka HASSAN GHADIMA REZAI, aka HASSAN REZAI ("REZAIE") for a violation of 18 U.S.C. § 2339B (material support of a designated foreign terrorist organization).

a.    Throughout this investigation, I have learned that the subjects in this investigation have knowingly conspired to support the MEK through fund raising.

b.    The subjects in this investigation were aware that this activity was illegal because of specific meetings and conference calls that took place after the MEK's designation as a foreign terrorist organization.

c.    The subjects in this investigations each took part in one or more aspects of the overt act of providing material support to the MEK a designated foreign terrorist organization. These overt acts include, but were not limited to the following:

1)    Soliciting donations for the MEK under the front organization CHR at LAX.

4

2)    Handling and transferring money obtained through LAX solicitations and other sources to include direct payments from MEK members, supporters, and sympathizers.

3)    Maintaining accounts and wire transferring money overseas in furtherance of this conspiracy, to provide material support to the MEK in the form of financial support and other means.

4)    Acting in a leadership role directing other MEK members, supporters, and sympathizers to conspire to provide material support to the MEK in the form of fund raising and other support activities.

5) Engaging in support activity in furtherance of the goals and objectives of a designated foreign terrorist organization.  This activity included such actions as coordinating MEK members and supporters in a violent disruption at UCLA during the visit of the Iranian Foreign Minister Khamal Kharazi.

6.    In addition, this affidavit is made in support of a search warrant for, and to seize evidence at 12656 Marco Place, Los Angeles, California, for a violation of 18 U.S.C. § 2339B (material support of a designated foreign terrorist organization).  This single family dwelling is being utilized by the Los Angeles cell of the MEK as a base and is known in the Farsi language as the "kanoon".  The items to be seized are those

items set forth in paragraph 7 of this affidavit, contained at 12656 Marco Place, Los Angeles, California, which is described as follows: a two-story stucco residential home with white trim. This location is clearly marked with the number 12656 below the front window sill to the left of the front entrance.  The driveway to the left of the entrance leads to a rear detached one-car garage that is part of the property to be searched.  The second story of the residential home is offset to the rear of the residence.  This location is located south of Palms Blvd., and west of Centinella Blvd., in the city of Los Angeles.

7.   The items to be seized at this location are evidence of the subjects offense and relate to the fund raising efforts of TAHMINEH, AHMADY, AFSHARI, REZAIE, MORADI, ESHKOFTEGI, and OMIDVAR on behalf of the MEK under the cover of the organization known as the COMMITTEE FOR HUMAN RIGHTS OF IRAN ("CHR").  Based on the information in this affidavit, I respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of Title 18 USC 2339B, will be found at 12656 Marco Place, Los Angeles, California:

a.   Files, charts, and ledgers used for maintaining records and recording data associated with fund raising for the MEK, NCR, NLA, CAR, and/or the individuals identified in paragraph 5.

b.   Checks, check records, receipts, credit card

6

transaction receipts, or other written records of receipt of donations to the CAR, MEK, NCR, and/or NLA or the individuals identified in paragraph 5.

c.    Log sheets or any other records that document the receipt of payment to the CAR, MEK, NLA, NCR, and/or the individuals identified in paragraph 5.

d.    Records showing names of contributors to the CAR, MEK, NLA, and/or NCR.

e.    Bank statements, canceled checks, undeposited checks and money orders, entries in cash disbursement journals, ledgers and check registers, records of accounts receivable and accounts payable, records of wire transfers, deposit and withdrawal slips, and other notes and papers reflecting financial deposits or disbursements that relate to payments between or among the following:  CAR, MEK, NLA, NCR, TAHAMTAN, AHMADY, AFSHARI, REZAIE, MORADI, ESHKOFTEGI, and/or OMIDVAR.

f.    Any documents establishing ownership or controlling interest in the CAR, MEK, NLA, and/or NCR.

g.    Any documents reflecting membership in the MEK, CAR, NLA, and/or NCR or a relationship between individuals identified in paragraph 5 to these entities.

h.    Contracts and other agreements between any of the persons and/or entities identified in paragraph 5 to the MEK, NLA, CAR, and/or NCR.

i.    Documents, including letters, correspondence, rulings, manuals, newsletters, and industry publications, that relate to fund raising statutes, rules, or regulations pertaining to terrorism related issues.

j.    Correspondence between any federal or state regulatory or law enforcement agency, the U.S. Department of State, and the individuals in paragraph 5.

k.    Income tax records, including tax returns and supporting documentation, such as Form 1099, for any of the individuals 5 or the MEK, NLA, CAR, and/or NCR.

l.    Any records that identify the members or supporters of the MEK, NLA, CAR, and/or NCR.

m.    Awards or trophies commemorating fund raising activity on behalf of the MEK, NLA, CAR, and/or NCR.

n.    **COMPUTER DATA** as described below:

1)    Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

8

2)    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

3)    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

4)    The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the

execution of the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers.  Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

5)    Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore,

a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

**COMPUTER ITEMS TO BE SEIZED**

6) Based on the above computer related information the computer related items to be seized are as follows:

7) As used above, the terms records, documents, programs, applications or materials includes records, documents, programs, applications or materials created, modified or stored in any form.

8) In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

9) Upon securing the premises, law enforcement personnel trained in  searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

10) If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the

11

data.

11) If the computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data within a reasonable amount of time, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review.  The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

12) Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

13) In searching the data, the computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

14) If the computer personnel determine that the

12

computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time not to exceed 60 days from the date of seizure.

15) In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

16) Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

17) Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

18) Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

19) Any documentation, operating logs and reference manuals regarding the operation of the computer

equipment, storage devices or software.

20) Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

21) Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

22) Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## II.   PROBABLE CAUSE

### MEK OVERVIEW

8.   As part of my duties for the last five years I have investigated an international terrorist organization known as the MEK.

9.   The MEK was designated by the United States Department of State as a foreign terrorist organization on or about October 8, 1997.  The MEK is a foreign terrorist organization currently headquartered in Iraq, advocating the violent overthrow of the current Iranian government. The MEK engages in acts of terrorism as a means of reaching that goal.

10.  On October 8, 1999, the MEK was re-designated as a foreign terrorist organization by the U.S. Department of State, and the NCR was added as an alias for the MEK.

14

11.    Based upon a review of a facsimile from FBI Headquarters in Washington, D.C., dated April 30, 1998 captioned MUJAHEDIN-E KHALQ, INTERNATIONAL TERRORIST GROUP, and my own investigation I learned the following:  The MEK was founded in Iran in 1963 by dissatisfied members of the Liberation Movement of Iran.  At the time the organization was founded, the goal was to overthrow the monarchist rule of the Shah of Iran, Mohammad Reza Pahlavi.  During the struggle to overthrow the Shah of Iran as well as after the Shah's overthrow, the MEK publically claimed responsibility for acts of terrorism against U.S. citizens, U.S. interests and other acts of terrorism, including the following:

a.    June 1973, the MEK claimed responsibility for the assassination of Lieutenant Colonel Lewis Hawkins a U.S. citizen assigned to defense projects in Iran.

b.    May 1975, the MEK claimed responsibility for the assassinations U.S. Air Force officers Colonel Paul Schaeffer and Lieutenant Colonel Jack Turner, assigned to the U.S. Military Assistance Advisory Group in Tehran.

c.    July 1975,  MEK assassins shot and killed Hassan Hossnan, an Iranian employee of the U.S. Embassy in Tehran.

d.    August 1976, MEK assassins ambushed and killed U.S. citizens William C. Cottrell, Robert R. Krongrad, and Donald G. Smith as they were driving to work in Doshen Tappeh in Southeastern Tehren.  All three were employed by Rockwell International.

15

e.    December 1978,   MEK assassins shot and killed U.S. citizen <u>Paul Grimm</u>, a Texaco executive who served as managing director of Oil Service Company of Iran, as he was driving to work.

f.    February 1979, the MEK participated in the seizure of the U.S. Embassy in Tehran.

g.    November 1979, the MEK again participated in the seizure of the U.S. Embassy in Tehran, which resulted in numerous U.S. citizens being taken hostage and held over fourteen (14) months.

h.    June 1981, the MEK began large scale protests against Khomeini, and after they suffered heavy losses, the MEK, was banned from Iran.

i.    August 1981, the MEK seized the Iranian Interest Section in Washington D.C.  Nine (9) people were taken hostage and over $500,000 in damage was done to the facility.  Twenty-four (24) MEK members were arrested in connection with the incident.

j.    April 1992, the MEK carried out attacks on twelve (12) diplomatic establishments in ten (10) countries, including the Iranian Mission to the United Nations in New York City.

k.    August 1992,   the MEK claimed responsibility for the grenade attack on the home of the deputy of the legislature of Iran's Lorestan province.

l.    November 1992,   members of the MEK and pro-Iranian individuals assaulted one another at Dulles Airport, near Washington, D.C.

16

m.    June 1993,   the MEK claimed responsibility for the bombings at eight (8) oil pipeline and refinery sites in western Iran.

n.    November 1994,   members of the MEK attacked the car of an Iranian diplomat in Denmark.

o.    April 1995, members of the MEK were involved in an assault with pro-Iranian individuals at LAX.   MEK members were charged with assault, and failed to appear in court.   Warrants were issued for multiple MEK members.

p.    June 1998,   MEK claimed responsibility for multiple bombings in Iran, which were reported to have killed at least three people and wounded several others.

q.    June 1998, MEK members assaulted U.S. Department of State, Bureau of Diplomatic Security special agents and the Iranian Foreign Minister Kamal Kharazi in New York City.   Four MEK members were arrested.   They later failed to appear in court and federal warrants were issued

r.    August 1998, MEK assassins shot and killed Assadollah Lajavardi the former head of Evin prison, in Iran.   Two innocent bystanders were also shot and killed along side Lajevardi in the attack which took place at Lajevardi's private business located in the Tehran Bazar.

s.    February 1999,   MEK attempted to assassinate Mohsen Rafiqdoust, the head of Iran's largest state-affiliated economic conglomerate, Bonyad-E Mostazafan Va Janbazan.

17

t.   April 1999, the MEK spokesman SHAHIN GOBADI in Paris, France claimed responsibility for the assassination of Brigadier General Ali Sayyad Shirazi, Deputy Chief of the Iranian Joint Staff Command of Armed Forces.

**ORGANIZATION**

11.   Based upon my investigative experience I have learned that the MEK is made up of at least three primary branches:

a.   The National Liberation Army (NLA), which is the military and operational branch of the MEK.  The NLA is headquartered in Iraq where they receive most of their military equipment and support from Saddam Hussain.  The MEK conducts most or all of their terrorist training and operations with the NLA under the protective umbrella of Iraq.

b.   A support network that operates in the United States and other foreign countries.  This support network in organized into cells that are lead by a MEK leadership cadre that is sent to the U.S. and abroad from Iraq and France.  This support network is responsible for propaganda, demonstrations, fund raising, and surveillance and intimidation of Iranian government sympathizers and agents.

c.   The political branch is referred to as the National Council of Resistance of Iran (NCR).  This group was recently unsuccessful in challenging their designation as a foreign terrorist organization in U.S. Federal court.  The NCR is very active in Washington, D.C. and Los Angeles.  The NCR is

18

primarily involved in political lobbying, propaganda, demonstrations, and legal issues associated with the MEK.

12.  From my investigation, I have learned that the MEK operatives in the U.S. are highly organized and take direction directly from MASOUD and MARYAM RAJAVI, the leaders of the MEK, who are based in Iraq.  In the U.S. these operatives fall in the MEK's support network branch and in the NCR.  In Los Angeles the support branch is the primary MEK operation and the NCR plays a minimal role.  Most if not all of the MEK leaders are former NLA fighters who have been promoted to leadership ranks and then are transferred to various support branches, such as the cell in Los Angeles.

13.  The current overall leader of the MEK is MASOUD RAJAVI. His wife, MARYAM RAJAVI, is also involved in the leadership of the MEK.  In many U.S. cities, including Los Angeles, the MEK operates from a main office or base known as a "kanoon".  This base is run by a MEK cell leader.  In Los Angeles, the current cell leader is TAHAMTAN.

**INVESTIGATION**

14.  On June 12, 1997, the FBI Legal Attache to the U.S. Embassy in Bonn, Germany, sent a communication to Los Angeles indicating that the German Federal Criminal Police ("BKA") were conducting a  money laundering investigation of MEK members involved in fund raising.  The BKA uncovered large sums of money being sent to Germany from various individuals in the U.S, some

19

of which were in the Los Angeles area.

15.   Near the time this information was received from Germany, KCBS Channel 2 News, the CBS network affiliate in Los Angeles, aired an investigative report that targeted the CHR fund raising operation at LAX.   Individuals of Iranian descent were observed soliciting at LAX on behalf of the CHR.   A review of the tape revealed that both AFSHARI and AHMADY were observed as CHR solicitors.

16.   As a result of the information from Germany and the KCBS Channel 2 News investigative report, the FBI initiated an investigation of the illegal fund raising activities of the MEK in the greater Los Angeles area.

17.   In February, 1998, banking records were obtained from a Bank of America account number 21626-01798, belonging to the COMMITTEE FOR HUMAN RIGHTS in IRAN, through a Federal Grand Jury Subpoena for records from June 1997 to December 1998.

a.   The signatories on this account were Fahimeh Azarani and REZAIE.   Fahimeh Azarani and HASSAN REZAIE are known MEK members or supporters.

1)   CW#1 reporting indicated that Fahimeh Azarani is a NLA fighter and is currently in Iraq fighting for the MEK.

2)   CW#1 reporting indicated that REZAIE was the cook at the MEK "kanoon" in Los Angeles up until he went to Iraq for NLA training.   REZAIE has recently returned to Los Angeles and is again participating in MEK events and assisting in fund

20

raising.

3)    REZAIE was photographed during numerous FBI surveillances of MEK functions.

b. An initial review of these records revealed numerous wire transfers to Turkey from this account.

1)    Between June and November 1997, 18 international wire transfers totaling $361,500 from this account were sent to SABAHI BARADARAN at a Turkish bank account at TC ZIRAAR BANKACI 129 ISTANBUL, ISTANBUL, TURKEY, account number 301009-155790.9.

2)    Between December, 1997, and December, 1998, 30 international wire transfers totaling $475,097 from this account were sent to MASHID TORBAT MOGHADDAM ARDEKANI at the Turkish bank account at TURKIYE IS BANKASI A.S. ULUS SUBESI GAM SOK #1, ULUS, ANKARA, 06041, TURKEY, account number 42003533789.

c.    In March 1999, a request was made for the bank records for these two Turkish bank accounts in subparagraph b. above to Turkish law enforcement authorities through the U.S. Department of Justice, Office of International Affairs and the FBI's Athens, Greece Legal Attache.

18.  On March 22, 1998, I, along with other FBI agents conducted a physical surveillance at the Los Angeles Airport Hilton Hotel.  The MEK was conducting a fund raising event in conjunction with an Iranian New Year's celebration.

a.    FBI surveillance observed the following MEK fund

raising subjects AHMADY, AFSHARI, OMIDVAR, REZAIE, and ESHKOFTEGI among others.

b. A blue Dodge Van, CA license plate 1RPA676 was observed dropping off MEK members and supporters at the hotel.

1) A check of the California Law Enforcement Telecommunications System(CLETS) revealed that the van was registered to Fahimeh Azarani, date of birth March 3, 1960, address of 7206 Wallaby Street, Ventura, California.

2) A review of the Haines Directory for Ventura County, California revealed that the address 7206 Wallaby Street was registered to Majid Lashkari a known MEK member or supporter.

3) The name Azarani was checked in the commercial LEXIS/NEXUS database, which revealed that Azarani was the President of a CHR at 8703 La Tijera Blvd., #204, Los Angeles, California and that Majid Lashkari was listed as the secretary using an aka of Majid Cashkari.

19. On April 10, 1998, AFSHARI was interviewed at LAX by FBI Special Agents including myself, as he was soliciting on behalf of the CHR.

a. AFSHARI advised that he was soliciting funds on behalf of the CHR. He indicated that the CHR provides the funds to refugees in Iran.

b. AFSHARI provided a financial report for the CHR which indicted that in 1995 the CHR raised $393,882 and in 1996 raised $474,503. This report indicated that 95% of these funds

22

were spent on assisting Iranian refugees.

20.  On May 1, 1998, Hadi Nafis was interviewed at LAX while soliciting donation on behalf of the CHR.  Nafis was cooperative and showed the interviewing agents the "picture binder" that he was using as a prop to solicit funds.

a.   Nafis indicated that he is soliciting on behalf of the CHR which is part of the NCR.  He denied any connection between the CHR and the MEK, and any connection between the NCR and MEK.

b.   Nafis indicated that many, or even most, of the CHR members are associated with the MEK.

