**H. DEAN STEWARD, P.C.**
H. Dean Steward (State Bar No. 85317)
dean@deansteward.com
107 Avenida Miramar, Suite C
San Clemente, CA  92672
Telephone:  949.481.4900
Facsimile:  949.496.6753

**McDERMOTT WILL & EMERY LLP**
Abbe David Lowell (Admitted *Pro Hac Vice*)
adlowell@mwe.com
Christopher D. Man(Admitted *Pro Hac Vice*)
cman@mwe.com
Roy L. Austin, Jr. (State Bar No. 211491)
raustin@mwe.com
600 Thirteenth Street, N.W.
Washington, D.C.  20005-3096
Telephone:  202.756.8000
Facsimile:  202.756.8087

Attorneys for Defendant
ROYA RAHMANI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ROYA RAHMANI, ALIREZA MOHAMMADMORADI, MOUSTAFA AHMADY, HOSSEIN KALANI AFSHARI, HASSAN REZAIE, NAVID TAJ, MOHAMMAD HOSSEIN OMIDVAR, et. al., <br><br> Defendants. | CASE NO.  CR-01-00209(DOC <br><br> **DEFENDANTS' MOTION IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES** <br><br> Hearing Date:  None Scheduled <br> Time: <br> Dept.:  Courtroom 9-C |

PLEASE  TAKE  NOTICE  THAT  defendants  Roya  Rahmani,  Alireza Mohammadmoradi, Moustafa Ahmady, Hossein Kalani Afshari, Hassan Rezaie, Navid Taj and Mohammad Hossein Omidvar ("the defendants"), pursuant to the

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

Confrontation Clause of the Sixth Amendment, hereby move the Court to exclude statements by unavailable witnesses that were elicited by government informants.

Dated:  April 3, 2009                                                    Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

_____/s/_____
Abbe David Lowell
Christopher D. Man
Roy L. Austin, Jr.

Attorneys for Defendant
ROYA RAHMANI

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................1

I.    THE CONFRONTATION CLAUSE REQUIRES THAT
      STATEMENTS ELICITED BY GOVERNMENT
      INFORMANTS FROM UNAVAILABLE WITNESSES BE
      EXCLUDED ...................................................................................................2

      A.    The Framers Adopted The Confrontation Clause To
            Eliminate Continental Legal Procedures in Criminal Cases.........3

      B.    A Major Objection To Continental Trial Procedures
            Was Their Susceptibility To Abuse By Government
            Informants ..........................................................................................6

      C.    Statements Elicited By Government Informants Are
            Testimonial And Subject To The Confrontation Clause ............12

II.   CO-CONSPIRATOR STATEMENTS INCULPATING A
      DEFENDANT WERE INADMISSIBLE AT THE TIME
      THE CONFRONTATION CLAUSE WAS DRAFTED ......................20

      A.    Prior To The Founding, The Exclusion Of Hearsay Was
            Far More Rigorously Enforced Than Under Modern
            Hearsay Law ......................................................................................20

      B.    Ex Parte Co-Conspirator Statements Were Excluded
            As Evidence Against The Accused Prior to the Founding ..........23

      C.    Prior To The Founding, The Co-Conspirator Exception
            To The Hearsay Rule Was Far More Limited That It
            Is Today ..............................................................................................23

CONCLUSION .........................................................................................................31

McDermott Will & Emery LLP
Attorneys At Law
Chicago

i

# TABLE OF AUTHORITIES

Page

## CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987)......................................28

*Close v. Calmar Steamship Corp.*, 44 F.R.D. 398 (E.D. Pa. 1968)..5, 6, 12

*Crawford v. Washington*, 541 U.S. 36 (2004) ...................................passim

*Davis v. Washington*, 547 U.S. 813 (2006) .....................................passim

*Dutton v. Evans*, 400 U.S. 74, 98 (1970).............................................23

*Giles v. California*, 128 S. Ct. 2678 (2008) .....................................20, 30

*In re Rolandis G.*, 232 Ill.2d 13 (Ill. 2009)....................................16-17

*Lee v. Illinois*, 473 U.S. 530 (1986) ....................................................17

*Lilly v. Virginia*, 527 U.S. 116 (1999) ..............................................1, 17

*Ohio v. Roberts*, 448 U.S. 56 (1980) ......................................................2

*Patton v. Freeman*, 1 N.L.J. 113 (1791).............................................28

*People v. Stechly*, 870 N.E.2d 333 (Ill. 2007)..................................16-17

*Queen v. Hepburn*, 11 U.S. (7 Cranch) 290 (1813) .............................27

*State v. Bobadilla*, 709 N.W.2d 243 (Minn. 2006) ...........................13, 16

*State v. Blue*, 717 N.W.2d 558 (N.D. 2006) .......................................19

*State v. Justus*, 205 S.W.3d 872 (Mo. 2006) ....................................19

*State v. Siler*, 876 N.E.2d 534 (Ohio 2007) ...................................16-18

*Tong's Case*, 84 Eng. Rep. 1061(K.B. 1662) .......................................23

*Tryal of Richard Langhorn*, 2 State Tryals (1st ed. 1719) 325 (Old Bailey 1679) .................................................................25

McDermott Will & Emery LLP
Attorneys At Law
Chicago

- ii -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

*Tryal of Thomas Knox and John Lane*, 2 State Tryals (1st ed. 1719) 410 (K.B. 1679) ..................................................................25

*Tryal of Lord Russell*, 2 State Tryals (1s ed. 1719) 133 (K.B. 1683) ..................................................................25

*Tryal of Algerone Sidney*, 3 State Tryals (1st ed. 1719) 207 (K.B. 1683) ..................................................................25

*Tryals of Charnock, King, and Keyes*, 4 State Tryals (1719 ed.) 1 (Old Bailey 1695) ..................................................................25

*United States v. Allen*, 425 F.3d 1231 (9th Cir. 2005) ..................13

*United States v. Ammar*, 714 F.2d 238 (3d Cir. 1983)..................31

*United States v. Bordeaux*, 400 F.3d 548 (8th Cir. 2005) ..................17

*United States v. Bruton*, 391 U.S. 123 (1968) ..................1-2

*United States v. Burr*, 25 F. Cas. 187 (C.C.D. Va. 1807) ............21, 26, 27

*United States v. Gooding*, 25 U.S. 460 (1827)..................28

*United States v. Massa*, 740 F.2d 629 (8th Cir. 1984) ..................31

*United States v. Mills*, No. Cr. 02-00938(E)DOC (Order of Dec. 22, 2005)..................2, 3

*United States v. Mills*, No. CR 02-938(A)DOC (Order of Feb. 17, 2006) ..................2

*United States v. Mills*, No. Cr. 02-938(E)DOC (Order of June 6, 2006) ..................2, 20

*United States v. One 1976 Mercedes Benz*, 618 F.2d 453 (7th Cir. 1980) ..................6, 11

*United States v. Ordonez*, 737 F.2d 793 (9th Cir. 1984)..................31

## OTHER AUTHORITIES

V *Acts of the Privy Council of England, Colonial Series* (1908-12)..........7

Akhil Amar, *The Bill of Rights* (1998) ..................3

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

14 *Annals of Congress* 87 (1804)................................................................11

2 Mathew Bacon, *The New Abridgement of the Law*
   (1st ed. 1736 & 6th ed. 1793)..............................................................24

Henry Bathurst, *Theory of Evidence* (1761) ..............................................25

3 William Blackstone, *Commentaries On The Laws of England* (1768)..21

Douglas Borisky, *Reconciling The Conflict Between The
   Coconspirator Exemption From The Hearsay Rule And the
   Confrontation Clause Of The Sixth Amendment,*
   85 Colum. L. Rev. 1294 (1985).......................................................30-31

Francis Buller, *An Introduction to the Law Relative to Trials at the
   Nisi Prius* (1772 ed.) .........................................................................25

Richard Burns *Justice of the Peace and Parrish Officer* (1755)..............25

1 Joseph Chitty, *A Practical Treatise on Criminal Law* (1819)................22

*Conductor Generalis* (Woodbridge, N.J.1765 James Parker ed.) ............26

   (New York 1788 James Parker ed.) ....................................................26

   (New York 1788 Hugh Graine ed.) .....................................................26

   (New York 1788 Robert Hodge ed.).....................................................26

Thomas Davies, *Not "The Framer's Design": How the Framing
   Era an Against Hearsay Evidence Refutes The Crawford-Davis
   Testimonial" Formulation Of The Scope Of The Original
   Confrontation Clause,* 15 J. L. & Pol'y 349 (2007)...................passim

Thomas Y. Davies, *What Did The Framers Know, And When Did
   they Know It? Fictional Originalism In Crawford v. Washington,*
   71 Brook. L. Rev. 105 (2005) ......................................... 20, 21, 24

Decl. of Independence (1776) .........................................................................6

Oliver Dickinson, *Boston Under Military Rule, 1768-1769* (1936).....9, 10

Oliver Dickerson, *The Navigation Acts And The American
   Revolution* (1951) .....................................................................5, 6

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

Wright & Graham, *Federal Practice and Procedure* § 6342.1 (2008).......7

Wright & Graham, *Federal Practice and Procedure* § 6344 (2008) .........6

Wright & Graham, *Federal Practice and Procedure* § 6345 (2008)..passim

Geoffrey Gilbert, *The Law of Evidence* (1754 ed.)............................22, 25

