THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
EILEEN M. DECKER (No. 151499)
Assistant United States Attorney
Chief, National Security Section
JUDITH A. HEINZ (No. 176264)
CHRISTOPHER GRIGG (No. 220243)
NILI T. MOGHADDAM (No. 226636)
ANTHONY J. LEWIS (No. 231825)
Assistant United States Attorneys
National Security Section
        1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-0721/7280
        Facsimile: (213) 894-6436
        email:    eileen.decker@usdoj.gov
        email:    judith.heinz@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. CR 01-209(C)-DOC |
| | ) |
| Plaintiff, | ) |
| | ) **GOVERNMENT'S TRIAL MEMORANDUM** |
| v. | ) |
| | ) |
| ROYA RAHMANI,et al. | ) TRIAL DATE: April 21, 2009 |
| | ) START TIME: 9:00 a.m. |
| Defendants. | ) |
| | ) Courtroom of the Honorable David O. |
| | ) Carter |
| | ) |

Plaintiff, United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, hereby respectfully submits its trial memorandum.

DATE: April 16, 2009          Respectfully submitted,

                              THOMAS P. O'BRIEN
                              United States Attorney

                              CHRISTINE C. EWELL
                              Assistant United States Attorney
                              Chief, Criminal Division


                              _____/S/_____
                              EILEEN M. DECKER
                              JUDITH A. HEINZ
                              CHRISTOPHER GRIGG
                              NILI T. MOGHADDAM
                              ANTHONY J. LEWIS
                              Assistant United States Attorneys
                              National Security Section

                              Attorneys for Plaintiff
                              United States of America

## TRIAL MEMORANDUM

### I.

### CASE SCHEDULING MATTERS

A.   Trial is set for April 20, 2009, at 9 a.m. before the Honorable David O. Carter, United States District Court Judge.

B.   The estimated time for the government's case-in-chief is approximately five months.

C.   Defendants Roya Rahmani, Alireza Mohammadmoradi, Moustafa Ahmady, Hossein Kalani Afshari, Hassan Rezaie, Navid Taj, and Mohammad Omidvar ("defendants") are released on bond.

D.   Trial by jury has not been waived.

E.   Defendants Roya Rahmani, Alireza Mohammadmoradi, Moustafa Ahmady, and Hassan Rezaie require the assistance of a Farsi language interpreter.

F.   Numerous witnesses will need the assistance of foreign language interpreters, including Farsi, Japanese, German, and French interpreters.

### II.

### THE INDICTMENT

Defendants are charged in the Third Superseding Indictment with one hundred and seventeen counts:

Count 1:        Conspiracy, in violation of 18 U.S.C. § 371;

Counts 2-7:     Mail Fraud, in violation of 18 U.S.C. §§ 1341, 2;

Counts 8-23:    Wire Fraud, in violation of 18 U.S.C. §§ 1343, 2;

Counts 24-26:   False Statements to a Financial Institution, in violation of 18 U.S.C. §§ 1014, 2;

1

Counts 27-30:   Fraud and Misuse of Visa, Permits, and Other Documents, in violation of 18 U.S.C. § 1546;

Count 31:       Procurement of Citizenship or Naturalization Unlawfully, in violation of 18 U.S.C. § 1425;

Count 32:       Conspiracy to Launder Money, in violation of 18 U.S.C. §§ 1956(a), 1956(h);

Counts 33-52:   Promotional Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 2;

Counts 53-58:   Concealment of Money Laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 2;

Counts 59:      Conspiracy to Provide Material Support or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1); and

Counts 60-117:  Providing Material Support or Resources to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1).

## III.

## STATEMENT OF FACTS

The government intends to prove at trial the following facts, among others:

**A.   Overview of the Offensive Conduct**

The Mujahedin-e Khalq (the "MEK") is an organization that has as its stated goal the overthrow of the government of Iran by

2

any means, including the use of terrorist activities.[1]  In 1997, the United States Secretary of State designated the MEK as a Foreign Terrorist Organization ("FTO").  That designation has been renewed on multiple occasions and has remained in effect continuously through the present.

During the time period charged in the indictment, the MEK had a headquarters in Europe, in a suburb of Paris, France, at 13-19 rue des Gords, 95430 Auvers-sur-Oise, France ("the Auvers").  Some MEK leadership was based at the Auvers and from that location controlled MEK activities, including the movement of money collected by MEK fund-raisers.