21.  On May 1, 1998, Mohammad Reza Khadjeh was interviewed at LAX while soliciting donations on behalf of the CHR.  Khadejeh was cooperative and showed the interviewing agent the "picture binder" that he was using as a prop to solicit funds.

a.   Khadjeh indicated that the CHR is part of the NCR, but not part of the MEK.

b.   Khadjeh indicated that he was in Los Angeles for fund raising purposes.

22.  On June 18 1998, Lt. Michael Briseno, LAX Police, was interviewed about the CHR activities at LAX.

a.   Briseno indicated that he sees the CHR solicitors regularly at various terminals soliciting and that they are picked up and dropped off by a blue van.

23.  On June 19, 1998, Lt. Briseno, LAX Police, was

23

interviewed and about the CHR activities at LAX.

a.    Briseno indicated that he has seen the same blue van dropping off the Iranian solicitors that had previously been identified as CHR solicitors.

24.   On July 1, 1998, CW#2 was interviewed and indicated that the MEK is fund raising at LAX.

a.    CW#2 indicated that the MEK solicitors approach people and say that they are collecting money for the victims of human rights violations.

b.    CW#2 indicated that in fact they are collecting money to be used for military/terrorist training.

c.    CW#2 indicated that in order to persuade people at LAX they use "picture binders" showing people who have supposedly been executed and tortured.

25.   On July 2, 1998, an FBI surveillance observed the same blue van, California license plate 1RPA676 dropping off CAR solicitors at LAX and then picking them up in the afternoon and dropping them at an apartment building located at 5312 99th Place, Los Angeles, California.

26.   On July 10, 1998 the owner of 5312 West 99th Place, Los Angeles, James Berryman was interviewed and referred the interviewing agents to Neil Cadman.

a.    Cadman was Berryman's General Manager for several apartment buildings.

b.    Cadman maintains all files related to the

24

apartments including tenant information, rent payment information, and complaint records.

27.    On July 10, 1998, Neil Cadman the General Manager for property of James Berryman was interviewed and referred the interviewing agents to Doris Hoggart, the on-site apartment manager for 5312 99th Place, Los Angeles, California.

28.    On July 14, 1998, the FBI Savannah Information Service Center identified the CAR as a non-profit, public benefit, organization, incorporated in 1993.

    a.    The California corporation identification number is 01868321.

    b.    The president was listed as Azarani.

    c.    The address was listed as 8703 La Tijera Blvd., #204, Los Angeles, CA 90045.

    1)    This is the same address for CAR that was shown on the KCBS Channel 2 News televised investigative report.

    2)    This is the same address for the CAR from the Lexus/Nexus database search conducted on June 18, 1998.

    3)    This is the same address from the CAR paperwork provided by AFSHARI during his interview on April 9, 1998.

29.    On  July 20, 1998, Doris Hoggart, the on scene apartment manager of 5312 West 99th Place, Los Angeles, California, was interviewed.

    a.    She indicated that she has seen a large blue Dodge

25

passenger van picking up and dropping off the tenants in apartment #2 and apartment #5.

b.    She described the tenants as Middle Eastern individuals who were living in the two apartments #2 and #5. During routine maintenance checks on the apartment she saw several mattresses and bunk beds throughout both apartments.  She saw folding tables and writing boards on the walls with foreign writing.  She opined that the group in these two apartments was part of a religious cult.

c.    They abruptly moved out in February, 1997.

d.    She provided a copy of the rental agreement that contained biographical information of the individual who rented the apartment for the group as follows:

1)    Majid Lashkari: date of birth; November 6, 1956; Social security number 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; address 7206 Wallaby Street, Ventura, California (805)647-8958; employer Lothar Import, 2001 Williams Drive #415 Ventura, California, (805)983-6000.

2)    This address 7206 Wallaby Street, Ventura, California is identical to the address found for Azarani in CLETS and indicates that this address was used by Azarani on her California Department of Motor Vehicles application for a driver's license.

d.    In November, 1997,  she recognized the same group of people return and ask to rent three apartments at the same

26

building (5312 West 99th Place, Los Angeles, California).

e.    Because she did not have three units available,
she referred them to an apartment building located directly west
of her building with an address of 5316 West 99th Place, Los
Angeles, California.

30.    On July 20, 1998, Hector Castaneda, property manager
for 5316 West 99th Place, Los Angeles, California was interviewed
and provided the following information:

a.    In November 1997, several Middle Eastern
individuals moved into Unit #205.

b.    The apartment has several bunk beds set up inside.

c.    Castaneda provided a copy of the rental agreement
which contained the following information for the renter:

1)    Renter NAJAF TAJI ESHKOFTEGI; date of birth
June 9, 1950; Social Security Number 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; California
Driver's License Number C0530677; Address 10634 Valparaiso
Street, #23, Los Angeles, California; Employer Infinity Micro
Computer, 2289 Westwood Blvd., Los Angeles, California (310)470-
9426.

31.    On August 5, 1998, SA Riedel, FBI, went to 8703 La
Tijera Blvd., Suite #204, Los Angeles, California.

a.    No sign or advertisement was posted on the door of
the CAR office.

b.    SA Riedel observed in plain view mail protruding
from the mail slot addressed to COMMITTEE FOR HUMAN RIGHTS IN

27

IRAN.

32.  On September 16, 1998, Steven Meyer, property manager for 8703 La Tijera, Los Angeles, California, was interviewed:

a.    He verified that the tenant at Suite #204 was the CHR.

33.  On October 2, 1998, Steven Meyer, property manager for 8703 La Tijera, Los Angeles, California, consented to a covert FBI Closed Circuit Television(CCTV) camera being placed in his building inside the public hallway outside the entrance of Suite 204.  Meyer indicated that he had received permission from the building owner for this consent.

34.  In October 1998, CCTV surveillance coverage was initiated at 8703 La Tijera, Los Angeles, California, in the hallway at the entrance to Suite #204, the CAR office.

a.    This CCTV coverage filmed various Iranian males entering the office primarily in the evening.

b.    This coverage was stopped in early 1999 after someone tampered with the recording equipment.

c.    A review of the surveillance tapes showed numerous Iranian males entering the CAR office.  However, the video tapes were dark and the only one that could be identified was MORADI entering on December 6, 1998 and December 24, 1998.

35.  On October 29, 1998, Neil Cadman, the property manager for 5312 West 99th Place, Los Angeles, California, gave his consent for a CCTV camera to be place on his building.

a.    In the presence of CW#4,  ESHKOFTEGI came to the property management company and threatened the owners of the building where the covert CCTV camera was placed.  The CCTV was then discontinued.

b.    On February 6, 1999, CW#4 was interviewed.

1)    ESHKOFTEGI claimed that he was part of an Iranian organization that is working to overthrow the government of Iran and that this organization was more powerful than the FBI and the CIA.

2)    CW#4 indicated that ESHKOFTEGI then threatened to kill the employees of the property management company if ESHKOFTEGI found out that they were spying on him and his organization.

36.  On November 2, 1998, SA Riedel received photocopies of two rent checks for $1,500 dated September and October 1998 for apartment #2 and apartment #5, 5312 West 99th Place, Los Angeles, California.

a.    These checks were Bank of America cashier's checks with the purchaser as Fahimeh Azarani.

37.  On March 1, 1999, SA Riedel requested the bank records for the previously uncovered Turkish bank accounts.  These accounts were uncovered from CHR bank account records from Bank of America.  This request was routed through the FBI Legal Attache in Athens Greece and the Department Of Justice, Office of International Affairs.

a.    This request was for bank records for the following two accounts:

1)    Sabahi Baradaran, T.C. Ziraat Bankaci, 129 Istanbul, Turkey, Account Number 301009-155570.9 . Hereafter referred to as the ("BARADARAN ACCOUNT").

2)    Mashid Torbat Moghaddam Ardekani, Turkiye Is Bankasi A.S., Ulus Subesi, Gam Sok #1, Ulas Ankara, 06041, Turkey, Account Number 42003533789.  Hereafter referred to as the ("ARDEKANI ACCOUNT").

b.    The CHR bank account records documented 18 wire transfers to the Baradaran account from June 13, 1997 to November 24, 1997 totaling $361,500 and 30 international wire transfers from December 5, 1997 through December 23, 1998 totaling $475,097.

38.    On March 1, 1999, an interview of Rebecca Cadman, the property manager for 5312 West 99th Place, Los Angeles, California, indicated that Majid Lashkari vacated apartment #2 and apartment #5 on February 28, 1999.

39.    On March 5, 1999, Neil Cadman, was interviewed.  Majid Lashkari requested that his security deposit for the apartment#2 and apartment #5 at 5312 West 99th Place be mailed to him at P.O. Box 451666, Los Angeles, California.

40.    On March 11, 1999 SA Riedel went to the Westchester Post Office located on La Tijera Blvd.  From the application for post office box number 451666, SA Riedel learned that the post

30

office box had been rented by ESHKOFTEGI.

41.    On or about July 14, 1999, CW#1 began his cooperation with the FBI and this investigation.

42.    On July 14, 1999, CW#1 was interviewed and provided the following information:

a.    CW#1 indicated that based on his past and current involvement with the MEK that he is in a position to provide both current and historical information about the MEK.

b.    The NCR and the CHR are part of the MEK.

c.    The CHR is one of the front organizations that the MEK uses to raise funds for the NLA.

d.    CW#1 indicated that the fund raising section for the MEK is known as the "MALI EJTEMAIE" or "BAKSHA MALI".  The MEK raises funds in the U.S. for the NLA using a number of methods including:

1)    Airport solicitation at LAX and other airports.  CW#1 indicated that the airport solicitors are given training and instruction on how to fund raise for the MEK under the cover of the CHR. They are specifically instructed not to mention the MEK or the NLA.  The CW attended a meeting in October 1997, at 3721 Oceanview, Los Angeles, immediately following the designation of the MEK as a foreign terrorist organization.  This special meeting at the "kanoon" was set up because of the designation of the MEK as a foreign terrorist organization. MASOUD RAJAVI the leader of the MEK spoke on a conference call

31

and instructed the MEK cells in 12 locations including Los Angeles to continue to fund raise for the MEK.  RAJAVI told the solicitors to use the cover organizations of CAR and NCR because of this designation.  The CW indicated that all the money collected by these solicitors goes to the NLA.  He indicated that the solicitors use "picture binders or notebooks" to show unsuspecting travelors at LAX.   The fund raising subjects AFSHARI, AHMADY, OMIDVAR, REZAIE and ESHKOFTEGI were present for this meeting and participated in the discussion.

2)    Overpayments on their subscriptions to their newspaper known as "MOJAHED".  CW#1 elaborated that there is a set subscription price, but members and supporters send more money than is required and the excess money is used for MEK purposes to include funding of the NLA.

3)    Personal collections by the MEK leaders of their members, supporters and sympathizers.  CW#1 elaborated that MEK leaders use a list of members, supporters, and sympathizers, that has a dollar figure by each individual's name.  These figures are often as much as $10,000.  If the member, supporter or sympathizer does not have the money, the MEK leader has them use their credit card to get the moeny and then instructs the member or supporter to pay back his creditor.  If they refuse to pay, they will be threatened by the MEK.

4)   MEK owned businesses.  The MEK raises funds through a number of legitimately owned and operated businesses in

32

the U.S.  The CW described a method in which the MEK "launders money" which is known as "Sarafi" in the Farsi language.  This system is used when money is deposited in a MEK business in one city and then distributed by another branch in another city or country for a different purpose.  The CW identified a number of businesses involved in this activity as follows:

      i.    Hitech Construction, Raleigh North Carolina.

      ii.   Phoenix Travel Agency

      iii. Soltani Construction, Los Angeles, California.

     5) Criminal Activity.  The MEK is also involved in criminal activity as a way of raising funds for the NLA.  CW#1 described credit card fraud schemes used by the MEK. Additionally, CW#1 described a particular theft of approximately $100,000 in surgical sutures from a New York hospital.  CW#1 indicated that U.S. Customs had partially intercepted $30,000 of the theft before it was shipped out of the U.S.

     e.    During this interview, CW#1 identified AHMADY as one of the fund raisers who solicts at LAX on behalf of the MEK using the cover organization of CHR.

     f.    CW#1 described the rank structure of the MEK cell in Los Angeles.

     1)    MEK sympathizers are called "S".

     2)    MEK supporters are called "S1".

33

3)    MEK "under members" who are in the process of becoming members are called "Zireh-Ozv".

4)    MEK members are called "Ozv".

5)    MEK leadership cadre above "Ozv" have various names to include "Masouli Nehalt" and "Masouli Nahad".

g.    CW#1 described the organizational structure of the MEK cell in Los Angeles.

1)    Financial or Fund Raising section is called "EJETEMAIE MALI" or "BAKSHA MALI".

2)    Advertising and propaganda section is called "Tablighat".

3)    Organization and Administration section is called "Tashkilat".

4)    Intelligence and Information section is called "Etelahat"

5)    News and Television section is called "Khabar Gozari".

h.    When the MEK feels pressure from law enforcement agencies they will abruptly remove the cell leader and transfer them to another city, replacing them with a new cell leader.

44.    On July 29, 1999, FBI surveillance at LAX observed AHMADY soliciting at LAX.  AHMADY was primarily soliciting Asian travelers.  He was wearing a pink identification badge with the name CHR printed on it.  He was carrying a "picture notebook" and showing travelers pictures of starving children and Iranian

34

government atrocities.  At approximately 2:30 PM he exited the Tom Bradley Terminal at LAX and entered a 1982 Red Toyota, California License plate 2JVK825.  A check of CLETS revealed this plate to be registered to Fahimeh Azarani.

45.  On August 4, 1999, FBI surveillance at LAX observed AHMADY and AFSHARI soliciting at LAX.  They were primarily soliciting Asian travelers.  They were wearing pink identification badges with the name CHR printed on them.  They were carrying "picture notebooks" and showing travelers pictures of starving children and Iranian government atrocities.

46.  On August 26, 1999, CW #1 was interviewed and provided the following information:

a.  CW#1 reported that the Los Angeles cell leader of the MEK, at that time, was Sister Azadeh (LNU).

b.  CW#1 identified Shokuh Mousavinasab as one of the MEK fund raisers at LAX.

c.  CW#1 reported that following his release from INS custody he would be summoned to a MEK supporter's residence where he would be debriefed by a MEK member or supporter.  CW#1 opined that he would be asked about his time in custody, law enforcement interviews, and statements that he had made about the MEK.

47.  On August 27, 1999, CW#1 was interviewed and provided the following information:

a.  On August 26, 1999, CW#1 was contacted by Mitra Vatan and asked to come to her home for a debriefing about his

35

incarceration.

48.   On August 31, 1999, CW#1 was interviewed and provided the following information:

a.    On August 27, 1999, CW#1 went to the residence of Mitra and Farouk Vatan, MEK supporters.

b.    CW#1 was debriefed by Mitra Vatan about the particulars of his arrest and eventual release.

49.   On September 14, 1999, CW#1 was interviewed and provided the following information:

a.    On September 13, 1999, Mitra Vatan called the CW and told him that she had a message for him from the MEK.

b.    Vatan wanted the CW to come to her home.

50.   On September 15, 1999, CW#1 was interviewed and provided the following information:

a.    On September 14, 1999, CW#1 went to Mitra Vatan's residence.

b.    Mitra Vatan had a message for CW#1 from the wife of Mehran Nejad.  The message was for CW#1 to find out what happened to Mehran Nejad after his arrest that took place at the same time as CW#1.

c.    Mitra Vatan told CW#1 that there was a new leader of the Los Angeles cell of the MEK.

d.    CW#1 reported that Mahmoud Rajabzadeh Mashhadi, a MEK member was in trouble with the MEK because he raped or molested Amir Adabzadeh's 15 year old daughter.  CW#1 elaborated

36

that MASHHADI had fled the area and was hiding out in Washington D.C. Based on this information I began investigating the circumstances from this allegation.

1) On or about September 30, 1999, I discussed the matter with Los Angeles Sheriff Deputy Mike Young, a member of the Los Angeles JTTF.

2) On or about September 30, 1999, Deputy Young provided me with a local felony warrant information for Mashhadi. I informed Deputy Young that I had information on Mashhadi's whereabouts.

3) On November 30, 1999, Los Angeles Sheriff, Leroy D. Baca, wrote the FBI a letter requesting the assistance of the FBI locating and arresting Mashhadi.

4) On December 20, 1999, I obtained a Federal Arrest Warrant for Mashhadi as a fugitive under Title 18 U.S.C. § 1073.

5) On January 5, 2000, during a routine check of Mashhadi's former employer I located Mashhadi, who had just returned from the Washington D.C. area, and arrested him.