2 Geoffrey Gilbert, *The Law of Evidence* (Capel Lofft ed. 1791) ......21, 25

John Fauchaud Grimke, *South Carolina Justice* (1788) ........................26

Joseph Greenleaf, *An Abridgement of Burns' Justice of the Peace and Parish Officer* (1773) .......................................................26

2 William Hawkins, *Pleas of The Crown* (1721 ed. & 1771 ed.).......22, 24

2 Leach's Hawkins, *Pleas of The Crown* (1787 ed.)................................24

Lawrence Kessler, *The Treatment Of preliminary Issues Of fact In Conspiracy Litigations: Putting The Conspiracy Back Into The Coconspirator Rule*, 5 Hofstra L. Rev. 77 (1976)..............................28

John Knoebber, *Say That To My Face: Applying An Objective Approach To Determine The Meaning Of Testimony In Light of Crawford v. Washington*, 51 Loy. L. Rev. 497 (2005)..............17-18

Nelson Lasson, *The History And Development Of The Fourth Amendment To The United States Constitution* (1937) ........................9

Joseph Levie, *A Reexamination Of the Co-Conspirators' Exception To The Hearsay Rule*, 52 Mich. L. Rev. 1159 (1954)..............29, 30

Leonard MacNally, *The Rule of Evidence on Pleas of the Crown* (1802) ...............................................................................22

Maryland Assembly's, *Public Grievances of 1669* (1669) ........................7

Robert Mosteller, *Remaking Confrontation Clause And Hearsay Doctrine Under The Challenge of Child Sexual Abuse Prosecutions*, 1993 U. Ill. L. Rev. 691 (1993) ..........................................................24

Christopher Mueller, *The Federal Coconspirator Exception: Action, Assertion, And Hearsay*, 12 Hofstra L. Rev. 323 (1984) ........30

McDermott Will & Emery LLP
Attorneys At Law
Chicago

- v -

William Nelson, *The Law of Evidence* (1744).............................................24

N.Y. Const., art. XXXV (1777) ...........................................................20

Neal Nusholtz, A Brief History Of The Deficit And Tax Reform
  14 Mich. B.J. 679 (1995) .................................................................11

Oakley, *Form Hearsay To Eternity:  Pendency And the
  Co-Conspirator Exception In California – Fact, Fiction And
  A Novel Approach*, 16 Santa Clara L. Rev. 1 (1975) .....................29-30

O'Dougherty, *Prosecution And Defense Under Conspiracy
  Indictments*, 9 Brookly L. Rev. 263 (1940) ...............................31

Thomas Peake, *A Compendium of the Law of Evidence* (1801)...............22

Richard Starke, *Office and Authority of a Justice of the Peace* (1774) ....26

Thomas Starkie, *The Law Of Evidence* (1824).................................29

Wroth & Zobel, 2 *Letters of John Adams* (1965) ..............................10, 11

G.G. Wolkins, *Hancock's Sloop Liberty*,
  55 Mass. Hist. J. 239 (1922)...........................................................9, 10

McDermott Will & Emery LLP
Attorneys At Law
Chicago

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Pursuant to the Confrontation Clause of the Sixth Amendment, Defendants seek a motion in limine to exclude the out-of-court statements of unavailable witnesses that were elicited in response to questioning by government informants. Such statements were gathered at the government's request for the purpose of obtaining testimony for use at trial, which renders those statements "testimonial" and subject to the absolute bar of the Confrontation Clause. Indeed, as described in detail below, abuses by government informants testifying in such a manner was one of the primary reasons the Confrontation Clause was adopted. Because the out-of-court statements made to government informants were not made under oath, were not made to any Defendant's face or in open court, and the unavailability of the witnesses to testify at trial precludes the Defendants from cross-examining them and the jury from evaluating their credibility, the admission of such evidence would violate the Defendants' rights under the Confrontation Clause.

This Motion is directed to the government's use of informants the government deliberately used to elicit statements from various Defendants and others. If the Defendants who provided statements to these government informants choose not to testify, they will be unavailable as witnesses for the other Defendants to cross-examine and the jury will not be able to evaluate their credibility. See, e.g., Lilly v. Virginia, 527 U.S. 116, 124 (1999) (a witness who asserts their Fifth Amendment right not to testify is unavailable for purposes of the Confrontation Clause). Accordingly, statements these government informants elicited from non-testifying Defendants (or others who are unavailable to testify) should not be admissible as to the other Defendants. See, e.g., United States v. Bruton, 391 U.S. 123, 131 (1968) (noting the prejudice that jurors cannot segregate the evidence

against defendants when asked to decide facts common to all defendants); United States v. Mills, No. Cr. 02-938(E)DOC, at 9 (Order of June 6, 2006) (same). Given the risk of spill-over prejudice to the non-declarant Defendants, this Court has in the past "allow[ed] the government to choose its course of action. The government may admit for the truth of the matter any declarant's statement against that declarant. However, upon admission of such statements into evidence, the Court will order the severance and mistrial regarding . . . the non-declarant Defendants." Id. at 10.[1]   Such an order would be appropriate in this case.

## I.   THE CONFRONTATION CLAUSE REQUIRES THAT STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES BE EXCLUDED

The Supreme Court recently altered its Confrontation Clause jurisprudence substantially to bring it back into alignment with its historical origins.  In 2004, the Court decided Crawford v. Washington, 541 U.S. 36, which rejected the prior approach of Ohio v. Roberts, 448 U.S. 56 (1980), that made admissibility of an unavailable witness' testimony turn upon whether a court deemed the statement to bear an "adequate 'indicia of reliability.'" Roberts, 448 U.S. at 66.  Crawford explained that, to the contrary, "[a]dmitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation." 541 U.S. at 61.  While the Clause's ultimate purpose, of course, it to "ensure reliability of evidence," the Clause itself "is a procedural rather than a substantive guarantee.  It commands, not

---

[1]   Some courts after Crawford had concluded that whether a statement is testimonial depends solely upon the subjective intent of the declarant.  Prior to the Supreme Court's June 2006 decisions in Davis v. Washington and Hammon v. Indiana, 547 U.S. 813, this Court had been of that view.  See United States v. Mills, No. CR 02-938(A)DOC (Order of Feb. 17, 2006).  More recent cases focus upon either the subjective intent of the declarant or the government's objective purpose in gathering the statements.  (See. e.g., In re Rolandis G., 232 Ill.2d 13 (Ill. 2009); infra at 12-19.)  Given the Supreme Court's subsequent focus on the Confrontation Clause acting to limit evidence manufactured by the government in Davis and Hammon (discussed infra at 12-19), subsequent cases applying the Confrontation Clause as a bar where the declarant had no knowledge their statements would be testimonial (particularly child declarant cases, discussed infra at 16-18), and the additional history the Defendants are presenting this Court concerning the role of informants in influencing the Confrontation Clause (discussed infra at 3-12) – history the defendants do not believe has yet been presented to any court in this fashion – Defendants ask that this Court reevaluate its prior position in view of the evolving case law.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Id. Accordingly, the Supreme Court held that the Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the declarant had had a prior opportunity for cross-examination." Davis v. Washington, 547 U.S. 813, 821 (2006) (quoting Crawford, 541 U.S. at 53-54); see also United States v. Mills, No. CR 02-00938DOC, at 2 (Order of Dec. 22, 2005) ("The Supreme Court's 2004 Crawford decision substantially changed the way the Confrontation Clause meshes with the Rules of Evidence in criminal trials."). This rule precludes the introduction of out-of-court statements gathered by government informants for the purpose of use during trial.

### A.    The Framers Adopted The Confrontation Clause To Eliminate Continental Legal Procedures In Criminal Cases

Our modern right to trial by jury through an adversarial process often is romantically traced back to its British statutory and common law roots, but it often is forgotten that the American people had to declare their independence and fight a war to secure these rights because they were not being provided by the British. Unlike present times, when issues of criminal procedure rarely attract much interest from the public beyond those lawyers who practice in criminal courts, concern with criminal procedure was very much at the forefront of people's minds in colonial America. That is because, prior to the Revolutionary War, the oppression Britain imposed on the colonies was implemented more by the force of law than the force or arms, and those oppressive laws were enforced through the courts on this side of the Atlantic.

To decipher the meaning of the Confrontation Clause, the Supreme Court tells us we must "turn to the historical background of the Clause to understand its meaning." Crawford, 541 U.S. at 43. "[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure,

DEFS' MOT. IN LIMINE NO.1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

and particularly its use of <u>ex parte</u> examinations as evidence against the accused. . . . The Sixth Amendment must be interpreted with this focus in mind." <u>Id.</u> at 50. As Professor Akhil Amar explains, "at the core of many constitutional texts lies a paradigm case – a specific, historical evil that the drafting generation lived through and sought to destroy with a text that in effect proclaimed 'never again!'" and, for purposes of the Sixth Amendment, that evil was the procedure the British imposed in "the vice-admiralty courts." Akhil Amar, <u>The Bill of Rights</u> 301 (1998); <u>see</u> <u>Crawford</u>, 541 U.S. at 43-48 (charting the history of British use of these civil law procedures from the establishment of Marian depositions in the mid-1500s to providing "jurisdiction to Stamp Act offenses to the admiralty courts" in the "decade before the Revolution").