In addition, the MEK controlled a number of terrorist training camps and bases inside Iraq, where MEK members and supporters trained in the use of weapons, including Kalishnakov rifles and machine guns, and practiced military-style maneuvers, including the use of armored vehicles, tanks, and armored personnel carriers.  Outside some of these bases and camps, in bunkers located nearby, the MEK stored weapons, ammunition, RPGs, mortars, and rocket launchers.  MEK members and supporters would also meet regularly at the camps and bases to hear speeches by MEK leaders.  The MEK also had a headquarters in Baghdad, Iraq.

In the Los Angeles area, the MEK maintained several facilities where members would hold meetings; discuss fund-

---

[1] The Mujahedin-e Khalq has used a number of aliases, including: the National Liberation Army of Iran (the "NLA"); the People's Mujahedin of Iran (the "PMOI"); the National Council of Resistance (the "NCR"); the National Council of Resistance of Iran (the "NCRI"); and the Muslim Iranian Student's Society.

3

raising goals; chart fund-raising progress; train fund-raisers; create and provide recognition, incentives, and rewards for successful fund-raisers; and participate in international telephone conference calls with MEK leaders, members, and supporters located throughout the world.

As alleged in the indictment, the MEK raised money in the United States, and specifically in the Central District of California, through various fund-raising methods, including: (1) collecting money from MEK supporters and associates who knew that they were donating the money to the MEK; and (2) soliciting donations at public locations, such as airports, from individuals who did not know that, in fact, they were donating the money to the MEK.  The MEK used the term "Mali Ejtemaie" or "ME" to refer to the fund-raising efforts directed at unwitting donors.  The MEK used the money obtained from both of these fund-raising methods to fund the operations and activities of the MEK, including its terrorist activities.

When soliciting money from unwitting donors, the MEK claimed to be raising money on behalf of a charity called the Committee for Human Rights, which was also sometimes referred to as the Committee for Human Rights in Iran (under either designation, hereafter referred to as "CHR"), which operated as a front organization for MEK fund-raising operations in the United States.  The MEK registered CHR as a corporation with the Secretaries of State in many states, including California, Oregon, Maryland, Virginia, Georgia, and Colorado.  In addition,

4

the MEK registered CHR as a charity with the Internal Revenue Service, the City of Los Angeles, the Los Angeles Police Commission Charitable Service Section, and elsewhere.  The incorporation of CHR in multiple states and its registration as a charity was designed to create the appearance that CHR was a legitimate charitable organization.

The MEK members fraudulently collected money from unwitting donors by claiming that the money was being raised for charitable purposes.  Specifically, when engaging in fund-raising efforts at airports and other public areas, MEK fund-raisers claimed to unwitting donors that they were raising money for victims of natural disasters, victims of torture, orphans, refugees, or starving children.  In fact, as the fund-raisers and their supervisors all well knew, they were raising money for the MEK.

The MEK produced and circulated flyers and other material used to motivate MEK fund-raisers by various means, including graphing the progress of fund-raising and encouraging the collection of funds to purchase military-type equipment for the MEK.  For example, one flyer stated:  "An aircraft carrier, a present from people who are doing ME . . . ."  Another flyer, depicting a picture of a missile launcher, proclaimed "Financial Combatant . . .  This is a sample of the army's need, which one are you going to fulfill."

The MEK conducted concentrated fund-raising efforts during the holiday months, typically in November and December of each year.  During these months, MEK members and supporters from

around the world concentrated on fund-raising, particularly in public places such as airports, including at Los Angeles International Airport ("LAX").  The MEK used the Farsi-language term "Baseej," which generally means mobilization, to refer to these concentrated fund-raising efforts.

**B.**   **The Roles of the Charged Defendants in the Criminal Conduct**

MEK fund-raising activities in the Central District of California were organized and controlled by a Los Angeles-based MEK designated cell leader.  The Los Angeles cell leader received direction and guidance from the MEK about MEK activities in the Los Angeles area.  Defendant Rahmani was the leader of the Los Angeles cell for certain periods of time relevant to the conspiracy.  In this position, defendant Rahmani communicated with MEK leadership at the Auvers and throughout the world using various methods including, in person, by mail, telephone calls, telephone conference calls, emails, video tapes, and the Internet.  In this position, and as a means of furthering MEK fund-raising goals, defendant Rahmani also created and caused to be created motivational material for MEK fund-raisers.