6) Upon his arrest Mashhadi was uncooperative and invoked his right to an attorney.

7) I interviewed Larry Chong Mashhadi's former employer who was friendly and cooperative.

51. On October 7, 1999, the MEK conducted a protest at the Federal Building, located at 11000 Wilshire Blvd., Los Angeles,

37

California.

a.    Other agents and I conducted a surveillance of this demonstration.  The protestors were waiving both MEK and NLA flags.  They were holding up pictures of MASOUD and MARYAM RAJAVI the leaders of the MEK.  The MEK subjects TAHAMTAN, AHMADY, MORADI, and AFSHARI were observed along with numerous other MEK protestors waiving the MEK and NLA flags.

52.  On October 8, 1999, the U.S. State Department released their list of designated foreign terrorist organizations.  The MEK was again listed and the NCR was added as part of the MEK.

53.  On October 18, 1999, CW#1 was interviewed and provided the following information:

a.    On or about October 15, 1999, CW#1 received a telephone call from the MEK base in Los Angeles.  This base was referred to as the "kanoon".  The caller informed CW#1 that he had been cleared to visit the "kanoon" and gave CW#1 the telephone number of (310) 397-6183 as a contact telephone number.

1)    From a review of subscriber data for this telephone number I learned that the telephone was located at 12656 Marco Place, Los Angeles, California.

b.    CW#1 identified the new Los Angeles MEK cell leader as TAHAMTAN.  CW#1 indicated that TAHAMTAN was responsible for fund raising in the western U.S. and was a high ranking MEK member.

c.    CW #1 was shown a series of FBI surveillance

38

photographs from the MEK October 7, 1999, protest.  CW #1 identified some of the MEK protestors to include the subjects TAHAMTAN, AFSHARI, and AHMADY.

d.    CW#1 identified AHMADY and provided his home telephone number as (310) 398-3179.

e.    CW#1 learned that the MEK was mobilizing a large protest in Paris, France, to demonstrate and disrupt Iranian President Khatami's visit to Paris.  The MEK members from Los Angeles were traveling there on or about October 22, 1999.  These MEK members were further instructed to travel into surrounding European countries and to then travel overland to Paris to avoid being stopped and detained at the airports in France.

1)    This information was passed to French Law Enforcement officials through the FBI Legal Attache at the U.S. Embassy in Paris, France.

54.  On or about September 29, 1999, I received the previously requested account information from the two Turkish accounts identified in paragraph 17.  The majority of the documents were written in the Turkish language.

a.    These documents were subsequently translated to reveal that the two accounts in question had received numerous wire transfers from numerous sources.  One of these sources was the CHR.

b.    A review of the BARADARAN ACCOUNT information provided by Turkish authorities revealed nineteen (19) wire

39

transfers totalling $383,450 between April 29, 1997, and November 28, 1997, that came from the Bank of America CHR account identified in paragraph 37.  This corroborated the findings of FBI Financial Analyst(FA) Art Fonseca in which he tracked wire transfers from the CHR account to the BARADARAN ACCOUNT.

1)    These wire transfers matched with the wire transfers uncovered during the analysis of the CHR account by FA Fonseca.

2)    FA Fonseca accounted for $396,000 in wire transfers from the CHR account initiated by Fahimeh Azarani to the BARADARAN ACCOUNT between May 31, 1997, and June 30, 1999.

c.    A review of the ARDEKANI ACCOUNT information provided by Turkish authorities revealed forty-two (42) wire transfers totaling $638,877 between December 9, 1997, and June 14, 1999, that came from the Bank of America CHR account identified in paragraph 37.  This corroborated the findings of FA Fonseca in which he tracked wire transfers from the CHR account to the ARDEKANI ACCOUNT.

1)    These wire transfers matched with the wire transfers uncovered during the analysis of the CHR account by FA Fonseca.

2)    FA Fonseca accounted for $319,950 in wire transfers from the CHR account initiated by Fahimeh Azarani to the ARDEKANI ACCOUNT between May 31, 1997, and June 30, 1999.

3)    FA Fonseca accounted for $362,397 in wire

transfers from the CHR account initiated by MEK subject REZAIE to the ARDEKANI ACCOUNT between May 31, 1997, and June 30, 1999.

d.    The results of the analysis and review of the CHR bank account at Bank of America in Los Angeles, the BARADARAN ACCOUNT in Istanbul Turkey, and the ARDEKANI ACCOUNT in Ankara Turkey, corroborated CW#1 reporting about REZAIE and his fund raising activities.

e.    A further review of these records showed wire transfers from the ARDEKANI ACCOUNT to several locations, including a wire transfer of $400,000 on April 15, 1999, to an AL Mainey Used Auto Parts, United bank Ltd., Deira Dubaie, United Arab Emirates, Murshad bazar Branch, Account Number 02082-0043-6. This transfer among others did not appear to be related to humanitarian relief.

55.    On October 29, 1999, Reuters News Service reported that a large violent demonstration had taken place in Paris, France. This demonstration was reported organized by the NCR.

a.    CW#1 had reported prior to the event in Paris, France that members of the Los Angeles cell of the MEK were planning on traveling to France to participate in this demonstration.    The CW was asked to attend but declined.

56.    On November 3, 1999, CW#1 reported that there was a fund raising meeting at the MEK "kanoon" located at 12656 Marco Place.

a.    The CW reported that the "Action" or "Baseej" was

41

beginning for the 1999 holiday season on November 15, 1999, and would run through February, 2000.

     b.    The CW reported that the MEK would bring in solicitors from other countries to assist in fund raising efforts at LAX.

57.  On November 5, 1999, CW#1 reported that the MEK would be having a demonstration at the Federal Building located at 11000 Wilshire Blvd., Los Angeles, California.

     a.    An FBI surveillance observed subjects TAHAMTAN, AFSHARI, and AHMADY, among other MEK protestors.  TAHAMTAM was leading the protest and was the ranking MEK leader in Los Angeles.

     b.    Azadeh Rezaie was not present and CW#1 reported that TAHAMTAN was now running the Los Angeles cell of the MEK.

58.  On November 16, 1999, CW#1 was interviewed.

     a.    CW#1 reported that he attended the November 5, 1999 protest at the Federal Building.

     b.    CW#1 learned at this demonstration that some of the Los Angeles MEK members and supporters had been arrested in France during the October 29, 1999, protest.

     c.    Fund raising subject AHMADY approached CW#1 and questioned him as to his arrest and subsequent release.  CW#1 identified AHMADY as a MEK "under-member" with the rank "Zireh Ozv".

59.  On November 19, 1999, CW#1 reported that Azadeh Rezaie

was back in Los Angeles and TAHAMTAN had left for France on MEK related business.

60.   On November 29, 1999, CW#1 was interviewed.

a.   CW#1 indicated that Azadeh Rezaie is in charge of the fund raising activity in the MEK's Los Angeles cell.  CW#1 indicated that the subject TAHMINEH was in charge when Azadeh Rezaie was out of the Los Angeles area on MEK business.  Sister Faezeh is the assistant to Azadeh Rezaie and TAHMINEH.

b.   CW#1 described two of the MEK's Los Angeles sections.

1)   "Tadarokat" or logistic section.  This section of the Los Angeles MEK cell is responsible for transportation, lodging, food, medical, and maintenance.  They are responsible for taking care of the fund raisers who have been imported to Los Angeles during the fund raising "action" or "baseej" period.  This section reports to Sister Faezeh.

2)   "Mali Ejtemaie" or fund raising section. This section is responsible for fund raising activity for the MEK.  CW#1 indicated that this section was currently physically transferring cash to the Washington D.C. cell of the MEK.  CW#1 reported that the MEK was also known to use bank accounts and wire transfers to send money overseas, among other methods.

61.   On December 10, 1999, CW#1 was interviewed.

a.   CW#1 reported that he went to the "kanoon" located at 12656 Marco Place, Los Angeles, California.

43

b.   CW#1 described the house, the surrounding yard and vegetation, and the inside of the "kanoon".

1)   CW#1 observed MEK members wearing full NLA uniforms inside the "kanoon".  These were the same style of uniforms that the CW wore when he was fighting for the NLA in Iraq and Iran.

2)   CW#1 observed pictures of MASOUD and MARYAM RAJAVI positioned throughout the "kanoon" on the walls with MEK and NLA flags along side the pictures.

3)   CW#1 observed a list of rules of conduct inside the "kanoon" posted near the rear entrance under a diagram of the "kanoon" depicting the locations of different MEK organizational sections within the "kanoon".  The front entrance was blocked by a very large copy machine.  CW#1 indicated that this was a security precaution.  Some of the rules written in the Farsi language included:

i.   Be careful with the neighbors.

ii.  Don't talk about the MEK.

iii. Don't make any noise.

iv.  Leave the blinds shut.

4)   CW#1 observed a woman in a NLA uniform that he had known in Iraq when he was a NLA fighter.  CW#1 learned through conversation that she and the other uniformed MEK members were visiting from Iraq.

c.   While CW#1 was at the "kanoon" other MEK members

44

and supporters arrived that CW#1 recognized.

1)    Morteza Khashani was a MEK supporter who had spent time with the NLA and had participated in paramilitary/ terrorist training and operations.

2)    Mashid Salami was a MEK supporter.

d.    CW#1 reported that based on his observations at the "kanoon" and conversations that were taking place he recognized two other MEK supporters that were contributing to the fund raising effort by the MEK.

1)    Davood Farahani who is a MEK sympathizer or supporter who owns a used automobile dealership in Santa Monica, California.  Farahani provides vehicles for the MEK fund raisers that have been shipped into Los Angeles by the MEK for the period of time known as the "action" or "baseej".  This information was corroborated when I interviewed Davood Farahani on April 21, 2000, which is detailed in paragraph 67 below.

2)    Alborz Salami was a high ranking NLA fighter who was working for Davood Farahani in Santa Monica.  Alborz Salami was traveling to Iraq for terrorist operations up until 1997.  He currently is a MEK sympathizer or supporter and no longer is considered a MEK member.

62.    On or about January 5, 2000, an analytical review of subscriber information from the identified CHR telephone number (310) 216-6858 revealed that the subscriber was subject REZAIE with an address of 8703 La Tijera Blvd., Suite #204, Los Angeles,

45

California 90045-3900.  This is the same address as the CHR office.

63.  On January 7, 2000,  a FBI surveillance at LAX observed AFSHARI, among other MEK members and supporters, soliciting at LAX.  AFSHARI was wearing a pink identification badge with the name CHR.  AFSHARI was using a "picture notebook" containing pictures of starving children and Iranian government atrocities.

64.  On January 19, 2000, CW#1 was interviewed.

a.  On January 13, 2000, Mitra Vatan a MEK supporter called CW#1 from the "kanoon" located at 12656 Marco Place, Los Angeles, California and invited him to attend a MEK meeting in San Pedro at 1891 Gaffey Street, San Pedro, California, on January 15, 2000.

b.  On January 15, 2000, CW#1 accompanied Mitra Vatan and her husband Farouk Vatan to the MEK meeting.

c.  The meeting began at approximately 7:00 PM and was a celebration for the end of the Muslim holiday period known as Ramadan.

d.  Approximately seventy(70) MEK members and supporters attended the meeting.

1)  Subjects AHMADY, AFSHARI, REZAIE, ESHKOFTEGI, and OMIDVAR were present at this meeting.

2)  In addition to other MEK members and supporters the CW observed three new female MEK members who had just arrived from Iraq.  They were wearing NLA uniforms at the

46

meeting.

     3) CW#1 observed MEK flags, icons, and pictures of MASOUD amd MARYAM RAJAVI displayed at the meeting.

     e. Azadeh Rezaie played a video tape of a lecture by MASOUD RAJAVI that was an ideology lesson about MEK doctrine.

     f. Subject OMIDVAR approached CW#1 and asked him about Yousef Hammidy a MEK member who was in custody with INS.

65. On February 15, 2000, CW#1 was interviewed.

     a. On February 2, 2000, the CW called the "kanoon" at (310)397-6138 and spoke to Azadeh Rezaie.

     1) She scolded him for not helping the MEK more and told him to come to the "kanoon" as often as he could.

     2) She then began bragging about a MEK attack on an Iranian government base. She described how the MEK used 120mm mortars to surprise attack the base from six different directions.

     3) She told CW#1 to attend a MEK meeting at the Quality Hotel on February 13, 2000.

     d. On February 13, 2000, CW#1 attended the MEK meeting at the Quality Hotel.

     1) Azadeh Rezaie lead the meeting.

     2) CW#1 observed numerous MEK flags, icons, and pictures of MASOUD and MARYAM RAJAVI place around the meet location.

     3) Azadeh Rezaie told the MEK members and

supporters attending the meeting that it was a special time for the MEK and asked each member and supporter to provide money to support the MEK.  She asked if anyone could travel to Iraq to take up arms against the Iranian government.

4)    Azadeh Rezaie showed a MEK movie that showed the NLA and MASOUD RAJAVI.  The film also showed the son of RAJAVI undergoing paramilitary/terrorist training at one of the NLA camps in Iraq.

5)    CW#1 observed the subjects AHMADY, AFSHARI, REZAIE, OMIDVAR, and ESHKOFTEGI present at the meeting.

6)    CW#1 talked specifically with subject REZAIE. REZAIE indicated that he had recently returned from Iraq where he was training with the NLA.  They talked specifically about his training with heavy weapons.

66.  On March 28, 2000, CW#1 was interviewed.

a.    On March 24, 2000, CW#1 was informed about a MEK meeting at the "kanoon" located at 12656 Marco Place, Los Angeles, California that was to take place on March 26, 2000.

b.    On March 26, 2000, CW#1 attended the meeting at the "kanoon" with Mitra and Farouk Vatan.

1)    Subject AHMADY was in charge of the meeting.

2)    The normal MEK leadership were out of the Los Angeles area on a MEK related meeting.

3)    A conference call came in from Iraq.  CW#1 heard subject AFSHARI, who identified himself by name, at another

48

location in the Los Angeles area on the call as well.  Subject ESHKOFTEGI was present at the "kanoon" as well.

4)   The conference call was led by Mohamad Seyed Mohadesin.  Mohadesin was making disparaging remarks against the U.S. Government and Madeline Albright.  Mohadesin accused the U.S. Government of giving satellite surveillance footage of NLA bases in Iraq to the Iranian government.  Mohadesin was very upset with the U.S. lifting some economic sanctions on Iran.

67.  On April 21, 2000, Davood Farahani was interviewed.

a.   Farahani indicated that he is a MEK supporter who donates $200 to $300 to the MEK every six(6) months.

b.   When asked who takes his donation, Farahani indicated that subject AFSHARI who fund raises at LAX on behalf of the MEK takes his donation usually.

c.   When asked how much he has donated each year he indicated that from 1990 to 1995 he donated approximately $1,000 per year, but recently between 1995 and present he has cut back his donations to approximately $500 per year.

68.  On May 9, 2000, CW#1 was interviewed.

a.   On April 21, 2000, the MEK had a special meeting at the "kanoon" to discuss the arrest and deportation proceedings of Mahnaz Samadi a high ranking MEK member who was in Los Angeles.  CW#1 learned about this meeting from Mitra Vatan.

b.   On May 7, 2000, CW#1 was summoned to a meeting at the "kanoon".  During this meeting CW#1 learned that fund raising

49

subject TAHAMTAN was now in charge of the Los Angeles cell of the MEK.   TAHAMATAN discussed the U.S. government's relationship with the Iranian government.   TAHAMTAN also discussed the arrest of Mahnaz Samadi.   Subjects AHMADY, ESHKOFETEGI, AFSHARI, and MORADI were also present at this meeting.

69.   On June 5, 2000, CW#1 was interviewed.

a.   On May 18, 2000, TAHAMTAN called CW#1 and instructed him to attend a special meeting at the "kanoon" on May 21, 2000.

b.   TAHAMTAN told the CW that Azadeh Rezaie is out of town indicating that TAHAMTAN was now in charge of the Los Angeles cell of the MEK.

c.   TAHAMATAN lead the meeting and told the approximately twenty (20) MEK members and supporters that Iranian president Khatami would be visiting Berlin Germany in July, 2000. TAHAMTAN indicated that the MEK will attempt to disrupt the visit with protests, civil disobedience, civil unrest, and a special operation too sensitive to discuss.   TAHAMTAN indicated that July 10, 2000, was the day all MEK members and supporters were asked to travel to Berlin, Germany to participate in this disruption operation.   She cautioned that the German police will be looking for Iranian MEK members and supporters and instructed those at the meeting to travel to surrounding European countries and then cross overland into Germany.   She indicated that this was the same technique used in the October 29, 1999, MEK operation in

France.

d.   After the meeting TAHAMTAN pulled CW#1 aside and asked him to go to Germany for this operation.  CW#1 declined indicating that he would be unable to return to the U.S. because of his immigration problem.  TAHAMTAN accepted this excuse then told him instead to raise $1,000 for the MEK to fund this operation in exchange for not participating.

e.   As in the MEK demonstration in Paris on October 29, 1999, this information was passed in a general form to the German Law Enforcement Authorities prior to the demonstration.