In addition to objecting to the British implementation of Continental criminal trial procedures in the vice-admiralty courts in the colonies, our Founding Fathers objected to the use of those procedures in England. After Henry VIII broke England away from the Catholic Church, a successor, Queen Mary I attempted to restore the Catholic Church in England through repressive means. Through the so-called Marian Persecutions, many people were executed for their religious beliefs. These executions did not occur simply through an edict from Mary, lawful procedures to secure a conviction had to be followed. Those procedures were changed by Queen Mary, however, through the creation of civil law-styled Marian examinations. <u>Crawford</u>, 541 U.S. at 43-44 (citing 1 & 2 Phil. & M., c. 13 (1554), and 2 & 3 <u>id.</u>, c. 10 (1555)).

These examinations would be made by a justice of the peace, a summary of the witnesses testimony would be written down, and these written summaries would be used as evidence at trial. <u>Crawford</u>, 541 U.S. at 44. While the nature of these examinations varied, it was common that the witness' statements would not be made face-to-face with the accused and that the defendant would not be afforded a right of cross-examination. Often, the statements were drafted by government

McDermott Will & Emery LLP
Attorneys at Law
Chicago

- 4 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

agents and the witnesses were pressured to sign them. The injustice of using these statements at trial was highlighted through several prominent treason trials, most notably the 1603 trial of Sir Walter Raleigh. Id. at 44.

Raleigh was implicated in treason by an alleged co-conspirator, Lord Cobham, who had changed his story many times and who's credibility was shaken. Cobham's Marian examination and an unsworn letter were read to the jury implicating Raleigh, and Raleigh objected that Cobham was not there to testify in person. Raleigh insisted that Cobham made those statements falsely while under duress and that he would recant those statements if called to testify. Despite Raleigh's protests that he was being tried by the procedures of the Spanish Inquisition, he was convicted and sentenced to death. Id. at 44. The trial was regarded as a travesty at the time, and the case served as a rallying cry for legal reforms in the years that followed. Id. at 44-45.

Nevertheless, Marian examinations remained a feature of British law and they were applied forcefully in the American colonies through the vice-admiralty courts. Britain profited from its colonies through its Navigation Acts, which imposed a variety of taxes and regulated trade on terms favorable to England.[2] Not surprisingly, the Navigation Acts were incredibly unpopular throughout the colonies. Smuggling was not only common, but was well-accepted and practiced by even the most upstanding Americans. To prevent the colonists from thwarting the enforcement of the Navigation Acts through participation on juries, in 1696, England placed jurisdiction for the enforcement of the Navigation Acts in the vice-admiralty courts which operated free of juries and through civil law procedures. The involvement of the vice-admiralty courts was greatly expanded by the Stamp Act of 1765. Close v. Calmar Steamship Corp., 44 F.R.D. 398, 403 (E.D. Pa. 1968)

---

[2]   Although some of the Navigation Acts had long been on the books, they became a more substantial source of tension following the French and Indian War that concluded in 1763 and left Britain in need of money. Beginning with the Sugar Act of 1764, Britain increasingly used the Navigation Acts as a source of revenue and many scholars believe that was the principal cause of the Revolutionary War. See, e.g., Oliver M. Dickerson, The Navigation Acts And The American Revolution 211 (1951).

- 5 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

McDermott Will & Emery LLP
Attorneys At Law
Chicago

("[T]o enforce the unpopular trade and navigation statutes, particularly the Stamp Act, the Vice-Admiralty Courts were established in the colonies."); C. Wright & K. Graham, Federal Practice and Procedure § 6345 (2008) [hereinafter "FPP"]. "The vice-admiralty courts were to become a prime symbol of British tyranny over the colonies." Id. Indeed, after complaining of the unfair taxation and restrictions of trade, the Declaration of Independence refers to the vice-admiralty courts in America's list of grievances with the British crown for "depriving us in many cases, of the benefit of Trial by Jury." Decl. of Independence (1776); see United States v. One 1976 Mercedes Benz, 618 F.2d 453, 464 (7th Cir. 1980) (noting this objection in the Declaration of Independence and that the First Continental Congress, in 1774, denounced Britain for extending "the powers of the admiralty courts beyond their ancient limits," and similar denunciations had been made by the Massachusetts House of Representatives in 1765, 1769 and 1771). In Crawford, the Supreme Court noted that the lack of confrontation of witnesses in the vice-admiralty courts was a particular concern of early Americans. Crawford, 541 U.S. at 47-48.

### B. A Major Objection To Continental Trial Procedures Was Their Susceptibility To Abuse By Government Informants

The Framers did not oppose the Continental trial procedures because the procedures were foreign, but because they feared the procedures led to judgments that were substantively unfair. Much of that unfairness resulted from the way evidence was collected at the time. In both England and America, professional police forces did not develop until the 19th century. Crawford, 541 U.S. at 53. Criminal cases typically were initiated by an accusation from ordinary citizens, which would lead to a sheriff making an arrest based on the accusation and delivering the defendant to a justice of the peace who would conduct an investigation and determine whether the defendant should be tried. Id. Without a

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

McDermott Will & Emery LLP
Attorneys At Law
Chicago

professional police force to gather evidence, the government often had to rely upon government informants to make their case.

In colonial America, Britain relied upon government informants who would receive one-third or more of the fines and forfeitures imposed to enforce the Navigation Acts. FPP § 6345 ("[I]nformers were a crucial part of the enforcement machinery for the Navigation Acts."); see Dickerson, supra, 212; see also FPP § 6344 (explaining that Britain's reliance on informants began with the Molasses Act of 1737 and accelerated toward the end of the Stuart Dynasty). As with the more modern practice of providing leniency to informants through immunity agreements or plea bargaining, at times the colonial governments would extend pardons to informants. See, e.g., V Acts of the Privy Council of England, Colonial Series 365-67 (1908-12) (addressing Aug. 21, 1772 offer of pardon anyone who could act as an informant with regard to the destruction of the revenue schooner Gaspee in Rhode Island that was destroyed by the "Sons of Liberty" in protest to the Stamp Act). Under the civil law system of the vice-admiralty courts, testimony from these government informants typically came through written ex parte submissions by witnesses who never were subject to cross-examination.

Government informants quickly became one of the most despised categories of persons in the colonies.[3] "Informers figure prominently in Revolutionary propaganda against vice-admiralty courts, particularly after Parliament allowed vice-admiralty courts to immunize them from civil suits arising from their activities." FPP § 6345. "In the eye of the colonists, informers were more reprehensible than smugglers" and they were frequently targeted for violence by angry mobs. Id.[4] Religious people would compare the government informant to

---

[3] Opposition to the British use of government informants has a much earlier origin. The Maryland Assembly's Public Grievances of 1669 objected to the British use of "vexatious informers." FPP § 6344.

[4] The danger in being a government informant is highlighted by the burning of the Gaspee, a British ship that had run aground in Narraganset Bay, in 1772. The incident was the first planned use of force by the colonist against the British, and considered by many the first attack of the Revolutionary War. The British ultimately offered a reward of £500 for informers, but the public sentiment against informing was

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

the accuser in the Book of Job or Judas' betrayal of Jesus, and those looking to secular sources like Cesare Beccaria's Of Crimes and Punishments would see condemnation there as well: "Whoever suspects another to be an informer, holds him an enemy. . . ." FPP §§ 6342.1, 6345.[5] George Mason, who drafted America's first Confrontation Clause for the Virginia Constitution, wrote revolutionary propaganda critical of the vice-admiralty courts and their reliance upon government informants, which he explains are "'the most mischievous, wicked, abandoned and profligate race,' says an eminent writer upon British politics, 'that ever God permitted to plague mankind.'" FPP § 6345; see also id. § 6346 (quoting a Delaware Legislative Council objection to an anti-Loyalist statute because it "will encourage a race of informers, the pest of society, and who always were the engine of tyrants in every State. It is to be hoped that the just cause in which all America is embarked is not to be injured by the speeches of rash, foolish or wicked individuals, or at least they are not to be so much apprehended as the effects of so dangerous a precedent in the infancy of our Government.").

Informants in these vice-admiralty courts had a substantial impact on others who participated in the Constitutional Convention and in the Constitution's ratification. Henry Laurens, later to serve as President of the Continental Congress, had numerous run-ins with the vice-admiralty courts that led to the seizure of his

---

so profound that nobody came forward. FPP § 6345.

[5] Much of the religious–based criticism of government informants has been traced back to John Foxe's Book of Martyrs, which was widely read following its initial publication in 1563. The book was published shortly after Queen Elizabeth I restored Protestantism in England following the Marian Persecutions. The Book of Martyrs highlighted the historical persecution of Protestants, was widely disseminated as a propaganda tool with the support of the new regime and was vividly illustrated so that even the illiterate would understand its message. As Charles Alan Wright and Kenneth Graham explain, the "one striking feature of Foxe's work . . . is the amount of material it contains critical of informers. Informers are blamed for much of the persecution of early Christians." FPP §6342.1. They add that "Foxe's book did much to foster the hatred for informers that can be seen in early American sources." Id. The Bible itself has many references to the right of confrontation. See, e.g., Deut. 19:15-18; John 8:9; Acts 25:16. This theme also appears in the works of William Shakespeare. See, e.g., Richard II, Act 1, scene 1 (Richard II: "Then call then to our presence – face to face, and frowning brow to brow, ourselves will hear the accuser and the accused freely speak.").

- 8 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

ships. He used these experiences to wage a propaganda war against "the use of pampered informers and the denial of trial by jury." FPP § 6345.