Defendants Mohammadmoradi, Ahmady, Afshari, Omidvar, and others, solicited donations from unwitting donors at LAX.  In soliciting these donations, these defendants and the other co-conspirators presented unwitting donors with business cards identifying themselves as volunteers for CHR; badges containing their photographs that further identified them as authorized volunteers for CHR; petitions condemning human rights violations

6

in Iran; binders containing photographs of individuals, including children, who appeared to have been tortured, orphaned, or homeless; and materials indicating that donations would be used for medical care and homes for these individuals.  In presenting unwitting donors with these materials, these defendants and the other co-conspirators knew, but deliberately sought to conceal, the relationship between CHR and the MEK and the fact that CHR was being used by the MEK as a front to raise money to support MEK operations and activities, including terrorist activities. These defendants and the other co-conspirators deliberately sought to conceal these facts from the unwitting donors because they knew that the unwitting donors would not donate money if these facts were disclosed.

The airport solicitors collected cash, checks and credit card donations from the unwitting donors.  At the end of each day of collection, these defendants and the other co-conspirators returned their collected donations, solicitation books, and other solicitation material to the CHR office.  Information regarding credit card donations was then transmitted via interstate wire communication to the relevant financial institutions, with the money derived from the credit card donations then being deposited into the CHR BofA Account, from which it was transferred to accounts throughout the world to support MEK operations and activities.

Members of the conspiracy opened a bank account in the name of CHR at Bank of America (the "CHR BofA Account").  Beginning on

7

or about April 24, 1997, defendant Rezaie became a co-signatory on the CHR BofA Account.  In continuing to use the CHR BofA Account, and financial services associated with the CHR BofA Account, including wire transfer services used to transfer money throughout the world, defendant Rezaie and the other co-conspirators knew, but did not disclose, the relationship between CHR and the MEK and the fact that CHR was being used by the MEK as a front to raise money to support MEK operations and activities, including terrorist activities.  Defendant Rezaie and his co-conspirators deliberately did not disclose these facts because they knew that they would be unable to maintain the CHR BofA Account or use the financial services associated with that account if these facts were disclosed.

Similarly, defendants Rahmani and Mohammadmoradi, and others, opened bank accounts at various financial institutions using their own names and aliases.  These bank accounts were used to deposit and transfer money on behalf of the MEK, including to pay expenses associated with MEK operations and activities.  In opening and maintaining these accounts, and in using financial services associated with these accounts, including wire transfer services used to receive money from throughout the world, defendants Rahmani and Mohammadmoradi and the other co-conspirators knew, but did not disclose, their relationship with the MEK and the fact that moneys moving through the accounts were being used to support MEK operations and activities.  Defendants Rahmani and Mohammadmoradi and the other co-conspirators

deliberately did not disclose these facts because they knew that they would be unable to maintain the accounts or use the financial services associated with those accounts if these facts were disclosed.[2]

To enter and remain in the United States to assist with MEK activities in the United States, defendants Rahmani, Mohammadmoradi, Taj, and Ahmady, and others, submitted applications for immigration benefits to the INS.  In these applications, the defendants knowingly made false statements and failed to disclose material information, including their true identities and aliases, countries in which they had previously obtained immigration status, and their affiliation with the MEK. Defendants Rahmani, Mohammadmoradi, Taj, and Ahmady, and others, knowingly made these false statements and deliberately failed to disclose these facts because they knew they would not obtain the immigration benefits they were seeking if they were truthful and disclosed these facts.

---

[2] The facts indicate that members of the conspiracy would often assist the fraudulent activities and support the MEK in a variety of ways.  For example, defendant Taj, and others, using their own names and various aliases, rented and leased apartments, office space, and post office boxes that were used to assist the MEK with its activities in the United States.  In renting and leasing these facilities, defendant Taj and the other co-conspirators knew, but did not disclose, their relationship to the MEK and the fact that the facilities were being used to assist the MEK with its activities in the United States. Defendant Taj and the other co-conspirators deliberately failed to disclose these facts because they knew that they would be unable to obtain and use these facilities if they disclosed these facts.

## VI.

## CONCLUSION

The government seeks leave to file such supplemental memoranda as may be necessary before or during trial.