70.  On June 22, 2000, CW#1 was interviewed.

a.   CW#1 provided a cassette tape of a recorded conversation between himself and TAHAMTAN on June 10, 2000.  CW#1 indicated that TAHAMTAN discussed the following:

1)   Iranian intelligence officer named Ahmad Behbahani.

2)   A MEK terrorist operation in Iran

3)   Money that the CW is supposed to provide to the MEK to support the NLA and the operation in Germany in July, 2000.  CW#1 was instructed by TAHAMTAN to raise $1,000 but was instructed by myself to only provide $300 and offer to work with the MEK to make up the difference.

b.   The conversation was in the Farsi language and was subsequently translated.  From speaking with the CW after the meeting and reviewing the transcript of the conversation, I

51

learned that TAHAMTAN bragged about a specific MEK act of terrorism then argued with the CW over money that he was supposed to obtain for the MEK.  The specific portions of the conversation were translated as follows with TT representing TAHAMTAN:

TT:  ...You must have heard these Bahbahani stories and all that, haven't you?

CW:  News about Behbahani! Yeah I have heard that yeah but...

TT:  Also, there has been a struggle on Ilam (Iran).

CW:  Not this one.  No. I haven't heard.

TT:  There has been a struggle between our guys and the regime's mercenaries.  This has been the last news.

(later in the conversation)

TT:  No, you tell me now.  I prefer that we have our fights at the beginning.

CW:  I swear to God.  I tried very hard but it was only with fighting that I was able to get $300.

TT:  Tell her(CW #1's wife) to double it at least.

CW:  I know, but you have to excuse me.

TT:  Please, I know. I hope your enemies will be put to shame, but you should try.

CW:  I swear to God.  I like it very much to be able to help the organization, but in fact it's the thing.  I mean, I'm under too much pressure at this time.

TT:  Yes, okay.

CW:  Now accept this and I'll try to take care of the rest.

TT:  God willing.

c.  On June 11, 2000, TAHAMTAN called CW#1 and asked when he was bringing the money to the "kanoon".

d.  On June 11, 2000, after the cellular telephone conversation, CW#1 went to the "kanoon" at approximately 11:00 AM.

1)  At the "kanoon" CW#1 met with TAHAMTAN and Mashid Salami.

2)  CW#1 observed that all the MEK flags, pictures, and icons had been removed from the "kanoon". Additionally, the large copy machine had been removed from the blocking position at the front door.  When CW#1 asked TAHAMTAN why everything was removed,  TAHAMATAN explained that they recently had visitors and had removed the items so the visitors did not see any connection to the MEK.

3)  CW#1 wrote a check for $300 payable to the PEOPLES MUJAHEDIN OF IRAN(PMOI) and handed it to TAHAMTAN. TAHAMTAN told CW#1 that it was best to not make the check payable to the PMOI and for CW#1 to make out a new check and leave it blank.  TAHAMTAN elaborated that the MEK has a special account and she would write in the name of the account later.

4)  CW#1 provided a copy of the blank check and indicated he would provide a copy of the canceled check once it

53

was cashed.

e.   On June 15, 2000, TAHAMTAN called CW#1 and instructed him to attend a MEK meeting at 1891 Gaffey Street, San Pedro, California, on June 18, 2000.  The CW was not able to attend this meeting because of car trouble.

f.   On June 15, 2000, Mitra Vatan called CW#1 and told him that the MEK would be holding a demonstration at the German Consulate near the 6000 block on Wilshire Blvd., Los Angeles, California, on June 23, 2000.  Mitra Vatan told the CW that this demonstration would be against Iranian President Khatami's visit to Germany.

71.   On June 23, 2000, SA Reed Jones and other FBI agents conducted a surveillance of the demonstration at the German Consulate and observed the following:

a.   TAHAMTAN was the MEK leader running the demonstration.  The demonstrators were waiving MEK and NLA flags and carrying large pictures of MASOUD RAJAVI in a NLA uniform attached to sticks.

b.   In addition to TAHAMTAN subjects AHMADY, MORADI, REZAIE, and OMIDVAR were also present holding MEK flags.

72.   On July 10, 2000, various news services including the BBC reported that a large MEK demonstration had occurred in Berlin in which 40 MEK demonstrators had been arrested.

73.   On July 27, 2000, CW#1 was interviewed.

a.   CW#1 reported that TAHAMTAN had gone to Germany on

54

or about July 10, 2000 and had been arrested during the July 11, 2000 protest for fighting with police.

1)    CE#1 watched an Iranian television news report that covered the protest turned riot and saw TAHAMTAN being arrested by German Police.

2)    CW#1 provided a copy of the MEK's "MOJAHED" magazine, issue number 503, dated July 18, 2000.  This magazine showed pictures of the MEK demonstration in Germany, including pictures of Los Angeles MEK members.

b.    On July 25, 2000, Afarin Moustafi, a MEK supporter and girlfriend of Vahid Salami another MEK supporter, told the CW about a MEK meeting to be held at UCLA, in Los Angeles, California, on July 29, 2000.  She gave CW#1 a flyer indicating that the meeting was for an Iranian activist named Ahmed Shamloo.

74.   On August 4, 2000, CW#1 was interviewed.

a.    On July 29, 2000, CW#1 attended a MEK meeting at UCLA.

1)    This meeting was a memorial service to a slain political activist known as Ahmed Shamloo.

2)    Subject MORADI was in charge in TAHAMTAN's absence.

3)    TAHAMTAN was in Northern California for a MEK planning meeting of an upcoming large scale protest in New York City.

4)    Mitra Vatan asked CW#1 to attend this large

55

scale protest in New York City during Iranian President Khatami's visit to the United Nations.  Vatan told the CW that the MEK is planning on sending all available supporters and members into Newark, New Jersey, and that they were planning the same type of disruptions as they caused in Paris in October, 1999, and Germany in July, 2000.

75.  On August 24, 2000, CW#1 was interviewed.

a.    CW#1 updated the current organizational structure of the Los Angeles cell of the MEK.

1)    The fund raising section is called "MALI EJTEMAIE".

2)    The public relations section is called "Ravabet Omouie"

3)    There is a media section or television and Newspaper section.  This section is responsible for the MEK television program that airs every Saturday between 11:30 AM and 1:30 PM.

4)    The Command section is responsible for the overall coordination of the other sections and organizing special events such as protests, travel to demonstrations, meetings, and conference calls with other cells and higher MEK command in Iraq and Paris, France.

5)    The Los Angeles cell does not have an armed section as in other MEK cells outside of the U.S.  Instead the MEK has a new loosely affiliated group known as the "ALAMOUT

SOCIETY" that is the closest thing to an armed section.  The CW indicated that this new group has been involved with mischief to include egg throwing and threatening to commit arson.

b.    CW#1 reported that the "kanoon" was still located at 12656 Marco Place and that it was still being utilized as a base of operation to conduct fund raising on behalf of the MEK.

76.  On or about September 3, 2000, CW#1 traveled to Newark, New Jersey, with other MEK members and supporters. CW#1 participated in a highly organized operation by the MEK in which large scale demonstrations, acts of civil disobedience, and symbolic physical assaults of Iranian government officials and their motorcades were carried out at the behest of the MEK.

a.    On September 4 and 5, 2000, Reuters News Service reported that four Iranians had been arrested on various charges associated with the protests of Khatami's visit to the United Nations.  Three of the four were arrested for throwing yellow paint.  A NCR spokesman indicated that the assaults happened with yellow paint to symbolize the color of dismay.

77.  On September 18, 2000, CW#1 was interviewed.

a.    CW#1 indicated that he had received a telephone call from TAHAMTAN on September 15, 2000.  TAHAMTAN was calling CW#1 from the Washington D.C. area.  She told CW#1 that there would be a meeting at the "kanoon" located at 12656 Marco Place, Los Angeles, California, on Spetember 17, 2000.

b.    On September 17, 2000, CW#1 attended the meeting

57

at the "kanoon".  The meeting was led by TAHAMTAN and was a lecture about MEK political activity in Washington D.C.  CW#1 observed the subjects TAHAMATAN, AFSHARI, and ESHKOFTEGI among other MEK members and supporters at this meeting.  TAHAMTAN also discussed law enforcement authorities efforts in the United Kingdom(U.K.) to stop MEK fund raising activity and specifically talked about how they seized 600,000 pounds in U.K. currency.

78.  On September 19, 2000, CW#1 was interviewed.

a.  CW#1 called TAHAMTAN at the MEK "kanoon". TAHAMTAN told the CW that the MEK had learned that the Iranian government Foreign Minister Khamal Kharazi was traveling to Los Angeles in a few days and that she was trying to find out his itinerary so that she could organize a symbolic attack such as throwing yellow paint or eggs.

79.  On September 21, 2000, CW#1 was interviewed.

a.  CW#1 indicated that TAHAMTAN was in Westwood, California, coordinating approximately sixty (60) MEK members and supporters from a blue van in Westwood, California.  CW#1 indicated that TAHAMTAN was controlling and positioning two man teams around Westwood and UCLA with eggs and yellow paint.

80.  On September 21, 2000, the Iranian Foreign Minister Khamal Kharazi visited the Los Angeles area.

a.  CW#1 reported that members and supporters of the MEK were going to UCLA to attempt to throw eggs and protest his visit.

b.    CW#1's reporting was corroborated by a physical surveillance during which SA Reed Jones and I observed subjects MORADI and AHMADY, among other MEK members and supporters, at UCLA in the vicinity the Kharazi motorcade.  Both AHMADY and MORADI were instigating egg throwing and physical assaults of the attendees of the Kharazi speech.

81.  On October 15, 2000,  CW#1 attended a MEK fund raising planning meeting at the "kanoon" located at 12656 Marco Place, Los Angeles, California.  The CW was equipped with a body recorder and the meeting was consensually monitored.  From an interview of CW#1, immediately following the meeting, and a review of the transcript of the conversation, which was in the Farsi language, I learned the following:

a.    TAHAMTAN utilizes the "kanoon" to direct fund raising activities for the MEK.  These activities include, but were not limited to, international conference calls with other MEK leaders, planing of fund raising activities, and scheduling of MEK fund raising teams at LAX.

b.    This conference call was directed by Mehrafrouz Peykarnegar from Washington D.C.  TAHAMTAN was clearly subordinate to Mehrafrouz.  In addition to TAHAMTAN, the subjects AHMADY, AFSHARI, ESHKOFTEGI, MORADI, OMIDVAR, and REZAIE were present for the entire meeting.

c.    During the conference call the MEK was referred to as the "organization" or "Sazeman" in the Farsi language.

59

d.    During the conference call the area where the NLA operates was referred to as the "region".

e.    TAHAMTAN indicated during the conference call that she was the overall responsible person for the MEK fund raising effort in Los Angeles.

f.    The conference call marked the beginning of the yearly fund raising period.  It is referred to as a mobilization or "Baseej".

g.    TAHAMTAN pressed CW #1 to give $300 to the MEK or commit to working at LAX fund raising.

h.    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN, "MP" representing Peykarnegar, "JF" representing Jahanfar (last name unknown, calling in from Melbourne, Australia), "VS" representing Vahid Salami, "HS" representing Hossein (last name unknown, calling in from Toronto, Canada):

JF:        ...of course it's our duty because when our guys are doing those things in the region, we also have to do whatever we can in Australia or in any other country...

(later in the conversation)

JF:        ...over here, there are guys from the countries who also believe in our organization.  We have been showing them the videos and all of them are ready to help. But we need a permit because there is a problem with the law that you know about yourself.

60

MP:          Yes, yes, I understand.

TT:          They must talk it over with the authorities over there. It's not relevant to us.

MP:          Exactly, thank you very much. We'll talk to you. We have some information that we can provide them with.

VS:          Sister Mehrafrouz?

MP:          Yes, you can give it to them. We've been working on this ourselves.

VS:          Sister Mehrafrouz, I had a proposal. As we know, from know until the end of the year, people in America, Europe, and probably Canada, will be shopping. If we could ask our guys, those who are in business or those who can possibly help.  We can lease noticeable places in the malls or on the streets, and these would be great incomes during the next two months.  This has been done before.  With the help of our guys in this very state of California, we can assign groups of three to four people at the malls...in America, Canada, and Europe...to set booths...I think the income would be enormous.  For instance imagine if we can sell jewelry...it depends on...

(later, same conversation)

HS:          Hi Sister.

MP:          Hi.

HS:          I'm calling from Toronto. This is Hossein speaking.

MP:          How are you? I hope you are fine.

61

HS:          Yes, you too. There's a point that I want to talk to you about.

MP:          Yes, go ahead please.

HS:          The experience that our guys have had, in regard to inviting people to demonstrations. They brought up an interesting thing about the atmosphere in Iranian communities that has changed, and it's quite different from the past. This should help us in our fund raising. As it's said, we shouldn't look at them as before.

MP:          Exactly, exactly...what you are saying is correct.

(later, same conversation)

MP:          TAHMINEH, now you're together with your guys, right?

TT:          Yes, my guys are all here.

MP:          Well, considering the location and possibilities that they have...(unintelligible)...sister TAHMINEH's district. You [cell leaders] should all present your designated individuals by tomorrow. Meaning, a new organization with a new start and with the new commitment for this new atmosphere...

(later, same conversation)

MP:          Well guys, If you don't have any other proposals and also considering that it is getting late... if you let me...I'm going to end the meeting.  There is only one point...right now, the people who are in charge of the districts should contact their district to coordinate their schedules and

assign their duties for tomorrow. TAHMINEH! Now you are together with your guys over there right?

TT:        Yes, my guys are all here.

MP:        Well, considering the location and possibilities that they have...one of the...is sister TAHMINEH's district.  You should all present your designated individuals by tomorrow. Meaning a new organization with a new start and with the new commitments for the new atmosphere...Until...God willing...in other districts also our guys will call and...I will assign someone to follow-up on this matter...and as it is said, we all are going to become acquainted in front of God and the people...from the first day of our collective struggle.

RT:        Hi sister Mehrafrouz. This is Reza, are you well?

MP:        Hi. How are you? Are you there?

RT:        Sister Mehrafrouz, you should take care of Canadian forces especially those of Montreal. They are high quality forces for our fund raising over here.

MP:        [laughing] I think I should take care of Reza.

RT:        No sister, at this time you should only take care of them, until later.

TT:        No, Reza has come up with his commitment. I'm not much worried. We're only worried about those forces who don't have time.

(Later after the conference call was finished)

TT:        You're coming for the fund raising tomorrow,

63

right?

CW#1:     I...I can't come, sister...ha, ha, ha...

TT:       He is s scared and is trembling so much as if...

CW#1:     But if there is anything behind the scenes...I am ready for transportation...if I can.

TT:       The commitment for tomorrow is a separate issue.

CW#1:     Tomorrow, I'll be working.

(later in the conversation)

CW#1:     Well I don't know about tomorrow, but maybe another time...unless I...

TT:       Tomorrow everyone should either come for fund raising or they should pay the equivalent of one day's fund raising out of their own pocket.  With many people this is a reality.  They can't come, but we'll see about that.  With mobilization for fund raising.  Since our commitment is for that day and it's substantial, if we can't make up for it.

(later in the conversation)

TT:       We do want another kind of energy, but what we need the most is for the fund raising mobilization this is our job for four months and you know that.

(later in the conversation)

TT:       As far as that goes, if there is some other work somewhere else, I will tell you.  But tomorrow in return we should...

CW#1:     How much is that "in return part", $5,000.

64

TT:        The "in return part" is $300.  Leave the $5,000 for later.  But tomorrow is an exception.  Write your check and bring it.

82.  On October 17, 2000, CW#1 met with TAHAMTAN at the "kanoon" located at 12656 Marco Place, Los Angeles, California. The CW was equipped with body recorder and the meeting was consensually monitored.  From an interview of CW#1 immediately following the meeting and a review of the transcript of the conversation, which was in the Farsi language, I learned the following:

a.    CW#1 arrived at the "kanoon" and was greeted by TAHAMTAN.

b.    TAHAMTAN described two methods by which the MEK raises funds.

1)    She indicated that they get it from solicitations at LAX and describes this as the "money social matter".