One of the first major American trials to capture the public's attention was the highly charged political prosecution of John Hancock (a popular, but well-known smuggler, who also was one of the wealthiest men in the colonies) who was represented by John Adams. (Significantly, Adams would later draft the Confrontation Clause for the Massachusetts Bill of Rights and it was Hancock who moved in the Massachusetts ratifying convention for a bill of rights to be added to the federal Constitution. FPP § 6345.) Hancock had long been a target of the British, but they had difficulty finding anyone who would cooperate in building a case against him. Ultimately, it based a case against his sloop Liberty upon a technical violation.

The Navigation Acts required a bond to be posted before loading a new cargo, but the custom was to allow the bond to be paid as the ship cleared for its outward voyage. When a new cargo was loaded upon the Liberty in 1768 without the advance payment of the bond, the British seized the ship. FPP § 6345. A mob formed to prevent the ship from being hauled away, but when that proved unsuccessful, the mob turned violently against the Customs officers on the scene and then went after the remaining Customs officers in Boston.

Hancock used the incident to fan the flames of revolution. Although he initially offered a bond for the return of the Liberty, he changed his mind as violence toward the British began to spread across Boston. G.G. Wolkins, Hancock's Sloop Liberty, 55 Mass. Hist. J. 239, 264 (1922). In response to the violence, the customs officials offered to return the Liberty without bond, but Hancock (who could afford the loss), having conferred with Sam Adams and some of the more aggressive revolutionaries, passed word that he would not take back the Liberty. Id. at 260 & n.4, 262, 275. The "Sons of Liberty" took control of Boston, and the Customs officers fled and did not return until the following Fall when

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

McDermott Will & Emery LLP
Attorneys At Law
Chicago

British troops secured the city and imposed martial law. Id. The year after the seizure, in 1769, a still-angry mob ran the Liberty aground and burned it. After that, Customs officials were too afraid to make further seizures. Nelson Lasson, The History And Development Of The Fourth Amendment To The United States Constitution 72 (1937).

Despite having seized and sold the Liberty (but before the Liberty was burned), the British instigated a political prosecution of Hancock in the vice-admiralty court for aiding and abetting smuggling in November 1768. Oliver Dickinson, Boston Under Military Rule, 1768-1769, 102 (1936). The prosecution was based upon a sworn information from a government informant, Thomas Kirk, who claimed the ship's captain – who was then deceased – had offered him a bribe to let him land without paying a duty, locked him below deck when he refused and threatened him with violence if he reported what occurred. Id. While locked below deck, Kirk claims that he heard the wine on-board the ship being unloaded. Id. Under the vice-admiralty procedure, Adams had no opportunity to cross-examine Kirk and, just as importantly, he had no opportunity to cross-examine the statement of Hancock's alleged co-conspirator, the ship's captain. FPP § 6345.[6] Adams complained of the denial of rights associated with the reliance upon Kirk's testimony, insisting that "Every Examination of Witnesses ought to be in open Court, in Presence of the Parties, Face to Face." Wroth & Zobel, 2 Letters of John Adams 207 (1965). That complaint figured prominently in the press as well. See, e.g., Dickerson, Boston Under Military Rule, at 28 (noting that a common complaint in the press was that "'none of the interrogatories on behalf of the informers have been as yet lodged in the registers-office' (that is, the supposed

---

[6]    Adams no doubt would have reveled in the opportunity to cross-examine Kirk, as Kirk's partner denied knowledge of the incident, Kirk's prior written report of the incident did not contain any of these allegations, and, as an informant, he stood to gain one-third of the fines. Wolkins, supra, at 252. The Attorney General of England, William De Grey, who reviewed the allegations and authorized the prosecution even noted:  "The Difficulty in This Case will be that it rests at present upon the Evidence of Kirk confirmed by the previous declarations of Hancock; & Kirk's Evidence does not speak positively to His Knowledge." Id. at 239, 275.

- 10 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

evidence was not being made public), and that Bostonians 'heartily wish that the Co[missioners of the customs, the prosecutors] may still toil in their infamous fishery, without catching any evidence that may operate to [Hancock's] prejudice.'" Id. (quoting Nov. 28, 1768 newspaper entries).

Adams and other soon-to-be revolutionaries publicized the details of the Hancock trial through the "Journal of The Times," a series of newspaper articles that were published throughout the colonies. FPP § 6345.[7] There, Adams criticized the proceedings as "more alarming than any that had appeared to the world, since the abolition of the Court of the Star Chamber." 3 Wroth & Zobel, Letters of John Adams 54 (1965). The Commissioners' reliance upon statements allegedly made to government informants was a common theme of the attack. FPP § 6345. With respect to the vice-admiralty courts' reliance upon informants, the Journal wrote:

> Shall we compare them to the infamous times of the Stuart's reign, or the dregs of the roman state, when street conversation (however innocent) was taken up by vagabond pimps, employed and paid for their pains and carried to their superiors, who thence formed the measures of the administration. It is well remembered, that within these few years, such wretches were employed to pick up materials of this sort. . . .

Id. at 65. It complained that the case should be tried by a jury and "conform to all the other rules of the common law, thro' the whole trial," and stated indignantly, "[o]r will it be said Americans are to be tried by an hopscotch mixture of common law, and civil law!" Id. at 68.

Ultimately unable to marshal any credible evidence against Hancock, the charges were dismissed, but the vivid accounts of the trial profoundly impacted the opinions of the revolutionary generation. One 1976 Mercedes Benz, 618 F.2d at 464 (describing the Hancock trial as a "well-known instance of the contrast between the procedure" of the vice-admiralty courts and common law courts);

---

[7] The proceedings were unusual, as they went on for five months as the Commissioners repeatedly examined witnesses in search of some credible evidence at a time when the common-law rule for jury trials was that felony trials must be completed in one day. FPP § 6345.

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

- 11 -

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

Close, 44 F.R.D. at 404 n.15 (noting that the Hancock trial "dramatized vividly" the Colonists' feelings against the "non-jury procedure"); FPP § 6345.[8] Historians rightfully observe that "[m]any of the Hancock trial's features showed up in the Bill of Rights, such as:  The right to trial by jury, the right to a grand jury indictment, the right to cross examination, the right to a public trial, the right to confrontation of witnesses, and freedom of the press."  Neal Nusholtz, A Brief History Of The Deficit And Tax Reform  14 Mich. B.J. 679, 686 (1995).  In Crawford, the Supreme Court noted Adams' criticism of the vice-admiralty courts when addressing the impetus for the Confrontation Clause:  "John Adams, defending a merchant in a high-profile admiralty case, argued :  'Examinations of witnesses upon Interrogatories, are only by Civil Law.  Interrogatories are unknown at common law, and Englishmen and common Lawyers have an aversion to them if not an Abhorrence of them.'"  Crawford, 541 U.S. at 48 (quoting Hancock trial).

### C.    Statements Elicited By Government Informants Are Testimonial And Subject To The Confrontation Clause

When the government enlists an informant to infiltrate a suspected conspiracy and gather statements from suspected conspirators, its purpose in doing so is plain:  It seeks to elicit statements that can be used at trial.  Because the focus of the government's efforts is the obtaining of testimony, the statements elicited through the questioning of the government informant are testimonial.  Davis, 547 U.S. at 822.[9]

---

[8]    Following the Revolution, it remained the highest insult to refer to be called an informer.  For example, the eleventh article of impeachment for Justice Samuel Chase argued that by disregarding his duties he "did descend from the dignity of a judge, and stoop to the level of an informer."  14 Annals of Congress 87 (1804).

[9]    The Defendants maintain that the Confrontation Clause should exclude all out-of-court statements, regardless of whether those statements are now characterized as testimonial or non-testimonial.  There is no historical basis for the testimonial/non-testimonial dichotomy used in Crawford and Davis, as those terms were never used to differentiate the kinds of hearsay at common law.  Indeed, the word "testimonial" was not even used as an adjective during the Framing Era, but was merely used as a noun (i.e., a "testimonial" formally certifiying a person's character).  Thomas Davies, Not "The Framer's Design":  How the Framing Era Ban Against Hearsay Evidence Refutes The Crawford-Davis "Testimonial" Formulation Of The Scope Of The Original Confrontation Clause, 15 J. L. & Pol'y 349, 369-71 and n.50 & 51 (2007).  What the Supreme Court now characterizes as non-testimonial statements

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

While the law of hearsay continues to control much of the admissibility of out-of-court statements, the Confrontation Clause independently excludes statements that are hearsay if those statements are "testimonial."[10] Crawford, 541 U.S. at 51. In Crawford, the Supreme Court explained that "testimonial" statements are more than just formal testimony, such as prior testimony from a former trial or the submission of a sworn affidavit, but also would include "[s]tatements taken by police officers in the course of interrogations." Id. at 52; see also id. at 53 n.4 ("We use the term 'interrogation' in its colloquial, rather than any technical legal, sense."). The Court explained that "[p]olice interrogations bear a striking resemblance to examinations by justices of the peace in England" under the Marian depositions. Id. Marian depositions were taken by judges because there was no professional police force in England until the 19th century, and the Supreme Court found that distinction irrelevant. Id. As the Court explained: "The involvement of government officers in the production of testimonial evidence presents the same risk, whether the officers are police or justices of the peace." Id. Ultimately, "the key to determining whether a statement is testimonial is whether either a declarant or government questioner is acting, to a substantial degree, in order to produce a statement for trial." State v. Bobadilla, 709 N.W.2d 243, 252 (Minn. 2006).