2)    She indicated that they get it from solicitations from MEK members, supporters, and other Iranians. She describes this method as the "Iranian money matter".

c.    CW#1 negotiated with her about his involvement with the MEK fund raising activities.

1)    CW#1 was previously told on October 15, 2000 that he has to pay $300 if he is not fund raising at LAX.

2)    CW#1 proposed that he would give the MEK $150

65

and then volunteer part time with the MEK assisting in the fund raising effort.

d.    When the CW handed TAHAMTAN a check for $150 he asked her if it was going to the NLA.  TAHAMTAN confirmed that the money was going to the NLA thanking CW#1 by nodding her head in the affirmative.

e.    TAHAMTAN confirmed her presence in Berlin and New York City for the MEK operations described in paragraphs 69 and 76.

f.    Throughout the meeting the MEK was referred to as the organization or "Sazeman" in the Farsi language.

g.    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN:

TT:         ...How are you?  I hope you're well.  It's all a struggle for the commitment.

CW#1:     Well, it's hard man.

TT:         Yeah it's really hard.  He's saying the work should have some variety in it.  I said, this work of the Iranians. I'll give you the money work.  He said, I didn't say this one.  I said which one are you talking about then?

CW#1:     Money matter is the most difficult work.  It's very difficult.

TT:         The money matter because there are two kinds. One is money social...

CW#1:     Right

TT:       And one is...the Iranians.

CW#1:     Well, that one is different.

TT:       The money social matter has a difficult part and also an easy part.  In the difficult part you can't experience without humiliating yourself.  When you have experienced this once, then you'll move forward...you'll learn...whenever you have been in the money matter you know, man.

CW#1:     If you know why you are doing this, then it would be OK.

TT:       This is the ultimate goal.

CW#1:     If he thinks that he's begging.

TT:       Yeah man, from the first moment that one starts, one should consider the meaning of it... the Iranian money matter is also difficult.

CW#1:     Yeah, yeah, yeah, yeah, ha, ha, ha...

TT:       This is a battle.  This is not a battle for one or two pennies...when you go forward and ask for ten grand now...

(later in the conversation)

CW#1:     In short, forgive me...of course I'm giving you half of it now and the other half...

TT:       You'd give the other half later?

CW#1:     For that, whatever you preferred...or I may come one day to...

TT:       You would come one day, yeah.

CW#1:     I would come one day for the money matter.

TT:        We'd go only by ourselves. Nobody would come for the money matter.  Of course, going for the money matters...

CW#1:      Of course, I haven't been involved with money matters for years.

TT:        Right.

(Later in the conversation)

TT:        I have been all over the place.  I was here for a month.  I went to Berlin then I went to New York, I came here, then I went to...again.  I have not contacted him much.

(Later in the conversation)

CW#1:      ....This is for...anyway, this should go for our guys, should go to the other side, to the Liberation Army.

TT:        Thank you very much. (accepting the check for $150, nodding)

CW#1:      What else can I do.  Another thing is in regard to... of course, I'm asking your opinion on this...regarding this thing, this Alamout thing.

TT:        I also have told them personally.  I said, if you want to work everything should be within the framework of the organization's agenda.  You can't work outside that framework at all.  If the organization tells you to throw eggs, you should go and throw it...

83.  On October 24, 2000, CW#1 met with TAHAMTAN at the "kanoon" located at 12656 Marco Place, Los Angeles, California. The CW was equipped with body recorder and the meeting was

68

consensually monitored.  From an interview of CW#1 the following day on October 25, 2000, I learned the following:

a.    CW#1 arrived at the "kanoon" and was greeted by TAHAMTAN and Elaphe (last name unknown), a MEK member visiting from the United Kingdom.

b.    CW#1 was assigned to drive Elahe for the day and evening to meetings.

c.    The recording device was on for more than 10 hours.  CW#1 accompanied Elahe to meetings with various MEK members and supporters:

1)    CW#1 first drove to the residence of Amir Aram, who is a NCR member.  While at the residence AFSHARI arrived.

2)    CW#1 then drove Elahe to the residence of Monir Farahani.

3)    CW#1 then drove Elahe to the residence of Mitra Vatan.

4)    CW#1 then drove Elahe to a park in Chatsworth, California, for a meeting with other MEK members.

84.    On October 27, 2000, CW#1 met with TAHAMTAN and Mehrafrouz Peykarnegar, and other MEK members and supporters at the "kanoon" and other locations throughout the day.  CW#1 was equipped with a body recorder and the meeting was consensually monitored.  From an interview of CW#1, I learned the following:

a.    TAHAMTAN, Peykarnegar, and Elahe, made admissions

69

indicating that they were fund raising for the MEK and the NLA.

b.    TAHAMTAN asked the CW to go to LAX and assist in this fund rasing effort.

c.    CW#1 observed a MEK fund rasing chart that tracked the progress of the different MEK cells in other cities compared to the fund raising running total in Los Angeles.  MORADI's name was next to the entry for Los Angeles.  CW#1 read off the names and amounts on the chart into the body recorder.

85.  On November 3, 2000, CW#1 met with TAHAMTAN at the "kanoon" located at 12656 Marco Place, Los Angeles, California. CW#1 was equipped with body recorder and the meeting was consensually monitored.   From an interview of CW#1 I learned the following:

a.    CW#1 arrived at the "kanoon" on November 3, 2000, at approximately 10:30 AM.

b.    CW#1 met with TAHAMTAN, REZAIE, and Farhad, aka Hadi Nafis.

c.    The CW made the following observations inside the "kanoon":

1)    CW#1 observed MEK and NLA flags, icons, and pictures of MASOUD and MARYAM RAJAVI the leaders of the MEK and NLA.

2)    CW#1 observed a chart on the wall that tracked the progress of the MEK's fund raising effort compared to other MEK cells in the U.S. and abroad.   The name ALI REZA MORADI

appeared on the chart next to the entry for Los Angeles.

3)    CW#1 observed a desk or station for making identifications.  This station included a Poloroid camera, lamination machine, and assorted identification documents.  From CW#1's experience with he MEK this station was most likely used to create false identifications for MEK members traveling in and out of the U.S. and for making the CHR badges that the MEK members and supporters wear at LAX while fund raising.

4)    CW#1 observed MORADI arrive and pickup a package of documents.

5)    TAHAMTAN assigned CW#1 to stuff "MOJAHED" MEK newspapers with a fund raising flyer.

6)    CW#1 recalled that the MEK fund raising mobilization or "Baseej" this holiday season was named "OPERATION CHELCHELEH".

86.  On November 9, 2000, CW#1 was interviewed.

a.    CW#1 provided a tape of a recorded telephone conversation between himself and TAHAMTAN in which she asked him to come to the "kanoon" on November 3, 2000.

87.  On November 14, 2000, CW#1 was interviewed.

a.    CW#1 provided a consenually recorded tape of a telephone conversation he had with TAHAMTAN on November 14, 2000, at approximately 9:05 AM.  From an interview of CW#1 following the telephone conversation and a review of the transcript of the conversation, which was in the Farsi language, I learned the

71

following:

b.    TAHAMTAN made statements which indicated that she was aware that fund rasing for the MEK was illegal in the U.S. This admission was in the form of her caution in involving CW#1 in MEK fund raising activity.

1)    TAHAMTAN told CW#1 that it was a bad idea for him to fund raise at LAX for the MEK.  She indicated that because of his arrest, he might draw unwanted attention from law enforcement authorities to the MEK's fund raising effort.

2)    TAHAMTAN indicated that this decision had come from the Washington D.C. area MEK headquarters.

b.    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN:

TT:        ...Yes.  We also have already talked about the fund raising.

CW#1:    Right.

TT:        Also to let you know it easily, yourself.

CW#1:    Right.

TT:        Because of those things that there were (CW#1's arrest)...

CW#1:    Aha!

TT:        I had a chat with our guys...They said, because over here... you, know, man... it's (U.S. Government's) entire system is after picking a quarrel for this matter of ours.

CW#1:    Yes that's right, that's right, yeah, yeah.

72

TT:        I said, No problem. Tell Mehdi this is our dilemma.  Otherwise, we are dying to find someone to come and go after the fund raising for two hours.

CW#1:      That's right, yeah.

TT:        Mehdi himself would also probably understand where this contradiction comes from.  Because we can't do the thing with open hands.

CW#1:      Yeah, that's O.K.

TT:        So I think it's clarified for you.

CW#1:      Yeah, yeah, yeah, completely.

TT:        This is why, despite of our willingness for you to come, but because of that limitation (CW#1's arrest), we have to consider this dilemma.

88.  On November 16, 2000, SA Reed Jones and I conducted a physical surveillance at LAX.  I observed AHMADY, among other MEK solicitors, at the Tom Bradley Terminal.  AHAMADY and the other MEK solicitors were wearing pink identification badges with the name CHR.  They were using "picture notebooks" to show primarily Asian travelers pictures of starving children and Iranian government atrocities.

90.  On November 27, 2000, CW#1 was interviewed.

a.   CW#1 described the MEK fund raising money trail from Los Angeles to the MEK's NLA as follows:

1)   The money is raised by solicitation under the cover of the CHR at LAX and by donations from MEK sympathizers,

73

supporters, and members.

2)    The money is then either deposited into the accounts of a particular MEK member or supporter, or it is hand carried to the Washington D.C. area cell.  CW#1 identified two account one of MORADI and the other of R. Alipour, both at Bank of America.

3)    From either the accounts in Los Angeles or the accounts in Washington D.C. the money is wire transferred overseas to Europe, United Arab Emirates, or Jordan.

4)    CW#1 indicated that all the money goes to the MEK's NLA and none of the money goes to starving children or refugees as the CHR solicitors at LAX claim.

b.    CW#1 indicated that TAHMINEH is currently the individual who is the overall responsible MEK leader in charge of this fund raising effort in Los Angeles.

91.    On December 1, 2000, an FBI surveillance at LAX observed AHMADY, among other MEK solicitors, at the Tom Bradley Terminal at LAX.  AHMADY was primarily approaching Asian travelers and using a "picture notebook" to show primarily Asian travelers pictures of starving children and Iranian government atrocities.  The MEK solicitors were wearing a pink identification badge with name CHR.

a.    On January 22, 2001, CW#1 was shown the FBI surveillance tape from this surveillance and interviewed.

1)    CW#1 identified AHMADY as one of the MEK

74

solicitors.

2)    CW#1 indicated that from his experience fund rasing for the MEK in France, and from AHMADY's overall mannerism and body language, AHMADY was operating as the fund raising team leader.

3)    CW#1 pointed out that AHMADY was only targeting Asian travelers because the MEK believes they are often confused and disoriented and more susceptible to solicitation.

b.    The CW recalled that as previously reported, in past conversations, AHMADY has admitted to CW#1 that he fund raises at LAX on behalf of the MEK under the cover organization, CHR.

92.    On December 6, 2000, CW#1 met with TAHAMTAN and other MEK members and supporters at the "kanoon" and other locations throughout the day.  CW#1 was equipped with a body recorder and the meeting was consensually monitored.  From an interview of CW#1, a review of the transcript of the conversation, which was in the Farsi language, and a physical surveillance I learned the following:

a.    On December 6, 2000, SA Reed Jones and I, conducted a physical surveillance of the "kanoon" located at 12656 Marco Place, Los Angeles, California.  At approximately 4:00 PM, I observed CW#1 arrive at the "kanoon".  At approximately 4:45 PM, the CW departed the "kanoon" with TAHAMTAN in the back seat, and later identified Farhad, aka Hadi Nafis in

75

the front seat.

b.    CW#1 was summoned to the "kanoon" by TAHAMTAN so he could drive her around Orange County, California, in order for her to collect money from MEK supporters for the NLA.  CW#1 arrived at the "kanoon" at approximately 4:00 PM and met with TAHAMATAN and Farhad, aka Hadi Nafis.  When CW#1 arrived at the "kanoon" a group of MEK members and supporters had just arrived from LAX where they had been fund raising on behalf of the MEK under the cover of the CHR.

1)    CW#1 recognized the familiar CHR "picture notebooks" they were carrying.  CW#1 also observed numerous MEK and NLA flags, icons, and pictures of MASOUD and MARYAM RAJAVI placed around the "kanoon".

2)    MORADI was present for the conversation and had arrived with the other MEK LAX solicitors.  One of the solicitors was Jahanfar and was bragging to TAHAMTAN about his solicitation efforts.

3)    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN and "JF" representing Jahanfar:

TT:        ...In all European countries the youth pay good money.

JH:        In Europe it's easy because the guys work for cash and also get social security.  But in Australia the guys are not lazy.

76

JH:        Fund raising is good at eight(8).  It's good from eight(8) to six(6) P.M.

TT:        Sometimes, we jump off at five(5) A.M. until twelve(12) Midnight.  But the hours of fund raising is from 8:30 AM...9:00 AM to 8:00 PM.  Our guys who used to go on those days...They would go from morning to 1:00 AM or 2:00 AM.  The airport is not crowded means nothing.

CW#1:      The airport is always crowded.

TT:        The airport won't particularize when it's crowded or when it's not crowded.  There might be a flight arriving at 1:00 AM.

c.    TAHAMTAN,  Farhad, and CW#1 then went in CW#1's car and drove to the business owned by OMIDVAR located at Prestige Jewelry, 783 S. Main Street, Orange, California, 92868, (714) 543-4030.  The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN:

TT:        We are going to Orange County, for the fund raising.

1)    CW#1 indicated that OMIDVAR is a long time financial supporter of the MEK and the NLA and is considered the rank of "S1" or supporter.  The purpose of the trip was for TAHAMTAN to solicit $12,000 from OMIDVAR for his part of the fund raising mobilization or "Baseej" of the MEK.

2)    CW#1 participated in a discussion with OMIDAVR, OMIDVAR's wife, and TAHAMATAN at the business.

77

3)    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN, "MO" representing MOHAMMAD OMIDVAR, and "FH" representing Farhad, aka Hadi Nafis:

CW#1:    ...No, well, Fredman is not my lawyer.  He is Masoud's lawyer.  He is Masoud's lawyer.  He is a good Lawyer.

MO:    He knew about the organization better then us.

(later in the conversation)

TT:    Sign these, but don't look at them.

MO:    I should see what it is.  What do you mean?

TT:    There is no asking questions about the relationship with the organization.

MO:    Should I sign here.

(later in the conversation)

MO:    Last year, one of the brothers came and talked for two hours.  At the end I gave him twelve(12) checks for the future year.  $100 dollars a month.

TT:    Guys are smart.  They are paying for one year and relieve themselves.

CW#1:    The organization should open a section for the handicap of fund raising. Ha, Ha, Ha,...

(later in the conversation)

MO:    They have thrown rotten egg plans...gradually the guys are getting equipped with arms.

(later in the conversation)

78

TT:        Now that you have finished your work...Are you going home?

MO:        Yeah.

TT:        Can we also come, since his house is on the alley next to your home.  I wish Alireza was here to tell you something funny.  He said, I went for the encounter with one of our guys. One of our guys talked to the guy for the whole night.  At the end the guy took his credit card out and said, take it.  Go and do what ever you want with it.  Then tear it up and throw it away.

MO:        Kazem Rajavi, may God forgive him, said, You give one finger of yours to the Mujahedin and they will take your shoulder off.  You think our guys don't like to do something! They would have gone inside (Iran) if there had been a way.  And this is the only answer.

CW#1:      Yeah, man.

MO:        He said thousands of people have demonstrated against Khatami (President of Iran), Death to the dictator. Freedom of thoughts does not get along with beard and wools.

c.    From OMIDVAR's business TAHMINEH rode in OMIDVAR's car and Farhad rode with CW#1.  They went to OMIDVAR's residence. Among other conversations, TAHAMTAN pressures OMIDVAR for $12,000 for the MEK this year.  This conversation comes out while they are arguing about another MEK supporter who is avoiding TAHAMTAN and does not want to pay $5,000.  OMIDVAR argues that $12,000 is

79

too much for himself but eventually concedes.

1)    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN, "MO" representing MOHAMMAD OMIDVAR, "M" representing OMIDVAR's wife, and "FH" representing Farhad, aka Hadi Nafis:

TT:    Lets go to "kanoon", the house of RAJAVI Iran, Iran RAJAVI.  Then play for us.

(later in the conversation)

MO:    I'm telling her five grand...but she is saying, No he has got money.

M:    He is willing to pay five grand, himself.

MO:    This poor guy is ready to pay five grand, but he thinks she (TAHAMTAN) is going to say no.  He is willing to pay the five grand but she is not accepting.

TT:    He has made appointments to come two to three times...

MO:    She is saying. No more five grand.

CW#1:    Now it is fifty grand.

TT:    Now it is twelve grand, brother Mohammad(OMIDVAR), twelve grand.