The central danger the Confrontation Clause sought to prevent was the government's improper manufacturing of evidence that could be used against the

never would have been admissible because such statements would not be under oath (unless a dying declaration, where the solemn occasion of facing judgment from God was treated as tantamount to an oath). Id. at 391-92. Thus, the only persons who could qualify as a "witness" for purposes of the Confrontation Clause at the time of the Framing were persons with first-hand knowledge. Id. at 381. Neither the Supreme Court nor commentators has yet identified any pre-Framing situation where non-testimonial hearsay was admitted in criminal proceedings against a defendant. Id. at 377. While the Defendants wish to preserve this issue for appeal, because the Crawford-Davis formulation of the testimonial/non-testimonial distinction is controlling and that distinction is not problematic for purposes of this Motion, the focus of this Motion will be on establishing why statements elicited by a government informant for use at trial are testimonial.

[10] Co-conspirator statements made other than to law enforcement or their agents, for example, are unlikely to be testimonial. See, e.g., United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005) (co-conspirator statements made to a co-conspirator who later acts as an informant are not testimonial). Their admissibility would turn upon the law of evidence, rather than the Confrontation Clause.

- 13 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

accused, and the Supreme Court felt that concern was implicated whenever the government was involved in gathering out-of-court statements.

> Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse – a fact bourne out time and again throughout a history with which the Framers were keenly familiar. This consideration does not evaporate when testimony happens to fall within some broad, modern hearsay exception, even if that exception might be justifiable in other circumstances.

Crawford, 541 U.S. at 56 n.7.

The Supreme Court's decision in Davis clarified the meaning of "testimonial" by explaining that it depends "objectively" upon the "primary purpose" for which the government is acting when obtaining the statements. When those statements are being gathered for use at trial, they are testimonial, but not when they are collected for some other purpose.

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to a later prosecution.

Davis, 547 U.S. at 822.

Davis was jointly decided with Hammon v. Indiana, and the Court's different outcomes in the two cases help to juxtapose "testimonial" from "non-testimonial" hearsay. In Hammon, the Court had no difficulty finding that statements made to a police officer at the scene of a crime were testimonial, even though they had not been made in a formal setting as in Crawford, where the statements were made at a police station, following a Miranda warning and tape recorded. Davis, 547 U.S. at 830. The statements elicited in Hammon were testimonial because the officer was not seeking to respond to an "emergency in progress," "the interrogation was part

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

- 14 -

of an investigation into possibly criminal past conduct." Id.  As such, the statements were being gathered for a testimonial purposes.

By contrast, in Davis, the Court held that statements made in response to an "interrogation that took place in the course of a 911 call" were not testimonial.  Id. at 826.  The purpose of that interrogation was not to collect evidence for use at trial, but "viewed objectively," "the nature of what was asked and answered . . . was such that the elicited statements were necessary to resolve the present emergency, rather than simply to learn (as in Crawford) what happened in the past." Id. at 827.

Davis also made clear that the statements must be evaluated in the context in which they are made, rather than through some bright-line rule that turned upon the place where the statement was made or whether it was made under oath.  Although the 911 call made in that case was "a call for help against a bona fide physical threat," which is likely the norm for 911 calls, the Court held out the possibility that "one might call 911 to provide a narrative report of a crime absent any imminent danger" and that would require a different result. Id.  In addition, the Court explained that an interrogation designed to respond to an emergency could evolve into an interrogation to obtain testimonial statements. Id. at 828.  In Davis, for example, after the 911 operator had elicited sufficient information to respond to the emergency, the operator kept the caller on the line asking "a battery of questions." The Court explained that "[i]t could readily be maintained that, from that point on, [the caller's] statements were testimonial" and the Court suggested that trial courts use motions in limine to "redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence." Davis, 547 U.S. at 829.

Davis and Hammon helped to clarify that whether a statement is "testimonial" depends upon the objective purpose for which the statement is either made or obtained.  While a statement clearly is "testimonial" if made by a declarant who expects the statement to later be used at trial, the fact that the Framer's

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

principal concern was with abuse by the government in collecting evidence have led courts to acknowledge the expectation of the declarant is not necessarily controlling. Courts look to the "primary purpose of the interrogation." In re Rolandis G., 232 Ill.2d 13, 2008 WL 4943446 (Ill. Jan 26, 2009). "The [C]ourt's analysis in Davis . . . does not focus on the expectations of the declarant in order to determine whether statements are testimonial; rather, the test set forth in Davis centers on the statements and the objective circumstances indicating the primary purpose of the interrogation." State v. Siler, 876 N.E.2d 534, 541 (Ohio 2007). To the contrary, in Davis, "[t]he Court held that whether such statements were testimonial depended on the intent – more specifically, objective manifestations of intent – of the police when taking the statement." People v. Stechly, 870 N.E.2d 333, 348 (Ill. 2007); Bobadilla, 709 N.W.2d at 251 n.3 ("We do not think an approach that makes the declarant's perspective dispositive gives adequate consideration to Crawford's fear of governmental abuses."). As the Illinois Supreme Court recently explained, the Crawford

> Framework begs the question, "whose intent is determinative – the questioner or the declarant?" After reviewing Crawford and Davis, the Stechly plurality concluded that, when the statement under consideration is the product of questioning, either by the police or someone acting on the behalf of law enforcement, it is the objective intent of the questioner that is determinative.

In re Rolandis G., 232 Ill.2d 13 (Ill. 2009). But when the questioning is not on behalf of law enforcement, the focus of the inquiry ordinarily would be on the subjective intent of the declarant. Id.

Following Davis, courts have most typically made clear that it is not the declarant's intent that is controlling in cases finding statements by children "testimonial," even though the children delcarants were unable to appreciate that their statements could be used as testimony in some later trial. See, e.g., In re Rolandis G., 232 Ill.2d 13 (noting this is the view of the "majority of courts to

McDermott Will & Emery LLP
Attorneys At Law
Chicago

- 16 -

consider the question"); Siler, 876 N.E.2d at 47; Stechly, 870 N.E.2d at 362 (noting some inconsistent pre-Davis case law and explaining: "In the wake of Davis, however, the 'objective circumstances' of the statements at issue in those cases would almost certainly lead courts to their being found testimonial without looking to the declarant's intent.") (emphasis in original); see also United States v. Bordeaux, 400 F.3d 548, 556 (8th Cir. 2005) (same result pre-Davis). Indeed, Davis' "broad formulation is devoid of reference to the intent of the declarant, which implies that rather than the declarant's intent, the police intent to obtain information for prosecution is all that is relevant." Id.; see id. at 357 ("It is clear, therefore, that when the statements under consideration are the product of questioning by the police (or those whose 'acts [are] acts of the police', we must focus on the intent of the questioner in eliciting the statement."). Thus, where the government is gathering evidence by eliciting statements for use at trial, the statements are testimonial whether or not the declarant appreciates that is the case at the time.

This clarification of "testimonial statements" in Davis makes clear that statements elicited by government informants to build a case are testimonial. "Categorically admitting statements to an undercover officer turns a blind eye to the government's role in creating the statement, thereby inviting prosecutorial abuse, or worse, allowing the State to circumvent the Confrontation Clause altogether." John Knoebber, Say That To My Face: Applying An Objective Approach To Determine The Meaning Of Testimony In Light of Crawford v. Washington, 51 Loy. L. Rev. 497, 530 (2005); see id. at 529 ("[P]rior to Crawford, the Court held in Lee[ v. Illinois, 473 U.S. 530 (1986)] and Lilly[ v. Virginia, 527 U.S. 116 (1999)] that co-defendant confessions are not per se admissible under the declaration against penal interest exception to the hearsay rule when the statements also imply that the defendant is guilty. The Court's prior holdings in Lee and Lilly, along with the Crawford Court's concern for protecting citizens from government abuse, suggest

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

that at least co-conspirator statements to undercover officers that implicate the defendant as guilty are testimonial."); Id. at 540 ("[C]ourts should consider co-conspirator statements procured by undercover officers that implicate a defendant as guilty to be testimonial even though the declarant was unaware of the State's intent to use the statement at a later trial."); Siler, 870 N.E.2d at 356 (rejecting the "subjective intent of the declarant" approach because "[t]he State's exclusive focus on the declarant's intent . . . could lend itself to abuse by the State, by increasing use of statements gathered without the defendant's knowledge – for instance, undercover interviews of witnesses"). Under the Davis test, which focuses on the "nature of what was asked and answered, . . . viewed objectively," there is little doubt that questioning by a government informant are meant to elicit testimonial statements for use at trial. The fact that the government had some informants, like Mehdi Hosseini, tape record his conversations further confirms that he was being used to gather evidence.

Nor can the government take solace in the fact that government informants are not themselves law enforcement officers. The Supreme Court in Crawford explained that it was judges taking Marian depositions who were the principal targets of the Confrontation Clause, but it extended the Clause to statements elicited by police officers – the sort of government officials that did not even exist at the time of the Founding. Crawford, 541 U.S. at 53. But, as described above, the Framers were well aware of the role of government informants at the time of the Founding and they were distrustful of them even when their motive to lie then was merely monetary, unlike now when the motive to lie is even stronger, as many of the informants are seeking to avoid jail time themselves, to avoid deportation and are testifying to avoid the lethal wrath of the Iranian government. Just as the Court has prevented the government from circumventing the Confrontation Clause by "shifting investigative and testimonial functions" from judges to police, the Court would not allow the government to evade the Clause by shifting those functions to

McDermott Will & Emery LLP
Attorneys At Law
Chicago

- 18 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

government informants.  As the Court warns:  "Restricting the Confrontation Clause to the precise forms against which it was originally directed is a recipe for extinction."  Davis, 547 U.S. at 830 n.5; see also id. ("[T]he Confrontation Clause 'also reaches the use of technically informal statements when used to evade the formalized process.'") (quoting Id. 838 (Thomas, J., concurring and dissenting in part).)