MO:    I wrote twelve checks of $100 each to that brother.  He said let me go and buy a Coke for you.  He must have died by now...brother Ghodrat...may God forgive him.

M:    Have some food sister Tahmineh (TAHAMTAN) and talk about it later.

80

TT:        If I eat, I won't be able to move.

MO:        Now sister is only after twelve grand.

TT:        Twelve grand.

(later in the conversation)

TT:        No, it is too late now.  I'm not going there anymore.  I will tell him. If you are a supporter of the organization then you need to be a supporter...you should come yourself.

93.  On December 15, 2000, CW#1 was interviewed.

a.    CW#1 indicated that he was called on December 14, 2000, at approximately 9:55 PM by a MEK member named Nahid from Germany.   TAHAMTAN had passed CW#1's name to Nahid.

1)    Nahid instructed CW#1 to obtain a post office box so he could use it as a return address on MEK propaganda that was to be sent into Iran.

2)    Nahid told the CW that she would email him the addresses of the individuals who should receive this MEK propaganda.

b.    CW#1 consensually recorded the conversation and provided the tape of the conversation during the interview.

1)    From the transcript it was clear that Nahid had received CW#1's name and telephone number from TAHAMTAN.

2)    Nahid also indicated that she was with the MEK and that she wanted CW#1 to mail miniature MEK newspapers into Iran to a list of individuals who Nahid would provide via

Email.

94. On December 22, 2000, SA Reed Jones and I, conducted a physical surveillance of LAX. I observed AHMADY, among other MEK solicitors, at the Tom Bradley Terminal at LAX. AHMADY was primarily approaching Asian travelers and using a "picture notebook" to show primarily Asian travelers pictures of starving children and Iranian government atrocities. The MEK solicitors were wearing pink identification badges with name CHR.

a. I interviewed Mrs. Shiho Tillman, a Japanese national, after I observed her being solicited by one of the MEK solicitors, immediately following the solicitation. She was cooperative and provided information about the solicitation.

1) At approximately 11:00 AM she was approached by two Iranian males carrying "picture notebooks" and wearing pink identification badges. They looked official and appeared to be with a government organization.

2) They told her that they were representing the CHR and provided her with a pink CHR business card with the address 8703 La Tijera Blvd., Suite 204, Los Angeles, California, 90045, (310) 216-6858.

3) They showed her pictures of starving children and Iranian government atrocities and told her that they were seeking donations to help the starving children who were refugees.

4) She signed a petition and gave them $20.

5)    Mrs. Tillman indicated that she is a Department Manager for a major company and travels routinely between Japan and Los Angeles.

b.    On January 22, 2001, CW#1 was shown the FBI video surveillance tape of the MEK solicitors from December 22, 2000.

1)    CW#1 identified AHMADY on the tape.

2)    CW#1 pointed out the specific details of AHMADY's solicitations that are unique to the MEK's fund rasing operation.  These unique details included but were not limited to the following:

i.    The use of "picture notebooks" that are filled with pictures of starving children

ii.    Emphasis on targeting Asians, because of the MEK's belief that Asian traveling through LAX are often confused and more vulnerable to their solicitation.

iii. The overall mannerism and body language of AHMADY.

iv.    These same techniques were used when CW#1 solicited for the MEK in the past in France.

95.  On December 27, 2000, SA Reed Jones and I, conducted a physical surveillance of LAX.  I observed three, unidentified MEK solicitors, at the Tom Bradley Terminal at LAX.  They were primarily approaching Asian travelers and using "picture notebooks" to show pictures of starving children and Iranian government atrocities.  The MEK solicitors were wearing a pink

83

identification badge with name CHR.

a.    I interviewed Mr. Ari Satt, a Thai national immediately after I observed him being solicited by one of the MEK solicitors.  He was cooperative and provided information about the solicitation.

1)    At approximately 11:55 AM, Mr. Satt was approached by an Iranian male carrying a "picture notebook" and wearing a pink identification badge.  He looked official and appeared to be with a government organization.

2)    The Iranian male told Mr. Satt that he was representing the CHR.

3)    The Iranian male showed Mr. Satt pictures of starving children and Iranian government atrocities and told him that he was seeking donations to help the starving children who were refugees.

4)    Mr. Satt signed a petition and gave them $5.

5)    Mr. Satt indicated that he is a student and tourist from Thailand.

b.    On January 29, 2001, CW#1 was shown the FBI video surveillance tape of the MEK solicitors from December 27, 2000.

1)    CW#1 recognized one of the solicitors as Khashayar (last name unknown).  CW#1 had previously seen this individual at the "kanoon" on multiple occasion taking direction from TAHAMTAN and MORADI.

2)    CW#2 recognized the other MEK solicitor as

84

MAJID (last name unknown) and that he had also seen him at the "kanoon" taking direction from TAHAMTAN and MORADI.

3)    CW#1 pointed out the specific details of their solicitations that are unique to the MEK's fund rasing operation.  These unique details included but were not limited to the following:

i.    The use of "picture notebooks" that are filled with pictures of starving children

ii.    Emphasis on targeting Asians, because of the MEK's belief that Asian traveling through LAX are often confused and more vulnerable to their solicitation.

iii. The overall mannerism and body language of the solicitors.

iv.    These same techniques were used when CW#1 solicited for the MEK in the past in France.

96.    On January 5, 2001, SA Reed Jones and I, conducted a physical surveillance of LAX.  I observed AHMADY, among other MEK solicitors, at the Tom Bradley Terminal at LAX.  AHMADY was primarily approaching Asian travelers and using a "picture notebook" to show pictures of starving children and Iranian government atrocities.  The MEK solicitors were wearing pink identification badges with the name CHR.

a.    I interviewed Mr. Sugiawa Noriyuki, a Japanese National, immediately after I observed him being solicited by AHMADY.  He was cooperative and provided information about the

85

solicitation.

1)     At approximately 12:15 PM, Mr. Noriyuki was approached by an Iranian male who was carrying a "picture notebook" and wearing a pink identification badge. Mr. Noriyuki identified AHMADY by pointing at him as the Iranian male who had solicited him. AHMADY looked official and appeared to be with a government organization.

2)     Mr. Noriyuki indicated that AHMADY told him he was with a government organization and that Mr. Noriyuki was required to give money for starving children.

3)     AHMADY showed Mr. Noriyuki a "picture notebook" filled with pictures of starving children .

4)     Mr. Noriyuki indicated that he tried to give AHMADY $20 but that AHMADY told Mr. Noriyuki that because Mr. Noriyuki was Japanese that Mr. Noriyuki was required to give $50. Mr. Noriyuki then gave AHMADY $50.

5)     Also present for the interview was Ichiro Takahashi a manager at the LAX Duty Free retail store who acted as a translator.

b.     I interviewed Mr. Chou Chi, a Chinese National, immediately after I observed him being solicited by AHMADY. Mr Chi was cooperative and provided information about the solicitation.

1)     At approximately 12:30 PM, Mr. Chi was approached by an Iranian male who was carrying a "picture

86

notebook" and wearing a pink identification badge.  Mr. Chi identified AHMADY by pointing at him as the Iranian male who had solicited him.  AHMADY looked official and appeared to be with a government organization.

2)    Mr. Chi indicated that AHMADY told him he was with a California government organization and that Mr. Chi was required to give money for starving children.

3)    Mr. Chi gave $20 to AHMADY.

4)    Mr. Chi indicated that he is traveling from China, through LAX, on this way to Las Vegas and that he is a Sales Manager for Kokka Group Company, Ltd.

c.    I interviewed Mr. Zhibin Deng, a Chinese National National, after I observed him being solicited by AHMADY, immediately following the solicitation.  He was cooperative and provided information about the solicitation.

1)    At approximately 12:30 PM, Mr. Deng was approached by an Iranian male who was carrying a "picture notebook" and wearing a pink identification badge.  Mr. Deng identified AHMADY by pointing at him as the Iranian male who had solicited him.  AHMADY looked official and appeared to be with a government organization.

2)    Mr. Deng indicated that AHMADY told him he was with a California government organization and that Mr. Deng was required to give money for starving children.

3)    Mr. Deng gave $20 to AHMADY.

4)    Mr. Deng indicated that he is traveling from China, through LAX, on this way to Las Vegas and that he is a Sales Manager for Konka Group Company, Ltd.  He was traveling with Mr. Chi also a Sales Manager with the same company.

d.    On January 18, 2001, CW#1 was shown the FBI video surveillance tape of the MEK solicitors from January 5, 2001.

1)    CW#1 identified AHMADY on the tape.

2)    CW#1 pointed out the specific details of AHMADY's solicitations that are unique to the MEK's fund rasing operation.  These unique details included but were not limited to the following:

i.    The use of "picture notebooks" that are filled with pictures of starving children

ii.    Emphasis on targeting Asians, because of the MEK's belief that Asian traveling through LAX are often confused and more vulnerable to their solicitation.

iii. The overall mannerism and body language of AHMADY.

iv.    These same techniques were used when CW#1 solicited for the MEK in the past in France.

97.  On January 5, 2001, CW#1 was called on his cellular telephone by TAHAMTAN.  TAHAMTAN told CW#1 to be at a meeting at the "kanoon" located at 12656 Marco Place, Los Angeles, California, on January 7, 2001, at 5:00 PM.

98.  On January 7, 2001, CW#1 met with TAHAMTAN and other

88

MEK members and supporters at the "kanoon".  CW#1 was equipped with body recorder and the meeting was consensually monitored. From an interview of CW#1, I learned the following:

a.    The meeting was led TAHAMTAN.  Also present among other MEK members and supporters were AHMADY, AFSHARI, ESHKOFTEGI, and MORADI.  AHMADY was acting in a leadership role as well.

b.    Also present was a MEK member who the CW could only identify as Sister Ezet (last name unknown) who was wearing a NLA uniform.

c.    The meeting was a MEK intelligence brief given by TAHAMTAN.  TAHAMATN discussed the recent defection of Jamshid Tafreshi from an Iranian intelligence service.  She provided some of the details of Tafreshi's story and gave trade craft details that the MEK had learned from Tafreshi.  She cautioned the MEK members and supporters present to be on the lookout for any of these trade craft techniques and to report any such activities to her immediately upon discovery.

d.    The second part of the meeting was a memorial service for a high ranking NLA commander named Mahmoud Mahdavi, who had recently died of cancer in Iraq.  TAHAMTAN then showed a MEK propaganda video about Mahdavi.

e.    After the meeting CW#1 spoke to AHMADY and talked about his fund raising efforts at LAX on behalf of the MEK.

99.  On January 22, 2001, CW#1 was shown a video tape of a

KCBS Channel 2 News investigative report that aired in early 1998. CW#1 made the following observations:

a. CW#1 identified the following MEK members and supporters, among others, on the video tape that were filmed by KCBS Channel 2 News soliciting at LAX for the MEK under the cover of the CHR:

1) AHMADY. CW#1 indicated that as previously reported, AHMADY solicits at LAX on behalf of the MEK under the cover of the CHR. CW#1 indicated that in past conversations AHMADY admitted that he was fund raising on behalf of the MEK under the cover of the CHR. CW#1 specifically pointed out each time he observed AHMADY during this Channel 2 News investigative television report.

2) AFSHARI. CW#1 indicated that as previously reported, AFSHARI solicits at LAX on behalf of the MEK under the cover of the CHR. CW#1 indicated that in past conversations AFSHARI admitted that he was fund raising on behalf of the MEK under the cover of the CHR. CW#1 specifically pointed out each time he observed AFSHARI during this Channel 2 News investigative television report.

3) ESHKOFTEGI. CW#1 pointed to ESHKOFTEGI during one of the clips of the report and indicated that he was wearing a CHR badge and carrying a CHR "picture notebook". CW#1 indicated that ESHKOFTEGI was present for the past meeting regarding fund rasing and was present for the conference call

90

with MASOUD RAJAVI in which the MEK designation was discussed.

100. On January 22, 2001, a FBI surveillance identified the "kanoon" at 12656 Marco Place, Los Angeles, California.

a.    Two-story stucco residential home with white trim. The house is clearly marked with the number 12656 below the front window sill to the left of the front entrance.

b.    The driveway to the left of the entrance leads to a rear detached one-car garage.

c.    The second story of the residential home is offset to the rear of the residence.

d.    Six photographs were taken of the front of the residence and were reviewed by SA Reed Jones and me. SA Jones and I identified the photographs to be of the residential home that CW#1 has entered for meetings with MEK members and supporters on numerous past occasions.

101. On January 23, 2001, Larry Chong, was interviewed.

a.    Larry Chong is the former employer of Mahmoud Rajabzadeh Mashhadi who I arrested on January 5, 2000.

b.    Upon Mashhadi's release from INS, I reinterviewed Chong.  Chong was again friendly and cooperative.  Chong had no information regarding Mashaddi's involvement with the MEK nor did he know Mashhadi's current residence.  Chong did advise that he was in possession of some abandoned property of Mashhadi.  Chong provided the following items:

1)    a UCA 30 Broadcast Video Cassette.

2)    a VHS tape.

c.    On January 23, 2001, I reviewed the VHS tape that I obtained from Chong.  The VHS tape was a MEK training video detailing the MEK fund rasing effort at LAX.  During my review of the VHS tape which was in the Farsi language I observed the following:

1)    Interviews of MEK fund raisers at LAX and at the "kanoon".  Including interviews with AHMADY.

2)    An awards ceremony in which MEK subjects received awards and trophies for their fund raising effort at LAX.  These awards and trophies had NLA icons on them that show that the fund raising is for the NLA.  One of the presenters of the award is an Iranian female wearing a NLA uniform who I identified as Mahnaz Samadi.  Present for the ceremony among other MEK members and supporters were AHMADY, AFSHARI, TAHAMTAN, REZAIE and Farhad, aka Hadi Nafis.

3)    Pictures of NLA fighters performing training, maneuvers, and other violent activity.

4)    Alternating pictures of CHR fund raisers wearing the CHR badges and the "picture notebooks" and NLA fighters in Iraq.

5)    A speech by AHMADY.

6)    REZAIE receiving a trophy with an NLA icon on the trophy.

d.    On or about January 25, 2001, FBI language

92

specialist Behrooz Sarshar translated the video.  The video tape which is mostly in the Farsi language with some English parts is titled "Jump of the Lion".  Some of the specific portions are translated as follows with subjects AHMADY, AFSHARI, REZAIE, and TAHAMTAN all participating and speaking as follows:

Female Iranian MEK speaker, Sister Behjat:

Our work starts at 7:00 A.M. in the various Terminals, and ends at 12:00 Midnight. Los Angeles airport consist of seven domestic and one international terminals.  In fact, we work in eight different terminals.

(Farhad, aka Hadi Nafis, Mousa (LNU), aka Shervin (LNU) and a short Iranian male with a mustache who is know as Alireza (LNU) are shown while going to LAX.)

(MEK members and supporters singing a song together: Nasser Haddad is sitting next to the singer)

"Until with the fire we enlighten the night and.. until the night will end....Get up and end this oppression...."

(Majid (LNU), Alireza (LNU), Nasser Haddad and Farhad, aka Hadi Nafis are getting in a van)

Sister Behjat:

The work's trend is that the guys will come to the work right after they have their Morning Prayers at 5:30. They go in 5 to 6 bunch of guys to the good Terminals that are with the higher landings and more passengers. Usually, early morning flights are from Japan, Hong Kong and Taiwan. The first shift in fact, starts

93

from 6:30 A.M. in the Terminals.  The second group join them at 7:00 and the third group at 8:00 A.M. They have breaks at 1:30 P.M., 2:30 P.M.  Then another group goes 4:00 P.M. and then at 5:00 P.M. and 6:00 P.M. until 9:00P.M. 10:00 and they work until 12:00 midnight. Actually we work from 6:30 A.M. until 12 midnight in Los Angeles Airport.  The guys struggle a lot.  And most of the time, almost you can say for sure that all the guys and those who come for the 3rd shift they work straight until 12:00 O'clock, including those who will work the next early morning. We have problem with the guys, for that, they all want to work full time from the early morning, until midnight.  There are not enough flights to absorb all these guys. We have some how, arranged with the necessary scheduling to satisfy all the guys, as long as we can.  Noon time is the same way.  Even though we told some of our guys to go back and rest for couple of hours, however, after 1:30 we start to receive phone calls to the station, for their willingness to work straight, without any breaks. They want to stay in the Airport and have their lunch over there. We have to, sometime, to make them to go.  We usually give up to their wishes.

(Air Plane flight sounds).

MARYAM (LNU) who's wearing blue scarf and glasses and a blue outfit speaks to a passenger in English:

My name is MARYAM and I am from Iran. Do you speak Arabic?.. No?, Okay. Our main purpose is helping the victims of Iran. We

94

are all volunteers and working very hard.  We are a group of medical doctor and nurse students.  We are collecting money for the children and any other victims of Iran.