In Davis, the Court noted that "911 operators are not themselves law enforcement operators," but noted that "they may at least be agents of law enforcement when they conduct interrogations of 911 callers."  Davis, 547 U.S. at 823 n.2 (noting that it was holding this an open issue, but the Court strongly intimates the answer later in the opinion by suggesting trial courts eliminate testimonial statements to 911 callers through in limine procedures, id. at 829); see also State v. Justus, 205 S.W.3d 872, 880 (Mo. 2006) (finding statements "testimonial" when made to someone "acting as a government agent"); State v. Blue, 717 N.W.2d 558, 564 (N.D. 2006) (same).  There would not seem to be any question that government informants were being used as agents by law enforcement.

Likewise, it does not matter that the statements being made may have been volunteered.  The Supreme Court has noted that the evidence from Raleigh's trial, the injustice of which the Court notes played a major role in spawning the Confrontation Clause, "was a letter from Lord Cobham that was plainly not the result of sustained questioning."  Davis, 547 U.S. at 822 n.1.  Indeed, "[t]he Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation."  Id.  Thus, the government's involvement in procuring testimonial statements through a government informant plainly implicate the Confrontation Clause.

McDermott Will & Emery LLP
Attorneys At Law
Chicago

- 19 -

## II.    CO-CONSPIRATOR STATEMENTS INCULPATING A DEFENDANT WERE INADMISSIBLE AT THE TIME THE CONFRONTATION CLAUSE WAS DRAFTED

The Supreme Court explains that "the Confrontation Clause is 'most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding.'" Giles v. California, 128 S. Ct. 2678, 2682 (2008) (emphasis added) (quoting Crawford, 541 U.S. at 54). Because the Confrontation Clause was modeled after the confrontation clauses in the various state declarations of right adopted between 1776 and 1784,[11] our understanding of the Clause must rest upon the Framers' understanding of that right as it then existed. Id. at 154.[12] During that time frame, there was no exception to the common law right of confrontation or the developing law of evidence to admit a co-conspirator's statement against a co-defendant. And, post-Crawford, this Court already has found that statements otherwise admissible under the co-conspirator exception are inadmissible under the Confrontation Clause when they are testimonial. United States v. Mills, No. CR 02-938(E)DOC, at 8 (Order of June 6, 2006) (finding admission of testimonial statements by co-conspirators "for the truth of the matter asserted[] would eviscerate Crawford's 'core class of 'testimonial' statements' in conspiracy cases") (quoting Crawford, 541 U.S. at 51-52.).

### A.    Prior To The Founding, The Exclusion Of Hearsay Was Far More Rigorously Enforced Than Under Modern Hearsay Law

Founding Era hearsay law was far broader than modern hearsay law. "'[H]earsay' was defined to include all unsworn out-of-court statements made by

---

[11]    The Framers would have meticulously avoided reliance upon post-Independence authority from Britain. Thomas Y. Davies, What Did The Framers Know, And When Did they Know It? Fictional Originalism In Crawford v. Washington, 71 Brook. L. Rev. 105, at 154 & n. 156 (2005). The New York Constitution, for example, prohibited reliance upon British decisions after the Battle of Lexington on April 19, 1775. N.Y. Const., art. XXXV (1777).

[12]    The Bill of Rights was circulated shortly after this time-frame. The Bill of Rights, including the Confrontation Clause, was approved by the First Congress and submitted to the states on September 25, 1789, and James Madison took the language of the Confrontation Clause from the proposed amendments New York had submitted in 1788. Davies, 71 Brook. L. Rev. at 159.

- 20 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

anyone other than the defendant." Davies, 15 J. L. & Pol'y at 392. Moreover, "[u]nlike modern doctrine, the framing-era definition of 'hearsay' was not limited to out-of-court statements that were offered to prove the truth of what was said; that refinement does not appear in the framing-era authorities. Rather, the framing-era authorities simply indicated that unsworn statements were banned as evidence of a criminal defendant's guilt." Id. at 392.[13] The only exception was for dying declarations, where the solemnity of imminently facing judgment from God was thought tantamount to an oath. Id. at 391. And even when hearsay would be allowed, it would only be to provide background information, "but such evidence will not be received on any particular facts." William Blackstone, 3 Commentaries On The Laws of England 367 (1768).

The prohibition on the admission of hearsay was more aggressively enforced in criminal cases, where a common law right of confrontation was implicated. Hearsay exceptions applicable in civil cases would not apply in criminal cases. See, e.g., Geoffrey Gilbert, 2 The Law of Evidence 890 (Capel Lofft ed. 1791) ("But these and other Exceptions, which have their place in civil, do not apply in criminal Cases; and therefore in these the Attestation of the Witness must be to what he knows, and not to that which he has heard; for a mere hearsay is no Evidence. . . ."); Davies, 15 J. L. & Pol'y at 362 n.33 (because the Confrontation Clause applied only in criminal proceedings "civil hearsay exceptions had no bearing on the confrontation right"). Following the ratification of the Constitution, Chief Justice Marshall emphasized: "[C]ourts will always apply the rules of evidence to criminal prosecutions so as to treat the defence with as much liberality and tenderness as the case will admit." United States v. Burr, 25 F. Cas. 187, 191 (C.C.D. Va. 1807).

---

[13]    For this reason, the Defendants object to any effort by the government to circumvent the Confrontation Clause by seeking to introduce hearsay under the guise that it is not for the purpose of asserting the truth.

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

The exclusion of unsworn out-of-court statements at common law in criminal cases was limited not only by the law of hearsay, but by a "settled rule" of confrontation that "no evidence is to be given against a prisoner but in his presence" and a requirement that "evidence for the king must be upon oath." 2 William Hawkins, Pleas of The Crown 428, 434 (1721 ed. and 1771 ed.); 2 William Hawkins, Pleas of The Crown 602, 612 (Thomas Leach ed. 1787) [hereinafter "Leach's Hawkins"]; 4 id. at 418 (1795 ed.); see Chief Baron Geoffrey Gilbert, The Law of Evidence 107-08 (1754 ed.); id. at 149-50 (1777 ed.); id. at 149-50 (1788 ed.) (Even though a witness testifying as to what another said would be under oath, the admission of that hearsay is precluded because "the Person who spake it was not upon Oath; and if a Man had been in Court and said the Thing and had not sworn it, he had not been believed in a Court of Justice; for all Credit being derived from Attestation and Evidence, it can rise no higher than the Fountain from whence it flows, and if the first Speech was without an Oath, an Oath that there was such a speech makes it no more than a bare speaking, and so of no Value in a Court of Justice, where all Things were determined under the Solemnities of an Oath. . . ."). This remained true even after the Constitution was ratified. See, e.g., Leonard MacNally, The Rule of Evidence on Pleas of the Crown 360 (1802) ("No evidence can be received against a prisoner but in his presence: and therefore it is agreed that what a stranger has been heard to say, is in strictness no manner of evidence, either for or against the prisoner. The reasons assigned as the grounds of this rule are, because such evidence is not upon oath: and also because the party, who would be affected by such evidence, had no opportunity of cross-examination."); 1 Joseph Chitty, A Practical Treatise on Criminal Law 568-69 (1819) (excluding hearsay "[f]or the law admits of no evidence but such as is delivered upon oath, and the original expressions were not only uttered when the speaker not under that obligation, but are liable to be forgotten, misunderstood, and unconsciously altered,

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

by the party who repeats them."); Thomas Peake, <u>A Compendium of the Law of Evidence</u> 7-8 (1801) ("The Law . . . always requires the sanction of an oath. . . .").

**B.** **<u>Ex Parte</u> Co-Conspirator Statements Were Excluded As Evidence Against The Accused Prior To The Founding**

Raleigh's conviction in 1603 on the basis of an out-of-court statement by an alleged co-conspirator led to a reformation of the law to make clear that while a confession of a co-conspirator can be used against the confessor, it cannot be admitted against any other alleged co-conspirator. <u>See, e.g.</u>, <u>Tong's Case</u>, 84 Eng. Rep. 1061, 1062 (K.B. 1662) (holding a confession is "only evidence against the party himself who made the confession, but cannot be made use of as evidence against any others whom on his examination he confessed to be in the treason"). The Supreme Court took note of this reform in <u>Crawford</u> citing to both <u>Tong's Case</u> and the <u>Hawkins</u> and <u>Gilbert</u> treatises. <u>Crawford</u>, 541 U.S. at 45 ("Several authorities also stated that a suspect's confession could be admitted only against himself, and not against others he implicated."). Justice Harlan regarded the rule of <u>Tong's Case</u> as "universally accepted." <u>Dutton v. Evans</u>, 400 U.S. 74, 98 (1970) (concurring).