(MUSTAFA AHMADY, Mousa(LNU), aka Shervin(LNU) and Alireza are talking to different travelers at LAX.)

Maryam(LNU), with blue scarf:

To me this year is different with any other years in the past. We are more eager and motivated for having strong and unbreakable tie with Sister MARYAM (RAJAVI), after her recent victories, specially in Norway. It is very clear to us that what a wonderful job she has done in the recent years. The guys are willing to do anything for her sake. And reach to their goals and their undertaking.

Mohammad Afshar speaking to a traveler in English:

Excuse me, Gentleman, we are campaigning for the Human Right Violation in Iran. Unfortunately, in Iran, many, many people have been executed by the regime of Khomeini.

Mohammad Afshar speaking in Farsi:

I am engaged in this holly cause for about four weeks.  And I am so happy to participate in this good work. That is the service for the nation and the people of Iran. Specially, to be beneficial for the Mojahedin.

Sister Behjat, aka Tahereh:

If we take Los Angeles, as whole, beside those who are specifically are assigned, the groups are consist of the forces

95

of different groups.  There are in these groups volunteers from teachers and there is a man who has a printing shop. They left all their family back to serve for this cause. He used to work last year but he works this year too.  One other guys has jewelry shop and does miscellaneous work in a hotel and so forth. They are engineers and business men and all heading for one goal in this cause.  They all are trying to reach to their undertakings. Ahmad(LNU), aka Ahmad Berkeley is speaking to a traveler:

No, excuse me....

(Nasser Haddad is speaking to a traveler.)

Female Iranian speaker:

It would be impossible for me to do these kinds of work alone, because it is a difficult work.  But when I see to the larger and deeper scope, even though it is difficult but any time I go through these file, and see the pictures the job become so easy.  We get also moral support from the people. That is the reason the job is nearly easy for me.

Feamle Iranian speaker to a traveler:

I appreciate your help, thank you. I am sure this....

Maryam (LNU) with blue scarf:

This is the simplest job for me. It is easy and sweet.  It is very sweet, specially when you get the money and the money goes to the Liberation Army.  This pleases the brothers and sisters. Of course, it is the sweetest job, then.

Iranian female speaker, to a traveler in English:

Excuse me. Excuse me. How are you? We are volunteers for the violation of the Human Rights. Is it for real? Yes. I have already signed that. Thank you very much. Thank you. Appreciate it.

Reza Esfahani:

It is not that difficult. If some one has deep faith for democracy in Iran and the success for "Mojahedin-e-Khalgh", specially the Liberation Army, it doesn't have any difficulty, if one decides.

Mohammad Afshar:

You choose the right person among the passengers. If there are few, you choose the one who is likely a nice guy. Ha, ha. You choose the one who put his hand easier in his or her pocket, and pays more. You can say by looking at them.

Majid (LNU):

Here is the International Airport, and we have permit to work in here.  It is a very good opportunity to meet people who come from different countries and inform them of our cause. With regards to our work, basically is showing our documentary photos and the report from different Human Rights organizations. Also informing them of the condition of families who are in different ways, persecuted by the Khomeini regime. Naturally, after informing them of the regime's oppression we ask for the aids.

It is around one month that I started this work along with other guys.  I am proud for such a work in many respects.  One

97

becomes happy from deep in his or her heart when you inform the
people for the crimes committed by the Khomeini's regime.  And
what has happened to the people, in general. And what..and what
effective steps they can take to prevent it.

(Music in the background)

(Mohammad Reza is showing a CHR "picture notebook".  Farhad, aka
Hadi Nafis, and MUSTAFA AHMADY are soliciting travelers speaking
and using the same "picture notebooks".

Iranian female:

Truly speaking, I am very much hopeful. Specially the
obligation which are assigned to us are higher than what we can
do.  But I can see a clear view for successful achievements. I am
sure the struggle that our guys are doing will reach our goals.
The domestic and international games are coming up and we will
have a better crowd.

(At the "kanoon" clapping and singing together. MUSTAFA AHMADY,
HASSAN REZAIE, Majid (LNU), Iraj (LNU), Farhad, aka Hadi Nafis,
Reza Esfahani,  and Mohammad Reza are singing)

"...We pray God that this year shall be the last year to
succeed".....

Iranian male:

I met two ladies from Thailand. One was in her 50's and the
other one was in her 30's. When I showed the picture and
described about the things she pick up one $100 bill from her
wallet. I thought she is going to give it to me. But she did not.

98

She gave it to her mother. And the mother with special bowing gave it to me ,just like gesture in the movies. I was very impressed.

(Clapping and singing together at the Kanoon, TAHMINEH TAHAMTAN, Fahimeh Azarani and other Iranian females are among the singers):

....."We will take MARYAM (RAJAVI) to Tehran, with the help of Liberation Army of Iran...."

(HOSSEIN AFSHARI, Mehran (LNU), Mohammad Afshar, MUSTAFA AHMADY also singing the same song)

MUSTAFA AHMADI:

We were looking for subject until the late in the day when we met a sister,...a lady from China. I started to talk to her. She said I am Moslem.  And she apologized for not having a vail on her head. She said I know your leader, but I don't remember her name. We gave her some time to remember.  (group laughing). Then we help her and asked her, if the leader is she or he?  She said is a she.  I realized that she has become close. I asked her say her first name. She still would not remember. Shahram helped her out and put "MARYAM (RAJAVI)" word in her mouth. She said yes, yes. That was very interesting and emotional to see that Chinese.

(Clapping together and singing, MUSTAFA AHMADY, TAMINEH TAHAMTAN, HASSAN REZAIE, HOSSEIN AFSHARI, Morteza Kashani, Reza(LNU), Mohammad Reza, Farhad, aka Hadi Nafis, Maryam (LNU), and Golnaz Javeher (a former Los Angeles cell leader,  are among other MEK

99

members and supporters)

"Get up to put a fire in the streets and parks...Until we release Iran from the ties and prisons..."

Iranian male:

One should have high hopes and it may in each second the things will change and we fly home. (clapping together) (Clapping and singing together are  HASSAN REZAIE, HOSSEIN AFASHARI, TAHMINEH TAHAMTAN, MUSTAFA AHMADY, Nasser Haddad, Morteza Khashani, Golnaz (Javerheri), Mehran (LNU), Fahimeh Azarani, Farhad, aka Hadi Nafis, aamoung other MEK supporters and members):

"Our expectation is over and this is the last year...This is MARYAM and MASOUD's (RAJAVI) year...."

Iranian female:

In deed you deserve this castle. Ha, ha (clapping) (Trophy award to Iranian Female):

It says (on the trophy) on it..With the "National Liberation Army of Iran" and the next, "With the Liberation Army we will become the wave and storm until we will take "Simorgh" (A fabulous bird) to the peak of the Demavend Mountain. (Clapping together).

(HASSAN REZAIE is observed receiving a fund raising award with a NLA icon on top of the trophy)

(A training skit acting in jest and making fun of Asians, and Latinos, along with laughing and clapping together, Farhad, aka

100

Hadi Nafis is one of the Actors)

Sister Behjat, aka Tahereh:

We are looking forward to accomplish our mission and fly back to Iran.   (Monir Farahani is seen.)

Iranian male:

As sister Tahereh expressed we all are anxious some day fly back to Iran. Our love is over there. That is why we are working so hard in here.  At the end of this conflict we will go back.

Iranian male:

Our love is over there. Our place is over there.  Yes that is for sure. God will help us. One of my goals is going back to Iran. This airplane flies where all our hearts are over there. (Music. MEK patriotic music playing in the background of images of the NLA training and paramilitary/terrorist operations)

    e.   On January 23, 2001, CW#1 was shown this video.

    1)   CW#1 watched the tape and made observations based on his experience in the MEK.  Specifically with experience in fund raising for the MEK in France.  CW#1 then made notes of his observation which he used to give details following the viewing. CW#1 was asked to comment on the video after viewing.

    2)   CW#1 immediately identified the video as a MEK fund raising video.  These types of videos are made and distributed by the MEK to NLA fighters in Iraq to increase moral and show them that their supporters in Los Angeles are doing their share to support their paramilitary and terrorist efforts

in Iraq.

3)    CW#1 was very surprised that the FBI was able to obtain this video and indicated that this program is rarely shown in the U.S.   The CW indicated that he had previously seen videos like this when he was in France fund raising.   CW#1 pointed out at the beginning of the video that the MEK's NATIONAL LIBERATION ARMY(NLA) training camps were shown as an introduction. Following this a MEK member is interviewed describing the specific details and physical layout of LAX.   This MEK member then describes how they are at LAX fund raising on behalf of the MEK under the cover of the CHR.   She indicates that the funds are going to support the MEK's NLA.

4)    CW#1 indicated that the video then turns to a group of MEK members beginning their day of fund raising.   They are shown traveling to LAX in a yellow van along the 405 freeway south.   CW#1 recognized one of the MEK fund raisers as Farhad, aka Hadi Nafis.   CW#1 recognized the van and indicated that it was used by the Los Angeles cell of the MEK a few years ago (1998 or 1999) and that it came from Canada.   CW#1 pointed out the Canadian license plate on the van.   CW#1 indicated that he knew most of the MEK members in the van and recognized the "picture notebooks" they were carrying as the MEK's CHR "picture notebooks".   He then described how the video shows how they are dropped off at each terminal in LAX.   After a short while they are observed focusing their solicitation efforts on Asians.

102

Again, CW#1 indicated that the solicitors are told to target Asians because of the MEK's belief that Asians are often disoriented and vulnerable to their solicitation.

5)    The video then turns to MEK fund raisers making testimonials.  They are speaking in Farsi and indicate that it is hard work but they endure it because it is for the MEK and the NLA.  One Iranian female MEK member wearing a blue outfit with a blue scarf is filmed speaking in English to a traveler at LAX and tells her that she is with a group of doctors and nurses fund raising for starving children.  CW#1 indicated that none of the individuals shown on the video are doctors or nurses.  CW#1 indicated that most are currently MEK members and are in Iraq fighting for the NLA.  After this claim that she is with a group of doctors and nurses this same Iranian female(with the blue scarf) makes a testimonial on the video that the money is really going to the NLA.

6)    CW#1 observed both MUSTAFA AHMADY and HOSSEIN AFSHARI on the video. AHMADY spoke about fund raising efforts on behalf of the MEK and the NLA.  The CW specifically pointed out both AHMADY and AFSHARI at various times of the video.

7)    The video then cuts to the inside of a residence.  CW#1 identified the inside of the residence as 3721 Oceanview, Los Angeles, California.  CW#1 indicated that he had been inside this location many times before and recognized the

103

inside as that of the previous location of the MEK base or "kanoon".  The CW indicated that the new location of the "kanoon" is 12656 Marco Place, Los Angeles, California.

8)    The video shows an award ceremony celebrating the fund raising efforts of the MEK solicitors.  The CW pointed out the trophies that were being awarded as having icons of the MEK's NLA on them.  TAHAMTAN, AHMADY, REZAEI, and AFSHARI are observed at this ceremony and AHMADY delivers a short speech.  REZAIE is even awarded one of the trophies for his efforts fund raising.  CW#1 indicated that this ceremony was very similar to ceremonies that he had previously attended in France during similar MEK fund raising operations.

9)    CW#1 indicated that TAHAMTAN, the current leader of the MEK cell in Los Angeles is observed at this ceremony cheering and participating in the event.  In the background, large portraits of MASOUD and MARYAM RAJAVI are hanging in the background.  The CW indicated that the RAJAVI's are the current leaders of the MEK and the NLA.

10)   The video then cuts back to LAX for more testimonials of MEK solicitors.  CW#1 indicates that at this point in the tape they clearly make admissions that they are fund raising on behalf of the MEK and NLA.

11)   The tape ends with footage from the MEK's NLA training bases in Iraq.  Pictures of paramilitary/terrorist training, the MEK and NLA flags, firearms training, tanks, and

104

hand to hand combat are shown in a series of short clips.  CW#1 indicated from his past experience in the MEK's NLA, he could identify the actual training camps from the film footage.  He identified the uniforms, the flags, and locations as the MEK's NLA.  This footage switches back and forth between the NLA training and fund raising at LAX.  CW#1 indicated that this technique is used in the film to show the connection to the efforts of the fund raisers in Los Angeles to their NLA counterparts in Iraq.

102. On January 23, 2001, I consenually monitored a call between CW#1 and AFSHARI.  From interviewing CW#1 immediately following the call, and review of the transcript of the conversation, which was in the Farsi language, I learned the following:

a.    CW#1 owed AFSHARI $100.  CW#1 called AFSHARI to tell him that he wanted to pay him the money.

b.    AFSHARI requested CW#1 drop the money off at the "kanoon" when AFSHARI returned after fund rasing at LAX.

c.    The specific portion of the conversation was translated from Farsi to English as follows with "HA" representing AFSHARI:

HA:        If you want at 4:30 PM...if 4:30 PM is more convenient for you...I will be between the "kanoon" and here earlier.

CW#1:      Really?

105

(later in the conversation)

HA: Alright, as I said, I will leave the airport at 2:30 PM and I will be at the "kanoon" around 3:00 PM to 3:10 PM. And before I eat lunch, be with our guys for a while and write my reports. It is approximately going to be around 3:30 to 3:45 PM

103. On January 24, 2001, CW#1 went to the "kanoon" at 12656 Marco Place, Los Angeles, California. CW#1 was equipped with body recorder and the meeting was consensually monitored. From an interview of CW#1 and a review of the transcript of the conversation, which was in the Farsi language, I learned the following:

a. CW#1 was going to the "kanoon" to pay AFSHARI $100 that he owed AFSHARI.

b. When CW#1 arrived, the MEK LAX fund raisers had just arrived after a day of fund rasing at LAX. Among other MEK members and supporters AFSHARI and AHMADY were among these fund raisers.

c. TAHAMTAN was also present and was showing a MEK propaganda video to the fund raisers.

d. CW#1 spoke to AHMADY about fund raising at LAX on behalf of the MEK.

e. CW#1 returned the $100 he owed AFSHARI and then spoke privately with TAHAMTAN.

1) CW#1 told TAHAMTAN that he had met an Iranian male (CW#3) that was supportive of the MEK and might be willing

106

to donate money to the NLA. TAHAMTAN told CW#1 that he should bring this individual (CW#3) to a MEK meeting at 1891 Gaffey Street, San Pedro, California, on February 11, 2001. TAHAMTAN told CW#1 that this meeting was a memorial for the assassination of a MEK leader.

104. On January 25, 2001, a FBI surveillance at LAX revealed the following:

a.    AHMADY was observed among other MEK members and supporters soliciting at the Tom Bradley Terminal. AHMADY was wearing a pink identification badge with the name CHR.

b.    AHMADY spotted FBI Photographic Specialist Joel Nussbaum and confronted him. Nussbaum left the area without identifying himself.

105. On January 29, 2001, I reviewed an FBI surveillance video tape from LAX dated December 14, 1999.

a.    On the video the MEK subjects AHMADY, AFSHARI, and MORADI, among other MEK members and supporters, were observed fund raising on behalf of the MEK under the cover of the CHR.

b.    CW#1 was shown this video as well.

1)    CW#1 could not identify two female and one male Iranian MEK members soliciting at LAX, but was able to clearly identify AHMADY, AFSHARI, and MORADI. The CW pointed out in the video how, as previously reported, the MEK solicitors were specifically targeting Asians.

2)    CW#1 pointed out the following specific

107

details of the MEK solicitation that are unique to the MEK's fund

raising operations:

i.    The use of picture binders or notebooks

that are filled with photos of starving children.

ii.   The emphasis on targeting Asians,

because of the MEK's belief that Asians are often confused and

more vulnerable to their solicitation.

iii. The overall mannerism and body language

of AHMADY, AFSHARI, and MORADI.   CW#1 indicated that these same

techniques were used when the CW solicited for the MEK in the

past in France.

105. On January 31, 2001, I received a information from an

Internet site called "Guidestar" on the CHR.   This Internet site

publishes publically available records of non-profit charity

organizations.

a.    This document showed that the CHR was registered

with the IRS as a non-profit organization.

1)    Fahimeh Azarani, Majid Lashkari, and Eskandar

Eskancari are listed as the corporate officers.   The business

address is 8703 La Tijera, Suite #204, Los Angeles, California.

2)    The mission for CHR is lasted as follows:

"To provide information and educate individual and groups in

the community about situation of human rights violations in Iran.