<u>Tong's Case</u>, coupled with the requirement that all statements be under oath, essentially excluded all out-of-court statements by co-conspirators that would inculpate a defendant. Sworn statements, such as signed confessions, would be excluded under <u>Tong's Case</u> and more casual statements, such as co-conspirator statements made to a government informant, would be excluded because the statements were not made under oath. For such evidence to be admitted, the co-conspirator would actually have to testify at trial.

**C.** **Prior To The Founding, The Co-Conspirator Exception To The Hearsay Rule Was Far More Limited Than It Is Today**

Prior to the Founding, there was a debatable "limited-purpose exception [that] allowed the use of hearsay statements to prove background facts that did not

McDermott Will & Emery LLP
ATTORNEYS AT LAW
CHICAGO

- 23 -

go to the defendant's personal guilt; specifically, this exception permitted hearsay evidence to be used to prove the general existence of a conspiracy, but not the defendant's actual participation in it." Davies, 15 J. J. & Pol'y at 393. "Thus, this exception was not equivalent to the modern co-conspirator statement hearsay exception." Id.; see also Davies, 71 Brook. L. Rev. at 197 n.299 ("[T]he historical basis for the 'co-conspirator exception' referred to is dubious.").[14]

As Hawkins' leading treatise explains:

> As to . . . How far Hearsay is Evidence: It seems agreed That what a Stranger [an out-of-court declarant] has been heard to say is in Strictness no Manner of Evidence either for or against a Prisoner, not only because it is not upon Oath, but also because the other side had no Opportunity of a cross Examination; and therefore is seems a settled Rule, That it shall never be made use of but only by way of Inducement or Illustration of what is properly Evidence. . . .

2 Hawkins at 431 (1721 ed. & 1771 ed.); 2 Leach's Hawkins at 606-07 (1787 ed.). The reference to "inducement and illustration," although opaque today, was common in the legal work of that time to address general background facts that did not implicate the defendant. See, e.g., 2 Mathew Bacon, The New Abridgement of the Law 313 (1st ed. 1736 & 6th ed. 1793) ("It seems agreed, that what another has been heard to say is no Evidence, because the Party was not under Oath; also, because the Party who is affected thereby, had not an Opportunity of Cross-examining; but such Speeches or Discourses may be made use of by Way of Inducement or Illustration of what is properly Evidence."); William Nelson, The Law of Evidence 181 (1744) (same). Hawkins listed five seventeenth-century

---

[14]    More generally, aside from dying declarations, there was no support for the any of the modern hearsay exceptions at the time of founding. Davies, 71 Brook. L. Rev. at 119 ("[D]uring the framing era it was still black-letter law that hearsay was 'no evidence.' The modern conception of hearsay and the variety of exceptions under which hearsay is now admitted as evidence in criminal trials were at most embryonic at the time of the framing" and the Framers "never imagined that informal hearsay could become admissible evidence."); Robert Mosteller, Remaking Confrontation Clause And Hearsay Doctrine Under The Challenge of Child Sexual Abuse Prosecutions, 1993 U. Ill. L. Rev. 691, 745-46 (1993) ) ("The historical record is clear . . . that hearsay exceptions were not considered a substitute for cross examination at the time of the promulgation of the Confrontation Clause. Courts recognized only a handful of exceptions. . . . If we were to take our cue from the exceptions in effect at the time of the framing, the result would be a very restrictive one regarding the admission of hearsay in criminal cases.").

- 24 -

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

treason trials in the margin to illustrate the proposition where witnesses were allowed "to repeat hearsay statements that showed the general existence of a conspiracy against the government, but indicated that such statements were not to be treated as evidence of the defendant's own guilt." Davies, 15 J. 1 & Pol'y at 402 n.126.[15] The other legal sources that did acknowledge this rule also emphasized that such evidence could only be used to prove the general background fact that a conspiracy had existed, but could not be used as evidence inculpatory of the defendant. See, e.g., 2 Geoffrey Gilbert, The Law of Evidence 891 (Capel Lofft ed. 1791) ("But Hearsay may be Evidence of Inducement in matters that do not constitute the Crime, and are of a general Nature. As that there was a Plot, a Conspiracy, a Disaffection; but not to charge the Prisoner in particular.").

But it is far from clear that even this limited co-conspirator exception existed in the colonies. Many treatises of the day failed to acknowledge that even this limited exception existed. See, e.g., Chief Baron Geoffrey Gilbert, The Law of Evidence 107-08 (1754 ed.); id. at 149-50 (1777 ed.); id. at 149-50 (1788 ed.); Francis Buller, An Introduction to the Law Relative to Trials at the Nisi Prius 289-90 (1772 ed.); Henry Bathurst, Theory of Evidence 111 (1761); Davies, 15 J. L. & Pol'y at 412 ("Like Gilbert's treatise, the Bathurst and Buller treatises did not mention the existence-of-a-conspiracy exception that Hawkins and Nelson had discussed."). The leading justice of the peace manual, Richard Burn's Justice of the

---

[15]    Indeed, those cases made it quite clear that the evidence could not be used to implicate the defendant in the conspiracy or in any other way. See Tryal of Richard Langhorn, 2 State Tryals (1st ed. 1719) 325, 328, 3323, 3333 (Old Bailey 1679) (allowing evidence of general nature of Popish Plot conspiracy, but instructing the jury that was "no evidence" against the defendant); Tryal of Thomas Knox and John Lane, 2 State Tryals (1s ed. 1719) 410, 414, 415 (K.B. 1679) (allowing evidence of general nature of Popish Plot conspiracy, but only after evidence implicating the defendants had been introduced to place their conduct in context); Tryal of Lord Russell, 2 State Tryals (1s ed. 1719) 133, 144, 145 (K.B. 1683) (allowing testimony as to the existence of the Rye House Plot conspiracy, but instructing "[t]his is nothing against you [the defendant], I declare it to the Jury"); Tryal of Algerone Sidney, 3 State Tryals (1st ed. 1719) 207, 210 (K.B. 1683) (allowing testimony as to the general existence of the Rye House Plot conspiracy, while citing the Popish Plot cases, and instructing the jury to disregard a statement implicating the defendant in the conspiracy – "this Evidence does not affect you, and I tell the Jury so"); Tryals of Charnock, King, and Keyes, 4 State Tryals (1719 ed.) 1, 33 (Old Bailey 1695) (allowing hearsay accounts of a Jacobite conspiracy as "good proof" of the existence of the conspiracy, but instructing the jury such statements were "not Evidence" against the defendants).

- 25 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE
STATEMENTS ELICITED BY GOVERNMENT
INFORMANTS FROM UNAVAILABLE WITNESSES

McDermott Will & Emery LLP
Attorneys At Law
Chicago

Peace and Parrish Officer (1755) also failed to note the exception.  Davies, 15 J. L. & Pol'y at 415-16 ("[L]ike the treatises by Gilbert, Bathurst, and Buller, Burn omitted the limited-purpose exception that allowed hearsay to be admitted to prove the existence of a conspiracy.").[16]

The exclusion of any discussion of the co-conspirator exception in Burns' work is significant for understanding how the Framers would have viewed the issue on this side of the Atlantic.  Given the difficulty of case law-based legal research at the time, Colonial lawyers in the Americas relied heavily upon the seven major justice of the peace manuals that existed pre-Founding.  Each of those manuals followed Burns' approach and omitted any discussion of the co-conspirator exception whatsoever.  Davis, 15 J. L. & Poly at 416 n.160.[17]  "Thus, directly or indirectly, Burn's summary of criminal evidence was probably the most widely available source on the subject in framing-era America."  Id. at 417.

No American opinion appears to have addressed the viability of this potential exception prior to the Founding – a fact which itself casts doubt on the existence of such an exception – but the narrow nature of any possible exception was made clear by Chief Justice Marshall two decades later while riding circuit in the significant trial of Aaron Burr.  There, Marshall noted that "it is said by some, the declarations of all the conspirators, may be given in evidence on the trial of any one of them, for the purpose of proving the conspiracy" and it was argued that the exception applied in that case.  United States v. Burr, 25 F. Cas. 187, 195 (C.C.D. Va. 1807).  But Marshall emphasized that, even under that view, the evidence could not be used to

[16]   Interestingly, the 1755 edition of Burns' work lifted Hawkins passage regarding "inducement or illustration," but he did not link it with the exception for proof of the existence of a conspiracy.  In 1761, and in subsequent editions there was no mention of the conspiracy exception or of "inducement or illustration."  Davies, 15 J. L. & Pol'y at 415 n.159.

[17]   Those justice of the peace manuals were as follows:  Conductor Generalis (Woodbridge, N.J.1765 James Parker ed.); id. (New York 1788 James Parker ed); id. (New York 1788 Hugh Graine ed.); id. (New York 1788 Robert Hodge ed.); Joseph Greenleaf, An Abridgement of Burns' Justice of the Peace and Parish Officer (1773); Rishard Starke, Office and Authority of a Justice of the Peace (1774); and John Fauchaud Grimke, South Carolina Justice (1788).

- 26 -

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

McDermott Will & Emery LLP
Attorneys At Law
Chicago

inculpate a defendant when he explained, "I believe there is no case where the words of an agent can be evidence against his principal on a criminal prosecution." Id. at 195. Marshall could not accept that "mere verbal declarations made in [the defendant's] absence, may be evidence against him." Id. And he grounded his decision to exclude the out-of-court inculpatory co-conspirator statements in confrontation terms: "a man should have a constitutional claim to be confronted with the witnesses against him." Id. at 193; see also id. at 198 ("It is then the opinion of the court, that the declarations of third persons . . . not made in the presence of the accused, cannot be received as evidence in this case.").[18] Marshall even emphasized the importance of not allowing the hearsay rule to be hollowed out by broadening the exceptions to the rule: "I know of no principle in the preservation of which all are more concerned. I know none, by undermining which, life, liberty and property, might be more endangered. It is therefore incumbent on courts to be watchful of every inroad on a principle so truly important." Id.