Our main activity consists of providing aid to Iranian refugees

both domestically and overseas. Such aid comprises, but is not

108

limited to financial assistance for refugees and providing assistance to victims of persecution currently residing in the United States."

b.   The accompanying IRS Form 990(Return of Organizations Exempt From Income Ta ) reveals the following:

1)   Part III asks the specific question:

"Part III question 2."

During the year, has the organization, either directly or indirectly, engaged in any of the following acts with any of its trustees, directors, officers, creators, key employees, or members of their families, or with any taxable organization with which any such person is affiliated as an officer, director, trustee, majority owner, or principal beneficiary:

"2e."     Transfer of any part of its income or assets.

Answer "NO".

(If the answer to any question is "Yes" attach a detailed statement explaining the transactions).

2)   This document is signed and dated February 16, 1999, by Fahimeh Azarani.  This is an omission that makes no mention of the previous wire transfers to Turkey identified in paragraph 17 and paragraph 55 above.

106. On January 31, 2001, CW#1 called TAHAMTAN at the MEK "kanoon" and arranged to come over that night at approximately 7:30 PM.

107. On January 31, 2001, CW#1 met with TAHAMTAN and other

MEK members and supporters, including ESHKOFTEGI, at the "kanoon", located at 12656 Marco Place, Los Angeles, California. CW#1 was equipped with a body recorded and I consensually monitored the conversation. From an interview of CW#1, a review of the transcript of the conversation, which was in the Farsi language, and a physical surveillance I learned the following:

a.    TAHAMTAN was at the "kanoon" alone when CW#1 arrived. Shortly after his arrival, ESHKOFTEGI arrived and met with TAHAMTAN in CW#1's presence. TAHAMTAN was carrying out fund raising efforts specifically intended to aid the MEK, and the NLA. ESHKOFTEGI made a commitment to assist in the financial support of the NLA, and provided credit cards and a fraud scheme for using them to raise these funds.

b.    ESHKOFTEGI brought with him credit cards that he gave to TAHAMTAN for his personal donation to the MEK.

c.    TAHAMTAN told CW#1 that the money from these credit cards would go to the NLA to buys arms and more specifically mortars and RPG's (Rocket Propelled Grenades).

d.    TAHAMTAN specifically makes reference to the MEK's designation as a terrorist organization.

e.    The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN and "NE" representing ESHKOFTEGI:

CW#1:    Hi. How are you?

TT:    Hi. How about you? Are you well?

CW#1:      I thought you were not here. I didn't see the car.

TT:        The guys are gone. They are all gone fund raising, and at their outside jobs.

(later, same conversation)

TT:        They're calling us terrorists. They're declaring it.  They also know our base, but they've left us alone.

CW#1:      Yeah man. The guys go to the airport and come back. Could it be worse than this?

TT:        Yeah, they also go tho the airport. FBI also goes there, but they don't care.

(later, same conversation, after ESHKOFTEGI arrives at the "kanoon" and joins the conversation)

NE:        This is the card.  This is in my company's name. This is Home Depot, a chain company that you can go to and buy materials.  It's value is $15,000 and you can purchase materials, electric generator, electric saw.

CW#1:      Give me one of those brother Hojjat.

TT:        NAJAF! (correcting CW)

NE:        Do you have cash money? If you pay me cash, I'm ready.

TT:        Yeah, if you have cash money.

CW#1       How much do I have to pay?

NE:        $12,000 and I'll give you $15,000

CW#1:      It's too much.

NE:        Hassan Soltani and these guys Gholam can get

111

together with them. Hamid Samani also knows one or two guys who are in construction work.  Those guys can.  If there was a problem or you needed something give me a call and I'll do the thing.  But make Gholam responsible for that.

TT:      Yeah

NE:      And because I have received to many credit card offers, unfortunately I call and say I don't want.

TT:      We also, as they say, the situation is not like, materials are not needed.  For us, at this time, cash money is important.

NE:      Right now I have targeted the banks.  For instance, this one has sent me a letter to say that this Master Card is my last chance.

TT:      It is possible to buy material with this, right?

NE:      Yeah, that Home Depot is a chain store.

CW#1:      Sorry to interrupt, and before I forget, at this time I have a job. If you want,  I'm not sure how that guy is going to pay me, in cash or by check.  If he pays in cash I'll come and give it to you.

TT:      Yeah, he can take this one for the material.

CW#1:      Yeah, I'll give you that and I'll take this one to buy material.

TT:      Wouldn't they ask for credit, excuse me, I.D.?

CW#1:      ID card? no they wouldn't, of course they won't if it's for a company.  They may ask for a telephone number to call.

112

NE:        No, I'll leave my portable number here to give to them.

CW#1:      No, because Hassan Haddad who has a company he has these cards and he sometimes gives them to his employees.

NE:        They'll call if the amount is too high. They'll verify it.

TT:        Rahim also buys from Home Depot, and all that, probably.

NE:        Unfortunately, we don't have enough time. For instance, less them a month or maximum one month.

CW#1:      Really, one month?

NE:        Of course it's possible to purchase within two or three days. For instance, Hassan Solatani says "This has $15,000, I'll pay $10,000". He'll finish it within two days.

TT:        I'll talk to Gholam first.

NE:        Yeah, talk to Gholam first.  Find out who are the guys who are in this business. At this time I'm focusing on the banks. Banks are sending credit cards to lend money to my company.

CW#1:      That's good.

TT:        Of course, you never know about these, because the chances of finding these cards are low.

(later, same conversation, after ESHKOFTEGI has left)

TT:        Now we're looking high and low for cash

CW#1:      Home Depot at the National Liberation Army's

113

service?

TT:        No, we don't want merchandise any more. This is not the right time for sending merchandise.

CW#1:      No, I'm saying Home Depot also has come to serve the National Liberation Army.

TT:        We need money at this time to take action for preparation of overthrowing the regime, that's it.

CW#1:      Yes, exactly.

TT:        Yes, we want money for mortars, we want money for RPG's(Rocket Propelled Grenades), and a thousand and one other expenses man.

CW#1:      Yes, from very little ones to the big ones.

TT:        Now, everything moves towards the operation man, in direction of overthrowing the regime.

107. On February 2 , 2001, I interviewed CW#2.

   a.    CW#2 indicated as previously reported that the MEK is fund raising at LAX.

      1)    CW#2 has witnessed MEK members fund raising at LAX and described the "picture notebooks" that show pictures of starving children and Iranian regime atrocities.  On more than one occassion CW#2 has stopped and talked to MEK solicitors at LAX who told him they were doing the fund raising for the MEK.

      2)    CW#2 has had conversations with other MEK supporters and indicated that currently they are pushing for a large fund raising operation to support the NLA.  He identified a

114

associate named Seyed (LNU) who is a MEK supporter who recently arranged a visa for a Swedish MEK supporter who specifically came to the Los Angeles area for fund raising on behalf of the MEK.

b.   CW#2 indicated that from his experience as an Iranian military officer, his close ties to the Iranian community in Los Angeles, and his contact with MEK supporters, he has learned some of their trade craft to include fund raising at LAX using a cover organization.

c.   This reporting corroborates CW#1 reporting.

108. On February 5, 2001, I consensually monitored a telephone call between CW#1 and TAHAMTAN.   From an interview of CW#1 immediately following the telephone call and a review of the transcript of the conversation I learned the following:

a.   CW#1 called TAHAMATAN and discussed CW#3.   CW#1 asked TAHAMTAN if he could bring CW#3 with him to the MEK meeting on February 11, 2001.   TAHAMTAN agreed that it would be a good idea.

b.   CW#1 indicated that CW#3 was happy with recent MEK/NLA operations against Iran.

c.   The specific portion of the conversation was translated as follows with "TT" representing TAHAMTAN:

CW#1:          ...No, he is well informed...He was going to help...but of course he didn't trust me enough.

TT:     Aha! Then he should come and see everything himself from close by.

115

CW#1        I mean, he thought...for instance...Aha...He wanted to make sure...He was almost going to pay...But he said, No, since you are not a member.  I said no I am not a member.

TT:        How nice! You should bring him.

CW#1:      Yeah.

TT:  Good! He should come and get familiar from close by. (later in the conversation)

CW#1:      OK possibly, you might be able to get something from him.

TT:        Yes. A force has come to life from this.  What is his name?

109. On February 7, 2001, CW#1 was interviewed.

a.    CW#1 was interviewed about REZAIE.

1)    CW#1 indicated that REZAIE is a MEK member or supporter who is currently involved with the Los Angeles cell of the MEK.  REZAIE was formerly more involved then he is currently. CW#1 explained that REZAIE used to live at the MEK's Los Angeles "kanoon" when it was located at the 3721 Oceanview address.  REZAIE was heavily involved in fund raising up until a few years ago when in 1999 or 1998 he went to Iraq to fight with the NLA.  REZAIE returned after a short time with the NLA after he hurt his leg in paramilitary/terrorist training.  Only recently has REZAIE returned to the "kanoon" at the new location and begun assisting with the fund raising effort again.

b.    CW#1 was interviewed about Fahimeh Azarani.

116

2)    CW#1 indicated that he has not seen Azarani in Los Angeles area recently and believes she is out of the area on MEK related business.

3)    CW#1 indicated that Azarani and REZAIE were heavily involved in fund raising up until recently.  Both Azarani and REZAIE controlled the CHR bank account that was being used to collect the donations collected at LAX and the MEK members and supporters.

c.    CW#1 again reported on specific knowledge that the MEK is using the CHR as a front organization to raise funds at LAX.

d.    CW#1 was asked about the two Turkish accounts identified in paragraphs 17 and 55 and was shown some of the wire transfers into these accounts.  CW#1 did not recognize the accounts but did recognize the wire transfers from the CHR in Los Angeles.  CW#1 indicated that at the time the wire transfers were made between 1997 and 1999, REZAIE and Azarani were in charge of the fund raising account.

e.    CW#1 also recognized one of the destinations of wire transfers from the ARDEKANI account identified in paragraph 55 as AL-Mainey Used Auto Parts in Diera Dubai, United Arab Emirates.  CW#1 indicated that from his time fund raising for the MEK in France, he gained specific information about the MEK's network of businesses that are used to launder money between to eventually get it to the NLA.  CW#1 pointed out that the CHR is representing itself as a non-profit human rights organization, yet it is sending

117

money to a private business and a used auto parts store in Duabai and not a reputable human rights organization.

110. On February 11, 2001, CW#1 and CW#3 went to a MEK meeting at 1891 Gaffey, San Pedro, California. Both CW#1 and CW#3 were equipped with body wires and the conversations they had with other MEK members and supporters were consensually monitored. From conversation with both CW's immediately following the meeting, a physical surveillance by SA Reed Jones and I, and a review of transcripts of the conversations, I learned the following:

a. On February 11, 2001 at approximately 3:51 PM, SA Reed Jones and I initiated a physical surveillance from a covert location within 50 yards of the entrance to the meeting. From this position I witnessed CW#1 and CW#3 enter the meeting. I also witnessed, among other MEK members and supporters, TAHAMTAN, AHMADY, AFSHARI, REZAIE, OMIDVAR, MORADI, and ESHKOFTEGI either enter the meeting or standing in the lobby after the meeting.

b. Both CW#1 and CW#2 reported that the guest speaker for this meeting was Saleh Rajavi and is the brother of MASOUD RAJAVI the overall leader of the MEK.

c. Both CW#1 and CW#3 reported that TAHAMTAN showed a 8mm film of NLA training and operations in Iraq.

d. Both CW#1 and CW#3 reported that there was a donation box on one of the tables outside the meeting that was marked in Farsi "box for money to help".

e. CW#3 was introduced to TAHAMTAN by CW#1. She

118

thanked him for coming and took down his name and telephone number.

111.    On February 15, 2001, SA Reed Jones and I, consensually monitored a telephone call between CW#1 and TAHAMATAN.    From speaking with CW#1 immediately following the telephone call, and reviewing the transcript of the conversation I learned the following:

a.    CW#1 called TAHAMTAN at approximately 6:15 PM. TAHAMATAN started the call and asked CW#1 if he had heard the news. CW#1 indicated that he had not because his Internet connection is down.    TAHAMTAN bragged that the MEK or "our guys" had conducted 27 operations over the last two weeks against the Iranian government. CW#1 indicated that by the term operations she was referring to acts of terrorism.

b.    CW#1 told her that he had just done an electrical job for CW#3 and that CW#3 wanted to donate money to the NLA.    CW#1 added that CW#3 had given CW#1 $50 to give to the NLA but that he was unsure that the money was really going to make it to the NLA. TAHAMTAN told CW#1 to tell CW#3 that he could donate a larger sum of money and then call her(TAHAMTAN) to verify that the money was going to the NLA.    CW#1 pressed her to meet with CW#3 to solicit him money for the NLA.    TAHAMATAN told CW#1 that if CW#3 would donate $2,000 or $3,000 that she would agree to a meeting.

c.    CW#1 told TAHAMTAN that he would come to the "kanoon" the next day February 16, 2001, and drop off the $50.

d.    The specific portion of the conversation was

119

translated as follows with "TT" representing TAHAMTAN:

CW#1:            ...Thank you very much.  What's new, sister?

TT:              Nothing but a large number of operations.

CW#1:            Aha! I haven't heard.  My Internet has some problem.  When has it been?

TT:              A large number of operations...following the recent explosions in Tehran...over there...

CW#1:            Really? within the last two days?

TT:              Yes, after that time...approximately... I think...approximately, there has been 27 operations during the last two weeks.

CW#1:            May God preserve them!

(later in the conversation)

TT:              Tell him! Give me...then call and check with them. TAHMINEH usually answers the phone.  Come on, I will call them in front of you

CW#1:            Aha!

TT:              Tell them you have paid this much and I'll take it for them.  Otherwise, if you are ready to pay $2,000 or $3,000.  THAMINEH herself would come to get it.

CW#1:            Two thousand dollars!

TT:              Yeah...tell him. If you pay 2-3-5 thousand dollars...TAHMINEH herself would come to get it.  It is OK tell him.  All other forces are helping us this way.

112. On or about February 14, CW#3 received a newspaper from

120

the MEK at his place of business.  This is the same address he gave TAHAMTAN.

113. On February 16, 2001, CW#1 went to the "kanoon" located at 12656 Marco Place and met with TAHAMATAN among other MEK members and supporters.  CW#1 was equipped with a body wire and the meeting was consensually monitored.  From speaking with CW#1 immediately following the meeting and a review of the transcript of the conversation, which was in the Farsi language, I learned the following:

a.    CW#1 arrived at the "kanoon" at approximately 2:30 PM.  He was greeted by MORADI who indicated that TAHAMATAN was in the storage shed in the back yard of the "kanoon" retrieving something.  MORADI, AHMADY, AFSHARI, Monir Farahani, and were among other MEK fund raisers who had just returned from LAX.

b.    MORADI talked to CW#1 about the U.S. bombing of Iraq targets near Baghdad.  MORADI among other MEK members and supporters was very angry about the bombing.  AHMADY and MORADI talked about retaliation against the U.S. from Iraq terrorists who they indicated were most likely already in the U.S.

c.    TAHAMATAN then met with the CW and took the $50 that CW#1 told TAHAMTAN came from CW#3.  TAHAMATAN made fun of CW#1 that he was only able to get $50 form CW#3.  CW#1 specifically asked if the money was going to the NLA.  TAHAMTAN responded by thanking CW#1 and nodding to the affirmative.

**III. CONCLUSION**

121

114. Throughout this investigation many MEK supporters and members were identified.  This affidavit focused in on the subjects because probable cause exists that they knowingly provided material support to the MEK a designated foreign terrorist organization.  This investigation has recently focused on TAHAMTAN, the MEK Los Angels cell leader who is currently responsible for the overall fund rasing operation.  This investigation has also focused on some of the fund raiser themselves and in the case of OMIDVAR, one of the supporters who has in the past provided material support to the MEK and is currently providing material support to the MEK.

115. Based on my experience as an FBI Special Agent in investigating terrorism related investigations, the evidence collected throughout this investigation, and the witness statements, to include the statements of Cooperating Witnesses, I believe that probable cause exists to arrest the subjects TAHAMTAN, AHMADY, AFSHARI, REZAIE, MORADI, ESHKOFTEGI, and OMIDVAR for a violation of 18 U.S.C. § 2339B (material support of a designated foreign terrorist organization)  I also believe that this affidavit has established probable cause to search the

///

///

///

122

location 12656 Marco Place, Los Angeles, California for evidence of a violation of 18 U.S.C. § 2339B (material support of a designated terrorist organization).

/s/
_____
CHRISTOPHER E. CASTILLO
Special Agent FBI

Sworn and subscribed to
before me on this 26th day
of February, 2001

CARLA WOEHRLE

_____
UNITED STATES MAGISTRATE JUDGE