Writing for the Supreme Court, Chief Justice Marshall later reiterated the same principle that the rule excluding hearsay be upheld: "Its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practiced under its cover, combine to support the rule that hearsay evidence is totally inadmissible." Queen v. Hepburn, 11 U.S. (7 Cranch) 290, 296 (1813) (Marshall, C.J.). The early Supreme Court explained that it was "not inclined to extend the exceptions further than they have already been carried." Id. at 297. As the Court then explained:

> [I]t may well be doubted whether justice and the general policy of the law would warrant the creation of new exceptions. The danger of admitting hearsay is sufficient to admonish Courts of justice against lightly yielding to the introduction of fresh exceptions to an old and

---

[18] Marshall also construed the exception as requiring the alleged conspiracy be a conspiracy that is charged in the indictment. The fact that the statement in furtherance of the conspiracy was not the same as the conspiracy charged provided him with an additional basis for concluding that such an exception, if it existed at all, would not be applicable on the facts of that case. Burr, 25 F. Cas. at 198.

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

McDermott Will & Emery LLP
Attorneys At Law
Chicago

well established rule: the value of which is felt and acknowledged by all.

Id.

Those who seek to trace the co-conspirator exception back to its origins typically point to the Supreme Court's decision – nearly fifty years after the Bill of Rights was drafted and twenty years after Burr was decided – in United States v. Gooding, 25 U.S. 460 (1827). See, e.g., Bourjaily v. United States, 483 U.S. 171, 183 (1987) (identifying Gooding as the earliest decision).[19] The Supreme Court's initial recognition of an exception in Gooding, however, not only comes too late to inform the Framer's intent in drafting the Confrontation Clause, but its construction of the exception is far narrower than would be necessary to allow the alleged co-conspirator statements in this case to be introduced. That is because Gooding applied only on the facts of a clear master-servant agency relationship, rather than the alleged conspiracy in this case where there is no suggestion that Ms. Rahmani or any other Defendant authorized any alleged co-conspirator to speak on their behalf. See, e.g., Lawrence Kessler, The Treatment Of preliminary Issues Of fact In Conspiracy Litigations: Putting The Conspiracy Back Into The Coconspirator Rule, 5 Hofstra L. Rev. 77 (1976) (emphasizing Gooding was merely an agency case). Moreover, Gooding only addressed the issue of admissibility in the context of the law of evidence, without any mention whatsoever of the common law right of confrontation or the Confrontation Clause.

---

[19]    The exception is sometimes traced back to Patton v. Freeman, 1 N.L.J. 113 (1791). As with Gooding, that case follows the ratification of the Constitution and could not have informed the Framers' understanding of it. More importantly, Patton is irrelevant to interpreting the Confrontation Clause, which operates only in criminal cases, because Patton was a civil case. Davies, 15 J. L. & Pol'y at 362 n.33 ("The case simply did not address admissible criminal evidence."). Even in the civil context, it is unclear what the case means for the existence of a co-conspirator hearsay exception because, although the statement was admitted, there does not appear to have been any hearsay objection made. Id. at 2 (addressing the issue as one of relevance, whether a statement made by one conspirator to another could be used to prove that a third conspirator, who had stepped out of the room when the statement was made, was admissible to show the intent of all conspirators).

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

Gooding was prosecuted, as the owner of a ship, for unlawfully engaging in the slave trade on the basis of declarations made by the ship's captain offering to employ a mate to help capture slaves. Id. at 468-69. Following agency principles that hold a principal accountable for the acts of an agent within the scope of the agency, the Supreme Court explained that "what the agent says within the scope of his authority, the principal says, and evidence may be given to such acts as if they has actually been done and made by the principal himself." Id. at 470. The sole citation in support of that proposition comes from a treatise that only addresses the law of agency – without any mention of conspiracy. Id. (citing Thomas Starkie, The Law Of Evidence 60 (1824).)

It is one thing for the Court to hold a principal accountable for the acts he compels of his agents, but it is far from clear that the Court that decided Gooding would have extended the co-conspirator exception to reach more modern notions of a "conspiracy" where members of a conspiracy are deemed agents of one another, even though they may not even know each other. The substantive law of conspiracy has greatly expanded since Gooding, and this "[e]xpansion in the substantive law of conspiracy has been paralleled by relaxation of the hearsay rule." Joseph Levie, A Reexamination Of the Co-Conspirators' Exception To The Hearsay Rule, 52 Mich. L. Rev. 1159, 1162 (1954). Following Gooding, courts seldom had reason to address the issue of a co-conspirator exception because, until the substantive crime of conspiracy was expanded in the late nineteenth century, "the crime of conspiracy was rarely invoked by prosecutors." Id. at 1163. While the rational of Gooding is logical in a classic agency relationship "the elastic concepts of 'agency' embodied in current conspiracy law have eroded the original agency rationale." Oakley, Form Hearsay To Eternity: Pendency And the Co-Conspirator Exception In California – Fact, Fiction And A Novel Approach, 16 Santa Clara L. Rev. 1, 14-15 (1975). The extension of the exception from an agency context to conspiracy appears to "have been created by accident" and "the

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

- 29 -

McDermott Will & Emery LLP
Attorneys At Law
Chicago

agency theory may never have been intended to support a hearsay use of coconspirator statements." Christopher Mueller, The Federal Coconspirator Exception: Action, Assertion, And Hearsay, 12 Hofstra L. Rev. 323, 324 (1984).

To be clear, the principal point here is that regardless of the merits of the modern co-conspirator exception, such an exception did not exist at the time of the Framing and did not crystallize into a form that could have any application to this case until the late nineteenth century. Thus, it was not a Founding Era exception to the hearsay rule. See Giles, 128 S.Ct. at 2687 (rejecting California's forfeiture-by-wrongdoing hearsay exception in a Confrontation Clause setting because it was broader that any exception "established at the time of founding").

It is worth adding, however, that the modern co-conspirator exception itself is a foolish rule that was "created by accident" and, in "terms of theory, it is an embarrassment," so it would be unfair to assume that our pro-hearsay-rule Founders purposefully would have endorsed this exception to the rule. Mueller, 12 Hofstra L. Rev. at 324. The admissibility of co-conspirator statements is not justified because such statements are reliable, but only based upon the legal fiction that all conspirators are necessarily the agents of the other. The fact that these sorts of statements are not reliable is hardly debatable. "The conspirator's interest is likely to lie in misleading the listener into believing the conspiracy stronger with more members (and different members) and other aims than in fact it has. It is no victory for common sense to make a belief that criminals are notorious for their veracity the basis for law." Levie, 52 Mich. L. Rev. at 1165-66. "Frequently, the declarant's interest in furthering the conspiracy will be served by falsely incriminating the defendant or by exaggerating his role." Douglas Borisky, Reconciling The Conflict Between The Coconspirator Exemption From The Hearsay Rule And the Confrontation Clause Of The Sixth Amendment, 85 Colum. L. Rev. 1294, 1309 (1985). In addition, the notion that coconspirators are agents for each other "is little more than a legal fiction" and a dangerous fiction at that. Borisky, 85 Colum. L.

DEFS' MOT. IN LIMINE NO. 1 TO EXCLUDE STATEMENTS ELICITED BY GOVERNMENT INFORMANTS FROM UNAVAILABLE WITNESSES

McDermott Will & Emery LLP
Attorneys At Law
Chicago

Rev. at 1308. The exception "does not require that the out-of-court statement relate to the declarant's assigned role in the conspiracy or that the defendant be aware of who his cohorts were or what they were saying during the conspiracy," and "in a large or secretive conspiracy, the extrajudicial declarant may have had no knowledge of the defendant's role in the conspiracy," which creates the potential for "a declarant's statement, based on incomplete information, may mislead the trier of fact." Id. Consequently, even among the most dubious of the hearsay exceptions, "[t]he hearsay statements of alleged coconspirators are perhaps the most suspect of all." O'Dougherty, Prosecution And Defense Under Conspiracy Indictments, 9 Brookly L. Rev. 263, 275 (1940). Not surprisingly then, during the pre-Crawford Era, when admissibility turned upon reliability, such statements often were excluded as unreliable. See, e.g., United States v. Ordonez, 737 F.2d 793, 802-04 (9th Cir. 1984); United States v. Massa, 740 F.2d 629, 639-40 (8th Cir. 1984) United States v. Ammar, 714 F.2d 238, 255-56 (3d Cir. 1983). The Framers therefore would have found the modern co-conspirator exception completely foreign to their understanding of the law, and never would have sanctioned such an exception at the time the Confrontation Clause was drafted.

## CONCLUSION

Because statements elicited by government informants were obtained for the purposes of gathering testimony for trial, the introduction of such testimony must be excluded by the Confrontation Clause if those declarants are not available to testify.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO

- 31 -

Dated:  April 3, 2009                              Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**


_____/s/_____
Abbe David Lowell
Christopher D. Man
Roy L. Austin, Jr.

Attorneys for Defendant
ROYA RAHMANI

On behalf of all Defendants.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
CHICAGO